**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------X

LISA BALLANTINE and MICHAEL
BALLANTINE,

                          Plaintiffs,

       - against -

THE DOMINICAN REPUBLIC,

                        Defendant.

Case No.: 1:19-cv-03598

-------------------------------------------------------------X

---

# PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION TO VACATE ARBITRAL AWARD DECLINING TO EXERCISE JURISDICTION

---

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 7

ARGUMENT ............................................................................................................... 16

   I.   THIS COURT HAS JURISDICTION AND VENUE IS PROPER .................................. 16

   II.   THE MAJORITY AWARD SHOULD BE VACATED .................................................... 17

     A.   The Majority Exceeded Their Powers By Failing To Make Separate Factual Findings For Lisa Ballantine And Michael Ballantine ................................................................. 20

     B.   The Majority Exceeded Their Powers And Manifestly Disregarded The Law By Failing to Consider the Entire Lives of Each Of The Ballantines, As They Themselves Acknowledged They Must Do ........................................................................................................ 23

     C.   The Majority Exceeded Their Powers By Relying On Factors Relating To The Naturalization Of Lisa Ballantine And Michael Ballantine Themselves.............................. 28

     D.   The Majority Exceeded Their Powers By Relying On Factors Relating To The Investment To Determine Dominant and Effective Nationality ................................................. 30

     E.   The Majority Manifestly Disregarded The Law That The Tribunal Itself Said Was Relevant To The Case ................................................................................................. 33

     F.   The Majority Exceeded Its Powers By Using The Wrong Time Period In Which To Analyze Michael Ballantine's Dominant And Effective Nationality ................................... 35

     G.   The Majority Exceeded Its Powers By Refusing To Arbitrate An Arbitrable Dispute.. 37

     H.   The Majority Award Should Be Vacated For Evident Partiality ................................... 41

CONCLUSION ............................................................................................................. 43

Petitioners Lisa Ballantine and Michael Ballantine respectfully submit this Memorandum in support of their petition to this Court to vacate the arbitral award authored by two of the three tribunal members issued on September 3, 2019 (the "Majority" or the "Majority Award"), in connection with the arbitration they brought against the Respondent (the "Arbitration"), in which the Majority decline to arbitrate Lisa Ballantine's and Michael Ballantine's claims against the Respondent, the Dominican Republic ("DR"), despite the fact that the DR had expropriated the Petitioners' investments (the "Investment") in violation of the Dominican Republic-Central American Free Trade Agreement ("CAFTA-DR").

## PRELIMINARY STATEMENT

The Majority in this case refused to hear the merits of the case. The Majority did so because it found that the Petitioner Lisa Ballantine was dominantly Dominican and not dominantly American, and thus, unable to arbitrate against the Dominican Republic. This means that despite the DR reaping substantial benefits under CAFTA-DR for all the trade benefits, when it came time for the U.S to realize some benefit in the form of one of its investors receiving compensation for a clear expropriation, the investors (Lisa Ballantine and her husband Michael Ballantine), and by extension the United States, were denied that benefit. In order to understand the absurdity of the Majority Award that Lisa Ballantine was dominantly Dominican, it is important to understand a number of uncontested facts related to Lisa Ballantine.

Lisa Ballantine was born in Chicago, Illinois in 1967. (Lisa Ballantine Affidavit, at 2.) She had, to be sure, no family or historical connection to the Dominican Republic ("DR"). (*Id*.)

Lisa became engaged with charitable and religious activities both in the U.S. and elsewhere. (*Id*.) This led her, along with her husband Michael, to travel to DR for a missions trip. (*Id*.) All the while she remained a U.S. citizen with continuous residency in the U.S. (*Id*.)

While in the DR performing charitable and religious work, Lisa and her husband Michael decided to make an investment. While traveling in the interior of the DR, Lisa and Michael Ballantine decided to purchase a large tract of land and construct a luxury housing project. At the time they made this decision, the mountain was relatively sparse with no such projects on the mountain or very little mountain development in the surrounding areas.

Michael Ballantine was an active investor, being involved with, among other things, the building, marketing, and selling of the resort project. (*Id.,* at 6.) Meanwhile, Lisa Ballantine worked on her U.S.-based non-profit company that was providing water filters in developing countries, including but not limited to the DR. (*Id.*) In 2009, after being solely a U.S. citizen for 42 years, Lisa reluctantly took Dominican citizenship as well **for the sole purpose** of making sure that she could pass on her property in the DR to her children, being advised to do so by counsel. (*Id.*, at 4.)

While Michael Ballantine spent some time in the DR managing the investment, Lisa Ballantine was traveling all around the world in connection with her non-profit water filtration company, spending more time outside of the DR than within the DR – even in the period that the Majority found to be the relevant period. (*Id.*, at 4.) Much of that time was spent in the U.S. visiting her children or raising money to allow her to supply water filters all over the world. (*Id.*, at 6.)

At all times, over the course of her entire life, Lisa Ballantine maintained a residence in the U.S., had bank accounts in credit cards in the U.S., her siblings and parents lived in the U.S., and she was constantly in the U.S. (*Id.*, at 3.)

In 2014, when the DR had destroyed their investment, Lisa Ballantine and Michael Ballantine sold the property they owned in the DR and left, never to reside there again. (*Id.*, at 4.) They continue to live in the U.S. (*Id.*, at 4.)

Despite all the above, a majority of a Tribunal, composed of an arbitrator that almost exclusively finds for nation-states and has always found against Americans, and an arbitrator that retweeted an article discussing how he had made a "veiled rebuke" against the U.S. during the course of the arbitration, found that Lisa Ballantine was a dominant and effective Dominican national – i.e., that she was more Dominican than American.

Arbitration tribunals are allowed to make mistakes. And they are allowed "get it wrong." A tribunal cannot, however, (1) exceed their powers, (2) issue an award so imperfectly executed that a mutual, final, and definite award upon the subject matter submitted was not made, (3) manifestly disregard the law, or (4) be evidently partial. Under any of these circumstances, the award should be vacated.

Here, the Majority's Award should be vacated for several reasons.

**<u>First</u>**, the Majority simply treated Lisa Ballantine as if she did not exist, making factual findings related to Michael Ballantine and then attributing those, without explanation or analysis, to Lisa Ballantine. Despite having documents and testimony from Lisa Ballantine that were separate and distinct from Michael Ballantine, the Majority simply erased Lisa's evidence and did not analyze key issues with respect to her. This was no "harmless error"; the evidence in question was crucial to the Majority's decision. Yet they would cite something from Michael Ballantine that they found crucial and then state that this is why the "Ballantines" are dominantly Dominican citizens. Even if there could be said to be an award with respect to Michael Ballantine, there is no such award with respect to Lisa Ballantine. And she is entitled to have one.

**<u>Second</u>**, the Majority failed to take into account the entire life of Lisa Ballantine and, separately, Michael Ballantine, instead focusing on a small sliver of their lives (albeit lumped together). The Majority admitted that customary international law governed the dispute. Yet the

Majority failed to apply the law they knew to govern, a law that requires that the entire life of the investors be examined. This is how the Majority could reach the absurd decision that Lisa Ballantine, who was a lifelong resident of the U.S. and even after naturalizing into the DR, spend more time in the U.S. than DR, was dominantly Dominican. The law is clear that the entire life of each claimant must be examined when making this determination.

This point is not a minor one. If other tribunals adopt this absurd analysis, the U.S. could find itself with its own nationals suing it with some frequency. Lifelong U.S. citizens, with no connections to any foreign country, and who have large investments in the U.S., could simply spend a few years in a tropical paradise and then claim to be Dominican. (They could even stay in the luxury housing that Michael Ballantine built.) Such investors could cite to the Majority's decision, and state that the only relevant period was during a small window, allowing the Tribunal to ignore the years of attachment and connection that the investors have with the U.S. This decision could open up the floodgates to such claims because of the Majority's deliberate decision to fail to apply the law they knew to govern.

**Third**, the Majority exceeded their powers by relying on factors relating to the naturalization of Lisa Ballantine and Michael Ballantine themselves. The dominant and effective test in CAFTA-DR is only invoked when an investor has at least two nationalities. Thus, the fact that a person naturalizes and the requirements for such a naturalization should not be a part of the test. The U.S. requires that naturalized citizens swear under oath to "absolutely and entirely renounce and abjure all allegiance and fidelity to any . . . state . . . ." This sworn oath demands that the speaker have no allegiance or fidelity to any other state. Yet the U.S. allows persons to maintain their other nationality when naturalizing. Such a requirement does not make the speakers dominant Americans simply for swearing to this.

**Fourth**, the Majority exceeded their powers by relying on factors relating to the investment itself in making its determination. Michael Ballantine was an active investor, meaning he was forced to be in the DR to build, manage, market, and sell properties in connection with his investment. Lisa Ballantine had no such role, but did spend time in the DR to be with Michael and to manage her non-profit. The Majority not only considered facts relevant to Michael Ballantine's active investment, it heavily relied on these factors. In order to manage his physical investment, Michael Ballantine had to lease or buy a residence, had to have a bank account, etc. It would be impossible to be in the DR to manage an investment without having a place to live or a bank account. Yet the Majority found these factors to be important in its flawed analysis.

Such an analysis exceeded the powers of the Majority because it treats active investors differently from passive investors. By fiat, active investors would be deemed to be dominant nationals of the country where the investment was located because they would be spending time there to manage the investment, would have a residence, bank account, etc. This would make CAFTA-DR's investment protections meaningless for active investors.

**Fifth**, the Majority manifestly disregarded the law that the Tribunal itself said was relevant to the case. In the decision on bifurcation, issued early on in the case, the Tribunal noted that it was *required* to consider "the conduct of the host State [the DR] vis-à-vis the Ballantines . . . ." In fact, the Tribunal refused to hear the jurisdiction issues separately because it was – according to itself – required to examine the conduct of the DR against Lisa Ballantine and Michael Ballantine. Michael and Lisa Ballantine presented substantial evidence to show that the DR treated them as Americans, not Dominican. Yet the Majority simply refused to do any analysis of the DR's conduct towards the Ballantines. As discussed below, the DR treated Michael Ballantine like an American, discriminating against him in comparison to the Dominicans in neighboring projects. Lisa

Ballantine was likewise treated as an American by the DR. Yet the Majority could not be troubled to analyze any of this, despite stating expressly that it had to do so.

**Sixth**, the Majority exceeded its powers by using the wrong time period in which to analyze Michael Ballantine's dominant and effective nationality.[1] In basic terms, treaties like CAFTA-DR are similar to contracts. Just as courts have vacated awards when a tribunal has failed to give accord to the contract, this Court should vacate the award because the Tribunal ignored the treaty provisions and decided upon its own rules, which it cannot do. CAFTA-DR requires that the dominant and effective nationality be examined when the investment is made, not when the state destroys the investment or the claim is made.

**Seventh**, courts have held that a tribunal exceeds their power when they arbitrate a nonarbitrable dispute. Similarly, a tribunal exceeds its power when they fail to arbitrate an arbitrable dispute. The Majority here failed to hear this dispute, despite being required to do so. This is not a merits issue where a tribunal makes an error or does something that a party disagrees with. Here, neither Lisa Ballantine nor Michael Ballantine has been able to have their dispute heard. They did not receive the analysis of the merits of their case for which CAFTA-DR requires. Despite the DR receiving the many benefits of CAFTA-DR, the U.S. was deprived of one of its benefits under CAFTA-DR because its lifelong nationals were denied the determination of their case.

**Lastly**, given that one of the arbitrators dissented, that means that two arbitrators made the decision. If either of those arbitrators is evidently partial, the Majority Award must be vacated. Although a judicial predisposition is not sufficient to satisfy evident partiality, here there is

---

[1] The Majority failed to analyze Lisa Ballantine at all, without respect to this failure to analyze the correct period. So, accordingly, the Majority failed doubly in this regard with respect to Lisa Ballantine.

evidence of actual animus and partiality against the U.S. and in favor of other states. Such partiality is the most pernicious, depriving a party of the opportunity to have a neutral fact finder examine the issues in the case and make a determination.

Awards should not be vacated for error or because a tribunal got it wrong. Awards should be vacated when a tribunal issues its own brand of industrial justice. Here, the Majority did just that. The Majority failed to analyze Lisa Ballantine, instead treating her as if she were not a separate person. They ignored the law they said was apply, looked at factors they were not allowed to consider, failed to look at the factors that they themselves admit they were required to examine, even using the wrong time period for the analysis. This was not a simple error or a difference in judgment; this was deliberate. The errors in the Majority Award are legion, many of which are not discussed here because they do not rise to the level of being a basis for vacatur, but the real vice is that an American national with no ties to DR, who even after naturalizing spent more time outside of the DR than in it, was deemed to be a dominantly a Dominican national.

## <u>STATEMENT OF FACTS</u>

Typically, a petition or motion contains a combined Statement of Facts. Because of the manner in which the Majority lumped Lisa Ballantine with Michael Ballantine, often making findings of fact for both without considering Ms. Ballantine at all, the Petitioners will be submitting a Statement of Facts for each of the Petitioners.

The Majority Award stated that lifelong citizens of the U.S. who had maintained continuous residency there were transformed into dominantly Dominicans in a few short years. The test under CAFTA-DR is designed to prevent a national of one state from suing his or her home state by obtaining a nationality of another state. Here, the Ballantines were lifelong Americans, whose parents were also lifelong Americans. The test designed to prevent abuse was

used as a tool of abuse by the Majority, to issue their own brand of industrial justice. The statement of facts below identifies some of the facts relevant to this issue.

A.     **Statement Of Facts – Lisa Ballantine**

Lisa Ballantine was born in the Chicago, Illinois in 1967. (*Affidavit of Petitioner Lisa Ballantine*, at 2.) She has been continuously an American citizen from the date of her birth until the present day. (*Id.*)

Ms. Ballantine has maintained continuous residences in America her entire life, up until the present day. (*Id.*) Since being an adult, she has always maintained U.S. bank accounts, U.S. credit cards, leased or owned a residence in the U.S., and paid U.S. taxes. (*Id.*, at 3.)

Prior to 2008, Lisa Ballantine lived in the United States without exception, except for traveling and missions and charitable work. (*Id.*, at 2.) Thus, for 42 years, Ms. Ballantine had never had any permanent residency anywhere else than the United States. In 2008, Ms. Ballantine became a permanent resident of the DR, while maintaining continuous and unbroken residency in the United States. (*Id.*)

Even after 2008, Ms. Ballantine has spent the vast majority of her time in the United States. (*Id.*, at 6.) The Majority Award focuses on the years 2011 to 2014 (wrongly). Yet during that time Ms. Ballantines' life revolved around her family and her non-profit organization, none of which involved the DR. All of Ms. Ballantine's children were outside of the DR by 2010, the year that she became a DR national. (*Id.*, at 8.) Her youngest daughter finished her last two years of high school in the United States. (*Id.*, at 8.) And her youngest son began college in 2010, leaving in June 2010 and never returning. (*Id.*, at 8.)

During 2010 and 2011, Ms. Ballantine spent as much time as possible in the U.S. with her children and family. She maintained, as she always did, a residence in the U.S. (*Id.*, at 8.) She spent time with her parents, her children, and other family members. She traveled for her non-

profit organization, including travel in the DR and Haiti. (*Id.*, at 5.) She also spent time with Michael Ballantine, who was spending time managing and growing the investment in the DR. The DR's own Statement of Defense showed that in 2010, Ms. Ballantine spent only 101 days in the DR. (DR Statement of Defense, at ¶ 44.[2]) In 2011, the Statement of Defense shows that Ms. Ballantine spent only 159 days in the DR, well under half the year. (*Id.*) Again, just as she had done in 2010, she spent most of her time in the United States in 2011. (*Id.*)

In 2011, the DR began to increase its campaign of discrimination against Lisa Ballantine's and Michael Ballantine's investment. This resulted in Mr. Ballantine being required to spend more time in the DR to manage these issues. Accordingly, Ms. Ballantine spent more time in the DR from 2012 to 2014 to be with Mr. Ballantine, but she continued to reside in the U.S., spend time with her children and family in the U.S., and to travel elsewhere in connection with her non-profit water filtration organization. (*Id., generally*.) In total, considering the years from 2010 to 2014, Ms. Ballantine was in the DR for 904 days and outside the DR for 922 days. (*Id.*)

Ms. Ballantine was a passive owner of the investment in the DR. (*Affidavit of Lisa Ballantine*, at 6.) She did not actively manage the investment itself. (*Id.*) She was aware of what was happening with the investment, but was not involved in the management or day-to-day activities associated with the investment. (*Id.*) Instead, Ms. Ballantine was focused on her non-profit organization, FilterPure Filters, a U.S. 501(c)(3) organization with operations or activities in several countries. (*Id.*) Ms. Ballantine had a ceramics background and used this skill to help design a ceramic water filter that could be used to filter river water or bad faucet water. During the period that the Majority viewed as relevant for the dominant and effective nationality test, Ms. Ballantine's organization had established a water filter factory in Haiti and was overseeing this

---

[2] Attached to Baldwin Decl. as Exhibit H.

factory. (*Id.*) Her organization had previously established a factory in Tanzania in 2009. The entirety of the capital for these ventures came from United States donors who supported the non-profit. The non-profit distributed over 100,000 of our household point of use ceramic water filters. This is what Lisa Ballantine was doing before and after the relevant years of the Majority's analysis. (*Id.*; *see also* Witness Statement of Lisa Ballantine ¶¶ 5-16, attached to Baldwin Decl. Ex. D).

As detailed in her affidavit, which is taken from the materials and testimony submitted in the Arbitration, Ms. Ballantine only became a Dominican national in 2010, one year before the breach in this case and after she made her investment. (*Affidavit of Lisa Ballantine* at 4.) That is, she made her investment while solely a U.S. national and had only been a dual national for one year when the DR expropriated her investment. (*Id.*)

Ms. Ballantine further lays out that the center of her life, in light of the factors that the Tribunal was required to consider, was and always has been the United States. (*Id.*, at 7.) Her friends, family, social life, were all American. (*Id.*) As she did in the Arbitration, and as was mostly ignored by the Majority, Ms. Ballantine laid out separately from Michael Ballantine her connections and attachments to the United States.

In June 2015, she and Michael Ballantine sold their house in the DR. (*Id.*, at 9.) As of June 2015, she began to live exclusively in the U.S. again. (*Id.*) She has taken steps to renounce her Dominican nationality since the expropriation of her property means that she has nothing of value in the DR to pass on to her children. (*Id.*) She had testified that she only became a Dominican national to make sure that she would be able to pass on her property in the DR to her children. (*Id.*)

Ms. Ballantine continues to reside continuously in the U.S. (*Id.*) She filed the CAFTA-DR lawsuit to recoup her portion of the investment to which she is entitled.

10

The facts related to Lisa Ballantine's strong connections to the U.S. can be found in her first and second witness statement.

**B.      Statement Of Facts – Michael Ballantine**

Michael Ballantine was born in Chicago in 1964. (*Affidavit of Petitioner Michael Ballantine*, at 2.) He has been continuously an American citizen from the date of his birth until the present day. (*Id.*)

Mr. Ballantine has maintained continuous residences in America his entire life, up until the present day. (*Id.*) Since being an adult, he has always maintained U.S. bank accounts, U.S. credit cards, leased or owned a residence in the U.S., and paid U.S. taxes. (*Id.*)

Following his owning and managing a successful printing business, Mr. Ballantine began to engage in non-profit missions work. (*Id.*, at 3.) This work led him to visit the Dominican Republic. (*Id.*) When in the DR, Mr. Ballantine noted the potential the mountainous interior of the DC would have for luxury housing. (*Id.*) He settled on a particular mountain and, with his wife Lisa Ballantine, brought property on the mountain to build a project. (*Id.*) This first project, referred to by the Claimants in the Arbitration as Phase 1, was successful built and mostly over a short few years. (*Id.*) In addition to the houses and amenities, Michael Ballantine built a restaurant in the project.

Michael Ballantine was an active investor, meaning that he was managing the construction, engineering, marketing, sales, and other responsibilities of the business. (*Id.*, at 4.) This required Mr. Ballantine to be in the DR often to ensure the success of the investment.  (*Id.*)

Given the success of his project and his desire to protect his investment, Michael Ballantine took Dominican citizenship. (*Id.*, at 5.) In addition to taking citizenship to ensure that he would be able to pass on his property more easily to his children, Mr. Ballantine also hoped that taking Dominican citizenship would help lessen the discrimination he received from both the government

officials in the DR and the people. (*Id.*) Regularly called a "gringo," Mr. Ballantine wanted to show the potential purchasers that he was serious about the investment. (*Id.*)

His success, however, created issues for him and the project. (*Id.*, at 6.) Seeing his development, Dominicans began to attempt to replicate the project. (*Id.*) Domestic investors began to purchase land and construct housing projects in the mountains. (*Id.*) As Mr. Ballantine would later discover, many of these Dominican investors were building entire projects without even obtaining a permit. (*Id.*) Others had permits for projects that had significant slopes, or were in protected national parks. (*Id.*) In short, the DR either granted permits for similar properties or allowed those properties to be built without a permit. (*See* Claimants' Reply, at pages 172-174.[3]) Several of these comparator properties were owned by politically connected Dominicans. (*Affidavit of Michael Ballantine,* at 6.) The project that immediately connected to the Ballantines' project was owned by Juan Jose Dominguez, who had built housing on similar terrain and in a national park. (*See* Claimants' Reply, at pages 172-174.) Dominguez is the brother of Leonel Fernandez' first wife, and Fernandez was the President of the Dominican Republic from 1996-2000, and then again from 2004-2012, during which the Ballantines sought permission to expand JDD. (*Affidavit of Michael Ballantine,* at 6.) Dominguez was the de facto spokesman and representative of Fernandez in Jarabacoa during all twelve years of his presidency. (*See* Claimants' Reply, at para. 152.) Dominguez was also the son of Piedad Quezada Dominguez, who was the mayor of Jarabacoa from 2010-2016, again while the Ballantines were seeking permission to expand.  (*See id.*) Another project, Rancho Guaraguao, was owned by Miguel Jimenez Soto, a major general of the Dominican armed forces and a then ambassador of the DR. (*See* Claimants'

---

[3] Claimant's Reply Memorial is annexed to the Declaration of Edward Baldwin ("Baldwin Decl.") as Exhibit I.

Reply, at para. 164.) Soto had built an entire large project that was visible from a major road, without a permit, in a national park. (*Id.*)

Unlike the Dominican landowners that had built projects on significant slopes, built projects without permits, and had been allowed to build and sell these houses with impunity, the Ballantines were denied a permit to construct their phase 2 project on land they had purchased. (*Affidavit of Michael Ballantine,* at 7.) Michael Ballantine was threatened with arrest, they were harassed and taunted for being American. (*Id.*)

In 2010, when the situation began to become more difficult, Michael Ballantine took Dominican citizenship. (*Id.*, at 8.) He also began to spend additional time in the DR trying to advance the project. (*Id.*) In 2011, the DR denied his permit to build his Phase 2 project. (*Id.*) He was told that he could not develop the land that he and Lisa Ballantine had purchased because a portion of the land contained slopes in excess of 60% (grade of approximately 31 degrees). (*Id.*) Mr. Ballantine sought reconsideration of this decision, given that all around him Dominican landowners were building on properties with more significant slopes. (*Id.*) After three denials, the DR came up with another purported basis of denial – i.e., that his property had been made into a national park. (*Id.*)

Again, Mr. Ballantine later found that Dominican landowners had been able to build in the same national park and other similar national parks with the same level of slopes. (*Id.*, at 9.) Mr. Ballantine spent months trying to cause the DR to issue the permit. (*Id.*) They continuously refused, all the while allowing Dominican landowners to continue to build their unpermitted projects or projects with slopes in excess of 60%. (*Id.*)

Through all these times, despite having to spend increased time in the DR, Michael Ballantine continued to maintain residences in the U.S. (*Id.*, at 9.) He continued to live in the U.S.

as well as in the DR. By 2011, all of Mr. Ballantines' children lived in the U.S. where he would routinely see them. (*Id.*) He had a U.S. gym membership, U.S. bank accounts, exclusively U.S. credit cards. (*Id.*) His family, his friends, his connections, and his life was in the U.S. (*Id.*) To the extent he had property or bank accounts in the DR, it was connected to the investment. (*Id.*)

Like Lisa Ballantine, Michael Ballantine sold his house and has not lived in the DR since 2015. (*Id.*, at 11.) He has had to continue to visit the DR to caretake his investment and deal with legal issues but has not resided there. (*Id.*) He has also taken steps to renounce his Dominican nationality. (*Id.*)

The facts related to Michael Ballantine's strong connections to the U.S. can be found in his three witness statements.

### C.   Lisa Ballantine And Michael Ballantine Bring A Claim Under CAFTA-DR

After facing intense discrimination, and having their investment expropriated without compensation, the Ballantines brought an action pursuant to CAFTA-DR. The Tribunal consisted of three arbitrators. The first arbitrator, Marney Cheek, was appointed by Lisa Ballantine and Michael Ballantine. Ms. Cheek is a partner at Covington & Burling in Washington, DC where she co-chairs the international arbitration practice group.[4] Ms. Cheek was previously an Associate General Counsel at the Office of the U.S. Trade Representative. (*Id.*) The Respondent appointed Raúl Vinuesa, who is Chair Professor of International Law and Human Rights, and Director of Post-Graduate Studies in International Relations at the Faculty of Law of the University of Buenos Aires.[5]

---

[4] Covington & Burling, Bio, https://www.cov.com/en/professionals/c/marney-cheek.
[5] Geneva Center for International Dispute Settlement, Bio, http://www.cids.ch/mids/the-program/the-faculty/497-ra%C3%BAl-emilio-vinuesa.

The presiding arbitrator of the proceeding was Ricardo Ramirez Hernandez. Mr. Ramirez was a judge on the appellate court at the World Trade Organization.[6] Since that time, Mr. Ramirez's term was not renewed on the WTO court, reportedly at the insistence of the United States. (*Id.*)

On September 3, 2019, the Tribunal issued its decision. (Baldwin Decl., at ¶ 3.) The decision was issued in Washington, DC. (*Id.*) Arbitrators Ramirez and Vinuesa issued the Majority Opinion, finding that the dispute was not arbitrable because of an alleged lack of jurisdiction. (*Id.*[7]) The other arbitrator, Ms. Cheek, wrote a dissent,[8] stating that the Majority should had jurisdiction over the case and should have heard the case on the merits. Importantly, the Award notes that the Ballantines "presented a *bona fide* claim." (Majority Award, at ¶ 635.) Thus, this was not a case where a frivolous case was not heard because of some jurisdictional defect.

The Ballantines filed the Notice of Arbitration on September 11, 2014.[9] As discussed below, the Majority did not reach a decision until September 2019, almost 5 years later. Some of that delay was caused by the Ballantines seeking to resolve the dispute and receive the permit to which they were entitled, but the proceeding was long and involved many issues, only a small portion of which had to do with jurisdiction.

---

[6] *See* Reuters UK, "WTO being 'asphyxiated', outgoing judge says, in veiled rebuke to U.S.," available at https://uk.reuters.com/article/uk-usa-trade-wto/wto-being-asphyxiated-outgoing-judge-says-in-veiled-rebuke-to-u-s-idUKKCN1IT21G.

[7] Majority Award is attached to the Baldwin Declaration as Exhibit A.

[8] Ms. Cheek's dissenting opinion (the "Dissent") is attached to the Baldwin Declaration as Exhibit B. Prof. Vinuesa also filed a dissenting opinion specific to costs (attached to the Baldwin Declaration as Exhibit C), which is not directly the subject of this motion to vacate.

[9] Majority Award p. viii.

## **ARGUMENT**

### I.     **THIS COURT HAS JURISDICTION AND VENUE IS PROPER**

This Court has subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA"). Under the FSIA, "district courts should have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. 1330(a). The Dominican Republic is not entitled to immunity from Petitioners' claims for two reasons.  First, in general, by signing the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"),[10] the Dominican Republic contemplated enforcement in other signatory states, including the U.S., and thus waived any claims for immunity stemming from foreign arbitral awards. *See* 28 U.S.C. 1605(a)(1); *Creighton Limited v. Gov't of the State of Qatar*, 181 F.3d 118, 123 (D.D.C. 1999). Second, in this specific case, by agreeing to hold the underlying arbitration in Washington, D.C.,[11] the Dominican Republic waived any such claim.  See 28 U.S.C. 1605(a)(6); *Ipitrade Int'l, S.A. v. Federal Republic of Nigeria*, 465 F.Supp. 824, 826 (D.D.C. 1978) (holding "an agreement to arbitrate or to submit to the laws of another country constitutes an implicit waiver.").

Defendant is subject to personal jurisdiction in this Court pursuant to 28 U.S.C. § 1330(b) because service will be made under 28 U.S.C. § 1608(a). 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist . . . where service has been made under section 1608 of this title.").

---

[10] The New York Convention is codified in 9 U.S.C. §§ 201-208.
[11] *See* Procedural Order No. 1, Baldwin Decl. Ex. F, ¶2.

The annexed Petition to Vacate is brought pursuant to the Federal Arbitration Act ("FAA"), which provides that "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration." 9 U.S.C. §10(a). Foreign arbitral awards can be vacated under the FAA pursuant to the New York Convention.  9 U.S.C. § 208 ("Chapter 1 [including 9 U.S.C. § 10] applies to actions and proceedings brought under this chapter [i.e., foreign arbitral awards] . . . .").[12]  Furthermore, a "motion to confirm, vacate, or modify an arbitration award" under the FAA may also be brought "in any district proper under the general venue statute." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 195 (2000).

Venue is proper here because the referenced arbitration had Washington, D.C. as its seat,[13] meaning that the award was made in D.C., *see* 9 U.S.C. §10(a), and pursuant to 28 U.S.C. § 1391(f), which provides that all civil actions can be brought "in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4).

Thus, this Court has jurisdiction over this Petition to Vacate, is the proper venue for this action, and has the power to Vacate the award under the FAA and New York Convention.

## II.     THE MAJORITY AWARD SHOULD BE VACATED

This Court should vacate the Majority's award for several reasons. Under 9 U.S. Code § 10, incorporating the vacatur bases of the New York Convention, this Court may vacate an arbitration award where, *inter alia*, "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not

---

[12] Both the United States and the Dominican Republic are signatories to the New York Convention.
[13] Majority Award ¶14.

17

made," or "there was evident partiality . . . in the arbitrators, or either of them." In addition to these statutory grounds, this Court may also vacate "arbitration awards . . . if they are in manifest disregard of the law." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350 (D.C. Cir. 2006).

This Court should vacate an arbitral award when "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. §10(4). U.S. Courts, including this Court, have vacated numerous arbitration awards pursuant to this statute. *See Chem-Met Co. v. Metaland Int'l, Inc.*, CIV.A. 96-02548(TAF), 1998 WL 35272368, at *4 (D.D.C. 1998) (holding arbitrator exceeded authority); *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp.2d 631, 638-39 (E.D. Pa. 2009), *aff'd by* 400 Fed. Appx. 654 (3d Cir. 2010) (arbitrators exceeded authority by eliminating contractual provision in order to award unentitled damages); *Long Island R. Co. v. Long Island R.R. Police Benevolent Ass'n*, 131 Lab. Cas. P 11449 (S.D.N.Y. 1995) (arbitrator exceeded authority by fashioning a remedy that was inconsistent with the submitted issues.).

"Although courts play a limited role in reviewing arbitral awards, [this Court's] duty remains an important one." *Aspic Eng. & Constr. Co. v. ECC Centon Constructors LLC*, 913 F.3d 1162, 1169 (9th Cir. 2019). Courts have vacated the decisions of arbitrators when they are completely irrational or yield a result inconsistent with the contract or issues that were submitted. *See, e.g.*, *id.* at 1169 (vacating award because it was "irrational" and conflict with certain contractual provisions); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1112, n.20 (11th Cir. 2004). Arbitrators can exceed their authority if their threshold decision to arbitrate or not to arbitrate a claim is incorrect. *See Klay v. United Healthgroup, Inc.* (376 F.3d 1092, 1112 n.20 (11th Cir. 2004) ("If a dispute is nonarbitrable, then an arbitrator necessarily exceeds his powers in adjudicating it.").

This Court may also vacate the Majority's Award due to manifest disregard of law.  To vacate an arbitration award due to the arbitrators' manifest disregard of law, court must find that (1) the Tribunal knew the governing legal principle yet refused to apply it or ignored it altogether, and (2) law ignored by the tribunals was well defined, explicit, and clearly applicable to case. *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001); *see also Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277 (9th Cir. 2009) (partially vacating an award where the tribunal acknowledged and ultimately disregarded California law).

Here, there are ***8 separate and independent reasons*** why the Majority exceeded their authority, manifestly disregarded the law, or acted with evident partiality in ruling that lifelong U.S. citizen Lisa Ballantine had become dominantly and effectively Dominican after becoming a dual national of both the Dominican Republic (as well as her original American citizenship) for only a few years, thus refusing to arbitrate her claim under CAFTA-DR against the Dominican Republic. The same is true with Michael Ballantine's claim against the Dominican Republic.

Eight separate bases may seem like a lot. But, here, we have a situation where two arbitrators determined that an investor who invested in the DR while being a solely U.S. national, took Dominican citizenship for four short years in order to make sure she could pass on her property in the DR to her children, and lived outside of the DR more than inside of the DR during those four years, somehow became a dominant and effective Dominican. Such a conclusion is so flawed that the vices required to reach such an absurdity are manifest and legion. Each one of these vices is by itself a basis to vacate.

19

**A.      The Majority Exceeded Their Powers By Failing to Make Separate Factual Findings For Lisa Ballantine And Michael Ballantine**

The Majority exceeded their powers by failing to analyze Lisa Ballantine's claims. Instead, they often made factual findings related to Michael Ballantine and then attributed those facts to Lisa Ballantine.

Take one critical example. The Majority relied heavily on the assertion that "the Ballantines" took Dominican citizenship to promote and "bolster" their investment. Paragraph 584 of the Majority Award states in full as follows:

> Whilst the Claimants have mentioned that discriminatory treatment was one of the reasons for becoming Dominican, the Claimants have expressed that their motives were for protection of the investment, as a business decision for commercial aspects, an economic decision. The sole reason for becoming Dominican and domestic investors was the investment. The Tribunal finds trouble reconciling the fact that the Claimants' desire was to be viewed as Dominicans for purposes of bolstering their investment and yet, regarding the application of the protections designed for foreign investors, they contend such nationality is not as important.

The Majority asserts that the "Claimants," meant to refer to Lisa Ballantine and Michael Ballantine, have "mentioned" that "discriminatory treatment" was one of the reasons for taking Dominican nationality. Michael Ballantine stated that this was one of the reasons he took Dominican nationality. To the contrary, Lisa Ballantine testified (and this was not contradicted or called into question) that she took Dominican nationality for testate reasons, so that she would be able to pass along her property in the DR to her heirs.[14] But the Majority goes further, finding that the Majority could not "reconcil[e] the fact" that both of the "Claimants' desire was to be viewed as Dominicans for purposes of bolstering their investment."[15] Again, this was one of the reasons

---

[14] Lisa Ballantine Reply Witness Statement, at para. 15 ("I became a citizen of the DR to protect our investment in case of our demise. I was concerned that our children could lose the entire investment if were we to die.")

[15] Majority Award ¶584.

20

that Michael Ballantine took citizenship, not Lisa Ballantine. She was not doing so to be viewed as a Dominican.

Despite the fact that no evidence was presented that Lisa Ballantine took Dominican nationality to "bolster" her investment, that did not stop the Majority from directly imputing actions of Mr. Ballantine to Lisa Ballantine. In paragraph 591 of the Majority Award, the Majority actually notes that Lisa Ballantine did not sign any of the contracts that the Majority asserts show some connection to the DR. Yet, the Majority still asserts that Michael Ballantine signing these contracts relating to the management of the investment creates some intent of Lisa Ballantine with respect to Dominican nationality.

Such attribution is made throughout the Majority Award as the Majority appears to have found this highly important to its "analysis." In fact, it was this false finding with respect to Lisa Ballantine that the Majority directly included in the short conclusion as to why the Ballantines were dominantly Dominican. In paragraphs 599 and 600 of the Majority Award, where the Majority's conclusion is rendered, the Majority begins by stating "In Sum, the Claimants' motivation for taking on the Dominican nationality was said to be economic and commercial in nature . . . ." And the Majority continues to state that this is why the Ballantines are dominantly Dominican. Yet, as discussed, it was not contested that Lisa Ballantine took Dominican nationality to protect her family so that she would be able to pass on any property located in the DR, which has nothing to do with wanting to appear Dominican or bolstering her investment. Her sole desire was to protect her children, not because she had some desire to appear Dominican to people.

Thus, this was no "harmless error"; the evidence above regarding the intent to take citizenship was crucial to the Majority's decision, as the Majority Award admits.

There are many other examples of the Majority simply erasing facts relevant to Lisa Ballantine and just treating her as if the acts of her husband are attributable to her by fiat, some of which include:

- The Majority stated that "the **majority** of her [Lisa Ballantine's] days between 2010 to 2014 were spent in the Dominican Republic." (Majority Award, at ¶ 565 (emphasis added).) This must have been imputed to Lisa Ballantine because the Respondent themselves submitted a chart showing that Ms. Ballantine spent a **majority** of her time between 2010 to 2014 outside of the DR, not in it. (Respondent's Statement of Defense, Baldwin Decl. Ex. H, at ¶ 44.)[16]

- The Majority found that (without any citation or evidence) that "most of their time" between 2008 and 2014 was spent in the DR. (Majority Award, at ¶ 566.) As discussed above,[17] most of Ms. Ballantines' time from 2010 to 2014 was spent outside of the DR. No evidence is cited by the Majority with respect to Ms. Ballantine that adding in the years 2008 and 2009 changed this.

- The Majority states that "they conducted" a business in the DR, meaning the managing of the investment. (Majority Award, at ¶ 569.) The "they" here is designed by the Majority to include Lisa Ballantine, who was not managing the investment. Thus, the Majority attributed acts of Mr. Ballantine to Ms. Ballantine.

- The Majority stated that "the Claimants seem to have been more connected to the Dominican Republic by virtue of their investment." (Majority Award, at 598.) Yet, as described elsewhere, Michael Ballantine was managing the investment, not Lisa Ballantine. She had no active role in the management of the investment. So to the extent that such connectivity existed with respect to the investment, it was imputed to Lisa Ballantine.

- The Majority stated that "the Claimants established what appeared to be their 'main' business in the Dominican Republic . . . ." (Majority Award, at 576.) As the Majority was aware, Lisa's non-profit was a U.S. entity with operations in several countries. Lisa Ballantine's main business, so to speak, was her organization providing the water filters. (*Affidavit of Lisa Ballantine*, ¶¶5-6)

- The Majority stated that "their investment kept them economically centered in the Dominican Republic." (Majority Award, at 598.)

---

[16] Ms. Ballantine, separate from Mr. Ballantine, spent 904 days in the DR from 2010 to 2014, which means that she spent 922 days (a majority) outside of the DR. The Majority must have been imputing time from Mr. Ballantine in the DR to Ms. Ballantine.

[17] *See supra*.

Even if there could be said to be an award with respect to Michael Ballantine, there is no such award with respect to Lisa Ballantine. And she is entitled to have one.

We note that this failure is not only an excess of powers, as a tribunal has to actually review the evidence with respect to all parties, not just one of the claimants. But this is also what makes the Majority Award so imperfect that it cannot be said to be valid.

In addition, this is also a manifest disregard of law. The Majority noted that it was "called upon to examine the nationality of each Claimant, Mr. and Ms. Ballantine. (Majority Award, at ¶ 559.) The Majority then decided to make findings regarding Michael Ballantine and impute them (without explanation or justification) to Lisa Ballantine.

**B.      The Majority Exceeded Their Powers And Manifestly Disregarded The Law By Failing To Consider The Entire Lives Of Each Of The Ballantines, As They Themselves Acknowledged They Must Do**

In order to bring a claim under CAFTA-DR, a claimant must be an investor of a party other than the respondent foreign state. If the claimant is a dual national, which both Lisa Ballantine and Michael Ballantine were here, the claimant's "dominant and effective nationality" must be a different nationality than the respondent foreign state.[18] The entire purpose of the dominant and effective nationality test under CAFTA-DR is to prevent foreign investors from manipulating their nationality for the purpose of acquiring treaty protection against their home state (i.e., "treaty shopping").[19] Specifically, the dominant and effective nationality test encompasses the

---

[18] CAFTA-DR, Art. 10.28.

[19] *See, e.g.*, Matthew Skinner, Cameron A. Miles, and Sam Luttrell, "Access and advantage in investor-state arbitration: The law and practice of treaty shopping" (2010) 3(3) Journal of World Energy Law & Business 260, 260; *see also* Procedural Order No. 2 at ¶22 (acknowledging most jurisdictional challenges concern "claimants [who] have adopted nationality to gain access to treaty protections"); Majority Award ¶ 534 ("Usually, when dealing with nationality issues, investment tribunals are confronted with the question of whether an investor acquired nationality in order to gain access and protection through a treaty.").

23

requirement that the claimant have a "genuine link" with a country, which should overcome the problem of "treaty shopping."[20]

Here, the Majority exceeded their powers by failing to take into account the entire life of Lisa Ballantine and, separately, Michael Ballantine, instead focusing on a small sliver of their lives (albeit lumped together).

The Majority made clear in the Majority Award that it deliberately ignored the entire lives of the Ballantines and instead focused on a short time period. In the conclusion section of its finding regarding dominant and effective nationality, paragraphs 598 and 599, the Majority found the following to be the primary reason that the Ballantines were dominantly Dominican:

> "During that relevant period of time, they lived, ran a business and accepted to be viewed as Dominicans."

Let's break this crucial sentence down:

- "*During that relevant period of time . . . .*" First, the Majority makes clear that they are only examining a minute point in time, and completely disregarding the entire life of the Ballantines. According to this flawed analysis, a person could almost immediately become a dominant national of another country since all other data is thrown out. As discussed below, such a flawed analysis could lead to Americans moving out of the country for a few years and then suing the U.S. for investment claims as a dominant citizen of another country.

- ". . . *they lived* . . ." Here, this cannot be denied. The Ballantines lived during this period of time. As stated elsewhere, however, even during this relevant time, Lisa Ballantine spent more time outside of the DR than in the DR. So Lisa Ballantine was in fact living but mostly outside of the DR.

- ". . . *ran a business* . . ." As discussed above, this is another example of the Majority ignoring facts relating to Lisa as she was not involved in running the business. Lisa was involved in running her non-profit, which was based in the U.S. So Lisa was running a U.S. non-profit while Michael Ballantine was managing the investment.

---

[20] *See* Lee M Caplan and Jeremy K Sharpe, United States. in Chester Brown (ed), Commentaries on Selected Model Investment Treaties (Oxford Univ. Press 2013) at 769; *see also Mergé*, Italian-United States Conciliation Commission, Decision No. 55 (June 10, 1955) at 247 (stating "the closer and more effective bond with one of the two States must [] be considered").

- "*. . . and accepted [sic] to be viewed as Dominicans.*" It is difficult to know what the Majority meant by "accepted" here. But this appears to be related to Michael Ballantine's statement that **he** took Dominican nationality in part to lessen the discrimination he suffered for being American.

All of these constituent parts of the sentence relate to this small sliver of time, a small portion of the Ballantines' lives to that point. An entire history of country allegiance and connection, an allegiance and connection that remained and still remains, erased and disregarded.

This is not a simple error. It is not even **simply** a gross error. It is a deliberate act that requires vacatur because the Majority deliberately ignored the law that they themselves admitted applied, as explained below. A tribunal both exceeds its powers and manifestly disregards the law when it knows that a law should apply and instead issues its own brand of industrial justice – or injustice in this case.

Here, the Majority admitted that customary international law governed the dispute.[21]  Yet the Majority failed to apply the law they knew to govern, a law that requires that the entire life of the investors be examined. Both parties cited the customary international law rules that govern this dispute.[22]  This law is primarily reflected in the various cases determined by the Iran-US Claims Tribunal, which decisions acknowledge the law that the entire life of the person has to be taken into consideration.[23]

By failing to account for the whole life of Lisa Ballantine and, separately, Michael Ballantine, this became the vice by which the Majority could reach the absurd decision that Lisa Ballantine, who was a lifelong resident of the U.S. and even after naturalizing into the DR, spend

---

[21] Majority Award ¶¶ 529-531.

[22] *See, e.g.*, Respondent's Rejoinder Mem., Baldwin Decl. Ex. L, ¶¶47-49; Claimant's Rejoinder Mem., Baldwin Decl. Ex. J, ¶¶ 28-33.

[23] Claimant's Rejoinder Mem., ¶¶10, 32 (citing and discussing *Malek v. Islamic Republic of Iran*, 19 Iran-US Cl. Trib. Rep. 48, 49-50 (1988)); Respondent's Rejoinder Mem., ¶47 (citing Iran-US Claims Tribunal); *see also* Closing Statements Tr., Baldwin Decl. Ex. K, at pp. 1264-65.

more time in the U.S. than DR, was dominantly Dominican. The law is clear that the entire life of each claimant must be examined when making this determination.

This Court need not conduct an analysis of the entire life of Lisa Ballantine and, separately, Michael Ballantine, to vacate the award. It is enough to find that the Majority simply failed to follow its own law to conduct this analysis. Yet, if the Court does look at the facts, it becomes clear that Lisa Ballantine's and Michael Ballantine's lifetime attachments are to the U.S. Michael Ballantine lived in the U.S. exclusively from 1963 to 2006 and didn't become a dual national until 2010. And the Majority determined that in four short years that Michael Ballantine had abandoned his 43 years of attachments to the U.S. and somehow become Dominican. The idea is absurd, which is why the entire life is required to be examined.

This point is not a minor one. If other tribunals adopt this absurd analysis, the U.S. could find itself with its own nationals suing it with some frequency. Lifelong U.S. citizens, with no connections to any foreign country, and who have large investments in the U.S., could simply spend a few years in a tropical paradise and then claim to be Dominican. (They could even stay in the luxury housing that Michael Ballantine built.) Such investors could cite to the Majority's decision, and state that the only relevant period was during a small window, allowing the Tribunal to ignore the years of attachment and connection that the investors have with the U.S. This decision could open up the floodgates to such claims because of the Majority's deliberate decision to fail to apply the law they knew to govern.

As explained in detail by the dissenting opinion, the Majority explicitly recognized in its decision that the case must be decided under customary international law, but then departs from such law while applying the facts to the law. Specifically, the Majority improperly considered nationality contacts regarding the investment as proof of nationality and then gave no weight to

the rest of the Ballantines' lives, including the over forty years both spent living as solely U.S. citizens. It cannot (and should not) be the case that an investor should be penalized for simply taking required steps to protect his or her investment, such as the simple act of opening a bank account. Indeed, as the Dissent noted, "dominant and effective nationality is a distinct legal test separate and apart from the making of, maintenance of, or injury to a claimant's investment."[24]

Second, the Court also stated that it would follow customary international law in interpreting the definition of "investor of a Party," which includes the dominant and effective test.[25]   As explained in very painstaking detail by the Dissent, there is a "well-established customary international law standard" that should have been – and wasn't – followed by the Majority in determining dominant and effective nationality.[26]   Decisions from the International Court of Justice, Italian-US Conciliation Commission, and Iran-US Claims Tribunal, among others, have ruled that the entire lifetime of a dual national is important in the analysis.[27]   The Dissent made very clear that this line of cases has led to the test that was articulated in *Malek*: "[T]o establish what is the dominant and effective nationality at the date the claim arose, ***it is necessary to scrutinize the events in the Claimant's life preceding this date. Indeed, the entire life of the Claimant, from birth, and all the factors which during this span of time, evidence the***

---

[24] Dissent ¶3

[25] Procedural Order No. 2, ¶¶24-25; Majority Award ¶531 ("[T]he Tribunal has no doubt that the expression "dominant and effective" is rooted on *[sic]* customary international law.").

[26] Dissent ¶12.

27 *See, e.g., Mergé Case* (*U.S. v. Italy*), 14 R.I.A.A. 236, 247 (Italian-U.S. Conciliation Comm'n June 10, 1955) ("[H]abitual residence can be one of the criteria of evaluation [to determine dominant and effective nationality], but not the only one. The conduct of the individual in his economic, social, political, civic and family life, as well as the closer and more effective bond with one of the two [nation-states] must also be considered."); *Nottebohm Case* (*Liechtenstein v. Guatemala*), 1955 I.C.J. 4, 22-23 (Apr. 6, 1955) (stating "real and effective nationality" should be "based on stronger factual ties between the person concerns and one of the States whose nationality is involved).

*reality and the sincerity of the choice of national allegiance he claims to have made, are relevant.*"[28]  Thus, by not considering the relevant time period to be the entire lifetime of Lisa Ballantine and separately Michael Ballantine, the Tribunal departed from crystalized customary international law.[29]

By deciding that the dominant and effective nationalities of Lisa and Michael Ballantine were the Dominican Republic, the arbitrators "effectively dispense[d their] own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalsFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).  There is simply no plausible explanation for how two Americans who grew up in Chicago, lived (and continue to live) in the United States for over 50+ years, and moved to a different country for only a few years cannot be considered U.S. citizens for purposes of initiating an arbitration against the Dominican Republic. The decision just doesn't misapply the law; the Majority blatantly ignores its own guidance and comes to an incomprehensible decision.

### C.   The Majority Exceeded Their Powers By Relying On Factors Relating To The Naturalization Of Lisa Ballantine And Michael Ballantine Themselves

The Majority exceeded their powers by relying on factors relating to the naturalization of Lisa Ballantine and Michael Ballantine themselves to find them to be dominantly Dominican. The dominant and effective test in CAFTA-DR **is only invoked** when an investor has at least two nationalities. Thus, the fact that a person naturalizes and the requirements for such a naturalization should not be a part of the test as it is a prerequisite for the test to be done.

The absurdity of including issues relating to the naturalization itself becomes apparent when considering the U.S. The U.S. requires that naturalized citizens swear under oath to

---

[28] Dissent ¶11 (quoting *Reza Said Malek v. Iran*, IUSCT, Interlocutory Award (June 23, 1988).
[29] *Id.*

"absolutely and entirely renounce and abjure all allegiance and fidelity to any . . . state . . . ."[30] This sworn oath demands that the speaker have no allegiance or fidelity to any other state. Yet the U.S. allows persons to maintain their other nationality when naturalizing. Such a requirement does not make the speakers dominant Americans simply for swearing to this.

Yet, the Majority here found highly relevant and probative requirements of the DR for naturalization:

- The Ballantines "had to submit several documents, such as a sworn statement that their domicile was in the city of Jarabacoa and a declaration from their attorney stating that the Claimants 'identify closely with Dominican sentiment and customs given their long standing respect for, and period living in, our country, for which reason they would be happy to confirm, legally, their Dominican sentiment.'" Majority Award ¶181.

- The Ballantines "had to pass an assessment on their written and oral proficiency in Spanish, on their knowledge of Dominican history and culture." *Id.*

- A "standard naturalization interview" was required. *Id.*

- Noting the "set of rights and obligations" that naturalization bestows on an individual. *Id.* ¶583.

- Making an important point that naturalization was "requested" by the Ballantines. *Id.* ¶599.

This is not a simple error. This is failing to provide a test to a party that the party can meet, as such factors are always present in naturalizations. A party has a right to an actual hearing of probative evidence. This did not happen in this case because improper factors formed the basis for the Majority's findings.

---

[30] USCIS Website, Naturalization Oath of Allegiance to the United States of America, https://www.uscis.gov/us-citizenship/naturalization-test/naturalization-oath-allegiance-united-states-america.

**D.      The Majority Exceeded Their Powers By Relying On Factors Relating To The Investment To Determine Dominant and Effective Nationality**

The Majority exceeded their powers by relying on factors relating to the investment itself in making its determination. One must have an investment in order to seek relief under CAFTA-DR for mistreatment of the investment. This is, of course, obvious. And, unless the investor is entirely passive – *e.g.*, a passive shareholder – such an investment will involve economic connections to the host state where the investment is made. Again, this is obvious. So any active investor will have significant economic connections to the host state.

Here, the Majority relied heavily on the fact that Michael Ballantine had economic connections to the DR.[31] Surprisingly, the Majority even admitted that it relied in its determination (apparently in large part) on the economic connections related directly to the investment. In paragraph 598 of the Majority Award, the Majority first admits that the Ballantines personal and professional relations to the DR was limited, it then takes great note that "during that period of time their investment kept them economically centered in the Dominican Republic." In other words, the Majority knew that the Ballantines' personal and professional attachments were not in the DR, but decided they were dominantly Dominican because of the economic connections related to the investment – connections mostly of Michael Ballantine that they attributed to Lisa Ballantine.

But the Majority goes even farther. The Majority makes it known that these economic connections (mostly from Michael Ballantine) related to the investment are in large part the basis of the decision that the Ballantines were dominantly Dominican. In the conclusion of the decision, where the Majority is declaring that the Ballantines are not investors, the Majority states as follows:

---

[31] This was one of the many occasions where the Majority imputed actions of Michael Ballantine to Lisa Ballantine without justification. *See supra* Section II.A.

> "In sum, the Claimants' motivation for taking on the Dominican
> nationality was said to be economic and commercial in nature, for
> their business and the substantial investment they had made."
> (Majority Award ¶ 599.)

This leads the Majority directly to its flawed conclusion. The Majority focused on the economic connections related to the investment that the Majority asserted made the Ballantines Dominican.

The Majority really gave up the game when it admitted in one section that the connections that Michael Ballantine had to the DR were because of the investment. The Majority wrote that "the Claimants seem to have been more connected to the Dominican Republic by virtue of their investment . . . ." (Majority Award, at ¶ 573.) Of course, as stated above,[32] this relates to Michael Ballantine as Lisa Ballantine was not managing the investment. More pressingly, however, this shows that the Majority knew that these investment connections were its proof of dominant Dominican nationality. Thus, the Majority not only considered facts relevant to Michael Ballantine's active investment, it heavily relied on these factors in determining (absurdly) that he was dominantly Dominican. The failure to apply customary international law to this case (or to any investor-state arbitration case) is especially problematic.  Much of the Ballantines' supposed connections with the Dominican Republic that were cited by the Majority were done in order to establish economic connections to the Dominican Republic. For example, it was necessary for the Ballantines to be in the country,[33] set up bank accounts,[34] rent and/or buy property, and pay taxes. These are exact types of activities that ***any*** standard investor would have undertaken in connection with an investment in a foreign country. The Majority even notes that these accounts were related to "Jamaca de Dios" – i.e., the investment. (See Majority Award, at ¶ 575.) In short, the Majority

---

[32] *See, e.g.*, *supra* Section II.A.
[33] Majority Award ¶ 577.
[34] Majority Award ¶ 575.

decided the Ballantines were citizens of the Dominican Republic because they engaged in activities that any active investor would have done in the country where his or her investment was located. This decision is entirely contrary to customary international law – based on the decision, it is impossible in the eyes of the Majority for any active investor with dual nationality to bring a claim because this investor would need to take steps to manage his or her investment.

In order for the dominant and effective test to apply, there has to be an investment in the host state – here, the DR. Without such an investment, the test is a non-issue. Thus, an investment is the *sine qua non* of the entire test. An additional vice of the Majority was to give great weight to the investment that gave rise to this dispute. This obviously is something that a tribunal cannot do, as the investment is a prerequisite. Of course, for passive investors, such as a shareholder who simply buys shares in a company, this is not an issue as such an investor will not likely spend much time in the host state. For active investors, such as a person who builds a factory in the host state, such an analysis would prevent them from bringing a claim under the Majority's flawed analysis. This is because an investor who builds a factory has to spend substantial amounts of time in the host state, has to has a residence there, bank accounts, friends, neighbors, and maybe even join a rotary club.

In order to manage his physical investment, Michael Ballantine had to lease or buy a residence, had to have a bank account, had to have neighbors, and had to interact with people. It would be impossible to be in the DR to manage an investment without having a place to live or a bank account. Yet the Majority found these factors to be important in its flawed analysis.[35]

---

[35] Majority Award ¶¶ 563, 575 (discussing as part of the Tribunal's analysis that Mr. Ballantine had, respectively, a place of residence and accounts related to the investment in the DR).

Such an analysis exceeded the powers of the Majority because it treats active investors differently from passive investors. By fiat, active investors would be deemed to be dominant nationals of the country where the investment was located because they would be spending time there to manage the investment, would have a residence, bank account, etc. This would make CAFTA-DR's investment protections meaningless for active investors.

The Majority relied heavily on such evidence directly related to the investment. As another example, the Majority relied heavily on the nationality Mr. Ballantine used when he signed the contracts with the persons purchasing the homes. In paragraphs 589 and 590 of the Majority Award, the Majority took great note that Mr. Ballantine on several occasions stated in those contracts directly related to the investment that he was Dominican. Putting aside the absurdity that this relates to Mr. Ballantine's attachment to the DR or shows that he is dominantly Dominican (it doesn't), acts related to Mr. Ballantines' investment, such as the fact that he has to sign contracts with home purchasers, should not be part of an analysis to determine his dominant nationality.

**E.     The Majority Manifestly Disregarded The Law That The Tribunal Itself Said Was Relevant To The Case**

The Majority manifestly disregarded the law that the Tribunal itself said was relevant to the case. In the decision on bifurcation, issued early on in the case, the Tribunal noted that it was required to consider "the conduct of the host State [the DR] vis-à-vis the Ballantines . . . ."[36]   In fact, the Tribunal refused to hear the jurisdiction issues separately because it was – according to itself – required to examine the conduct of the DR against Lisa Ballantine and Michael Ballantine. Michael and Lisa Ballantine presented substantial evidence to show that the DR treated them as Americans, not Dominican. Yet the Majority simply refused to do any analysis of the DR's conduct towards the Ballantines. As discussed below, the DR treated Michael Ballantine like an American,

---

[36] Procedural Order No. 2, Baldwin Decl. Ex. G, ¶26.

discriminating against him in comparison to the Dominicans in neighboring projects. Lisa Ballantine was likewise treated as an American by the DR. Yet the Majority could not be troubled to analyze any of this, despite stating expressly that it had to do so.

In Procedural Order No. 2,[37] the Tribunal stated that in order to determine the dominant and effective nationality of both Michael and Lisa Ballantine, the Court will consider the conduct of the Dominican Republic towards the Ballantines. Specifically, the Tribunal stated that it "is of the view that the facts surrounding the investment made by the Ballantines, as well as ***the conduct of the host State vis-à-vis the Ballantines***, and vice versa, ***will need to be examined for purposes of determining the dominant and effective nationality of the Ballantines***."[38]

In addition, in Procedural Order No. 2, the Tribunal specifically stated that it would examine the following to determine dominant and effective nationality:  the circumstances in which the second nationality was acquired, the individual's personal attachment for a particular country, and the center of the person's economic, social and family life. The Majority did not consider all of these issues despite indicating it should do so, which provides yet another basis for knowing the law but failing to apply it.

Moreover, the Majority listed off three potential factors to be examined as part of the analysis, specifically "***the conduct of a particular State towards the investor***, how the investor presented himself or herself, or the reason underlying the investor's decision to apply for naturalization."

First, the Majority blatantly ignored all evidence demonstrating how the citizens and politicians of the Dominican Republic treated and viewed the Ballantines. The Ballantines never

---

[37] *Id.*

[38] *Id.* ¶26 (emphasis added).

thought of themselves of dominantly Dominican, as they weren't. But what was undeniable is that the Dominican officials and the Dominican people viewed the Ballantines as wholly American. As explained in the facts section above, the evidence of discrimination with respect to the Ballantines' U.S. nationality is overwhelming. The most damning evidence on this is a video from 2013 that was one of the claimants' exhibits in front of the Tribunal, which is filled with Dominican citizens and politicians calling Michael Ballantine, among other things, the "Gringo," the "Foreign," and the "American."[39]  In fact, the mayor of Jarabacoa—the city that refused to issue a no-objection letter for a part of the project—referred to Michael Ballantine as the "American of Jamaca de Dios."[40]  In addition, the Ballantines testified that the Dominicans treated them like foreigners or Americans, including using the same slur seen in the aforementioned video.[41]

The failure to even mention the video or the testimony confirming the irrefutable fact that the Ballantines were not integrated into Dominican culture in the 179-page, 637-paragraph award clearly shows a manifest disregard of law by the Majority and an excess of powers.

### F.    The Majority Exceeded Its Powers By Using The Wrong Time Period In Which To Analyze Michael Ballantine's Dominant And Effective Nationality

The Majority exceeded its powers by using the wrong time period in which to analyze Michael Ballantine's dominant and effective nationality.[42] In basic terms, treaties like CAFTA-

---

[39] Claimant's Rejoinder, Baldwin Decl. Ex. J ¶45; Closing Statements, Baldwin Decl. Ex. K, p. 1249 (referring to the video referencing Mr. Ballantine as the "Gringo") (Page 19 of the PDF).
[40] *Id.*
[41] *See, e.g.*, Supplemental Witness Statement of Michael Ballantine, Baldwin Decl. Ex. E ¶5 ("While in the Dominican Republic there was nothing in our actions that would lead anyone to assume we were dominantly Dominican and nobody did."); Witness Statement of Michael Ballantine ¶41 (stating a policeman told him "Gringo, if you paint even one stick of bamboo without permission you will be brought to jail.") (attached to Amended Statement of Claim, Baldwin Decl. Ex. D).
[42] The Majority failed to analyze Lisa Ballantine at all, without respect to this failure to analyze the correct period. So, accordingly, the Majority failed doubly in this regard with respect to Lisa Ballantine.

DR are similar to contracts. Just as courts have vacated awards when a tribunal has failed to give accord to the contract, this Court should vacate the award because the Tribunal ignored the treaty provisions and decided upon its own rules, which it cannot do. *See*, *e.g.*, *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd*., 659 F. Supp. 2d 631, 638-39 (E.D. Pa. 2009), *aff'd by* 400 Fed. Appx. 654 (3d Cir. 2010) (arbitrators exceeded authority by eliminating contractual provision in order to award unentitled damages).

CAFTA-DR requires that the dominant and effective nationality be examined when the investment is made, not when the state destroys the investment or the claim is made.

CAFTA's restriction on dominant and effective nationality is singularly tied to the definition of "investor of a Party." According to CAFTA Article 10.28, investor of a Party is defined as:

> means a Party or state enterprise thereof, or ***a national or an enterprise of a Party***, ***that*** attempts to make, is making, or ***has made an investment in the territory of another Party***; provided, however, that a natural person who is a dual national shall be deemed to be exclusively a national of the State of his or her dominant and effective nationality.

Specifically, an investor of a Party is defined as "a national or an enterprise of a Party, that . . . has made an investment in the territory of another Party."[43]  This restriction only applies to this definition. If you meet that definition, which each of the Ballantines does, one is an "investor of a Party" no matter where else that definition is used elsewhere. And the definition vests when you attempt to make, are making, or have made an investment. Any of those will satisfy for the definition.

Here, each of the Ballantines separately became an investor when they were making an investment. It is at that point that the dominant and effective nationality should be judged.

---

[43] *Id.*

The Majority's failure to apply the correct time period changes the entire purpose and meaning of CAFTA-DR, as written. And, as such, is an excess of power.

### G.     The Majority Exceeded Its Powers By Refusing To Arbitrate An Arbitrable Dispute

Courts have held that a tribunal exceeds their power when they arbitrate a nonarbitrable dispute. Similarly, a tribunal exceeds its power when they fail to arbitrate an arbitrable dispute. The Majority here failed to hear this dispute, despite being required to do so. This is not a merits issue where a tribunal makes an error or does something that a party disagrees with. Here, neither Lisa Ballantine nor Michael Ballantine has been able to have their dispute heard. They did not receive the analysis of the merits of their case for which CAFTA-DR requires. Despite the DR receiving the many benefits of CAFTA-DR, the U.S. was deprived of one of its benefits under CAFTA-DR because its lifelong nationals were denied the determination of their case.

The Majority's Award, which effectively rules that two lifelong U.S. citizens who moved to the Dominican Republic for the sole purpose (with respect to Michael Ballantine at least) of supporting their investment while continuing to keep ties to the United States and became in a short span of time dominantly and effective Dominican, is an absurd and inconceivable result. According to the Majority, an investor can spend a lifetime in one country, but by actively protecting a foreign investment in person and ultimately naturalizing into that country, the investor is, in essence, abandoning his or her previous nationality for purposes of treaty protection.

The issue here, however, is not the result is absurd. The legal issue here is that the Majority refused to hear a case that it should have heard. Had the Majority heard the case and decided against the merits, even if the Majority had been wrong to do so, that would be a different circumstance. It is because they refused to hear the merits of the case, and the case is arbitrable, that means that the Court should vacate the Award.

It is also important to consider that the Majority's decision effectively means that both Lisa and Michael Ballantine should be considered dominant and effective Dominican Republic nationals for purposes of bringing a claim under CAFTA-DR against the United States. Assuming hypothetically that either of the Ballantines were simultaneously investing in the United States from 2010 onward and that investment was somehow improperly harmed, the Ballantines would have a claim against the United States.

Vacating the Majority's decision here is especially important because there is no doubt that current and future tribunals will interpret the term "dominant and effective nationality" as this exact language is found in numerous U.S. treaties and indeed, is in the model U.S. bilateral investment treaty in the exact same capacity as the CAFTA-DR.[44] This is especially concerning given that one of the "core" U.S. bilateral investment treaty principles is providing "investors from both Parties the right to submit an investment dispute with the treaty partner's government to international arbitration."[45]  The Majority's opinion brings such a principle into doubt, as it makes it more difficult, if not impossible, for U.S. citizens taking an active approach to investing, and ultimately naturalizing, in a foreign country to use these exact dispute resolution protections in such treaties. Furthermore, allowing the Majority to depart from customary international law generally sets a dangerous precedent for future tribunals to similarly depart from establish law, including tribunals interpreting other aspects of the CAFTA-DR, most-favored nation clauses, or indirect/direct expropriation law as they related to U.S. citizens or other bilateral investment

---

[44] U.S. Department of State Website, 2012 U.S. Model Bilateral Investment Treaty, p. 4, *available at* https://2009-2017.state.gov/documents/organization/188371.pdf.
[45] U.S. Department of State Website, The U.S. Bilateral Investment Treaty Program, https://2009-2017.state.gov/e/eb/ifd/bit//index.htm.

treaties, each of which has its roots from customary international law.[46]

Given the factual background, it would be completely irrational for the arbitrators to decide that the Ballantines were dominantly Dominican. And yet, that is exactly the decision that the Majority made. The Majority clearly exceed their authority in making this ruling, blatantly ignoring law and ignoring facts related to this issue. Courts have previously intervened when an arbitrator disregards the plain text of a contract without justification[47]—in the same vein, this Tribunal has disregarded both Lisa and Michael Ballantine's entire livelihood in the United States, leading to a ridiculous and perverse result. Thus, this Court should intervene and vacate the Majority's decision.

The Majority's award also sets forth a scary precedent that any U.S. citizen who actively invests in, and ultimately naturalizes into, a foreign country, that U.S. citizen will be able to seek the benefit of treat protection ***against*** the United States after only a few years into the foreign country.

The perverse result stems from the Majority's description of their so-called "holistic assessment" that needed to be conducted, which is both contradictory and designed to rule against any active foreign investor who naturalizes into the foreign country. Specifically, the Majority described their assessment as:[48]

> Taking into account a claimant's entire life within the analysis of dominance and effectiveness *at a particular time* does not necessarily entail ascribing more weight to one nationality over the other due to the amount of time each of them has been held. Rather an analysis should be performed to examine how, *at that particular*

---

[46] *See, e.g.*, CAFTA Annex 10-B (directly acknowledging customary international law principles apply in sections of the agreement).

[47] *See, e.g.*, *Aspic Eng. & Constr. Co. v. ECC Centon Constructors LLC*, 913 F.3d 1162, 1169 (9th Cir. 2019).

[48] Majority Award ¶556 (emphasis in original).

> *time,* the connections to both States could be characterized in terms
> of dominance and effectiveness.

As an initial matter, the first sentence is entirely contradictory. It begs the question of how it would be possible to take into account the "entire life" of a claimant when the analysis is only done "at a particular time."[49]  It is seemingly impossible to take over fifty years of an investor's life into account if you are only analyzing the relevant question at a snapshot in time. But even assuming such an analysis could be accomplished, the second sentence clearly states that the Majority made no attempt to follow the customary international law standards that they mention. Requiring the analysis to only occur "at the particular time" of when the cause of action began or the claim was filed necessarily requires that ***any*** active investor who naturalizes into a foreign country is likely, if not required, to be dominantly and effectively a citizen of the foreign country in which he or she has invested.

This is further supported by the Majority choosing only to analyze the relevant facts "bearing in mind the specific context of this dispute,"[50] and thus, only considering facts after the investment was made.[51]  The Majority seemingly goes out of its way to make it clear that the dominant and effectively nationality analysis ***must*** occur while taking into account the investment itself. However, in doing so, the Majority essentially rules that a dual national should only passively invest in one of the CAFTA-DR countries, as moving to and naturalizing into that

---

[49] Similarly contradictory is the Majority's latter comment that explains that "factors related to the life of the Claimants before they moved and invested in the Dominican Republic are relevant, [but] ***but they should be analyzed with a view to determining their connection with the Dominican Republic and the United States at the relevant times*** [i.e., date of the alleged breach and the date the claim was filed]."  Majority Award ¶558.

[50] Majority Award ¶559.

[51] Majority Award ¶553-554 (stating, without citation, that nationality must be interrelated with the concept of investor/investment).

country in an attempt to decrease discrimination and help with the active investment will surely lead to losing the dispute resolution mechanism within CAFTA-DR.

### H.   The Majority Award Should Be Vacated For Evident Partiality

Lastly, given that one of the arbitrators dissented, that means that two arbitrators made the decision. If either of those arbitrators is evidently partial, the Majority Award must be vacated. Although a judicial predisposition is not sufficient to satisfy evident partiality, here there is evidence of actual animus and partiality against the U.S. and in favor of other states. Such partiality is the most pernicious, depriving a party of the opportunity to have a neutral fact finder examine the issues in the case and make a determination.

The FAA permits this Court to vacate an arbitration award "where there was evident partiality . . . in the arbitrators." 9 U.S.C. § 10(a)(2). Courts may disqualify an arbitrator "when a reasonable person, considering all circumstances, would have to conclude that an arbitrator was partial to one side." *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2nd Cir. 2007).

Here, the history of Prof. Raúl Vinuesa, the arbitrator appointed by the Dominican Republic in the Arbitration, shows that he cannot be considered as a neutral arbitrator. Of the last 23 investor-state arbitrations of which the Petitioners are aware in which Mr. Vinuesa acted as an arbitrator, he was appointed every time by the state party. Certainly, the state parties appointing Mr. Vinuesa as an arbitrator, while no investor was doing so, would have done so because they considered Mr. Vinuesa a certain vote for their side. And Mr. Vinuesa did not disappoint. In all those cases, if the case went to decision, he decided in favor of the state.[52] 23 times. This does not

---

[52] The last 23 times he has served as an international arbitrator, he has always been appointed as the arbitrator for the State, and never appointed by the claimant. In every single panel that has gone to a decision except for one, he has either ruled in favor of the State or if the ruling was in favor

mean Mr. Vinuesa was on the winning side every time. On the three occasions where the tribunal found for the investor, Mr. Vinuesa wrote a dissent. Thus, even on the three occasions when the other two arbitrators found for the investor, Mr. Vinuesa reflexively found for the capital importing country and against the capital exporting investor.

In addition, with respect to Mr. Vinuesa, with the investor-state cases of which we are aware, Mr. Vinuesa has never found for an American investor. Never. When an investor is in a tribunal with Mr. Vinuesa, they know they will see a dissent from him if they prevail in the case.

Investor-state arbitration is supposed to be built on the principle that each arbitrator is persuadable, and will decide in favor of the party that is correct on the facts and the law. Neutrality of the arbitrators in these proceedings is a bedrock principle that is designed to create trust in the system. A party has the right to have before it three arbitrators who will review the evidence and follow the facts and the law. That does not appear to be the case with Mr. Vinuesa. To be sure, there are likewise arbitrators that are often appointed by investors. But those arbitrators do sometimes find in favor of the states. The same, in reverse, cannot be said with respect to Mr. Vinuesa.

In addition, Mr. Ramirez, the president of the Tribunal, has been accused of being against the United States. In a Reuters article, Mr. Ramirez's outgoing statement following the termination of his appointment was reported as being a "veiled rebuke" to the U.S. Mr. Ramirez tweeted out this article, including the "veiled rebuke" portion, in his public Twitter account:[53]

---

of the claimant, he wrote a dissenting opinion on behalf of the State. In the sole decision where Prof. Vinuesa ruled for the investor, the U.S. claimant was eliminated on jurisdiction and the Tribunal ruled that the state did not have to pay adverse costs, over the objection of a dissenting opinion.

[53] Twitter Account for Ricardo Ramirez, citing to: https://uk.reuters.com/article/uk-usa-trade-wto/wto-being-asphyxiated-outgoing-judge-says-in-veiled-rebuke-to-u-s-idUKKCN1IT21G.



Ricardo Ramirez
@ricardoramirezh

WTO Being 'Asphyxiated', Outgoing Judge Says, in Veiled Rebuke to U.S. nyti.ms/2LEXigu

12:57 AM · May 29, 2018 · Twitter for iPhone

Surely putting out such a public statement in the middle of an arbitration where the claimants are U.S. citizens would lead a "a reasonable person . . . to conclude that an arbitrator was partial to one side." 492 F.3d at 137.

**CONCLUSION**

Accordingly, for the abovementioned reasons, the Court should vacate the arbitration award and order the Dominican Republic to submit to arbitration in accordance with CAFTA-DR. The Court should further issue whatever orders are required to effectuate the submission of the arbitration, or whatever else justice requires.

Respectfully submitted,

By:     */s/ Edward Baldwin*
        **Steptoe & Johnson LLP**
        Edward Baldwin (DC Bar #973850)
        1330 Connecticut Avenue, NW
        Washington, D.C. 20036
        Tel: (202) 429-6203
        ebaldwin@steptoe.com

By:     */s/ Derrick F. Moore*
        **Moore Law**
        Derrick F. Moore (DC Bar #1645015)
        600 Third Avenue, 2nd Fl.
        New York, NY 10016
        Tel: (315) 794-4714
        derrick@mooreatty.com

        *Counsel for Plaintiffs Lisa Ballantine and Michael Ballantine*

43