# EXHIBIT K

IN THE MATTER OF AN ARBITRATION UNDER THE DOMINICAN
REPUBLIC–CENTRAL AMERICA–UNITED STATES FREE TRADE
AGREEMENT, SIGNED ON AUGUST 5, 2004 ("CAFTA-DR")

AND

UNDER THE UNCITRAL ARBITRATION RULES
(AS ADOPTED IN 2013)
(the "UNCITRAL Rules")

- - - - - - - - - - - - - - - - - - - -x
                                       :
In the Matter of Arbitration Between:  :
                                       :
MICHAEL BALLANTINE, LISA BALLANTINE,   :
                                       :   PCA Case No.
      Claimants,                       :     2016-17
                                       :
      and                              :
                                       :
THE DOMINICAN REPUBLIC,                :
                                       :
      Respondent.                      :
                                       :
- - - - - - - - - - - - - - - - - - - -x  Volume 5

ORAL HEARING

Friday, September 7, 2018

The World Bank
1818 H Street, N.W.
MC Building
Conference Room 4-800
Washington, D.C.

      The hearing in the above-entitled matter came
on, pursuant to notice, at 12:00 p.m. (EDT) before:

      PROFESSOR RICARDO RAMÍREZ HERNÁNDEZ,
        Presiding Arbitrator

      MS. MARNEY L. CHEEK, Co-Arbitrator

      PROFESSOR RAÚL EMILIO VINUESA, Co-Arbitrator

ALSO PRESENT:

      MR. JULIAN BORDAÇAHAR
      Secretary to the Tribunal

   Court Reporters:

      MS. MARGIE DAUSTER
        Registered Merit Reporter (RMR)
        Certified Realtime Reporter (CRR)
      B&B Reporters
      529 14th Street, S.E.
      Washington, D.C.  20003
      United States of America

      MR. DANTE RINALDI
      MR. DIONISIO RINALDI
      D.R. Esteno
      Colombres 566
      Buenos Aires 1218ABE
      Republic of Argentina

   Interpreters:

      MS. SILVIA COLLA

      MR. DANIEL GIGLIO

APPEARANCES:

   Attending on behalf of the Claimants:

      MR. EDWARD "TEDDY" BALDWIN
      MR. MATTHEW ALLISON
      MS. LARISSA DIAZ
      MS. SHAILA URMI
      Baker & McKenzie LLP
      815 Connecticut Avenue, N.W.
      Washington, D.C. 20006
      United States of America

   Claimant Representatives:

      MS. LISA BALLANTINE

      MR. MICHAEL BALLANTINE

APPEARANCES (Continued)

   Attending on behalf of the Respondent:

      MR. MARCELO SALAZAR
      MS. LEIDYLIN CONTRERAS
      MS. RAQUEL DE LA ROSA
      Dirección de Administración de Acuerdos y
        Tratados Comerciales Internacionales,
        Ministerio de Industria y Comercio
      MS. PATRICIA ABREU
      MR. ENMANUEL ROSARIO
      MS. ROSA OTERO
      MS. JOHANNA MONTERO
      MS. CLAUDIA ADAMES
      Ministerio de Medio Ambiente y Recursos
        Naturales

      MR. PAOLO Di ROSA
      MR. RAÚL R. HERRERA
      MS. MALLORY SILBERMAN
      MS. CLAUDIA TAVERAS
      MS. CRISTINA ARIZMENDI
      MR. KELBY BALLENA
      MS. KAILA MILLETT
      Arnold & Porter, LLP
      601 Massachusetts Avenue, N.W.
      Washington, D.C. 20001-3743
      United States of America

   Of Counsel:

      MR. JOSÉ ANTONIA RIVAS CAMPO

C O N T E N T S

PAGE

CLOSING ARGUMENTS:

ON BEHALF OF CLAIMANTS:

   By Mr. Allison......................................1176

   By Mr. Baldwin......................................1205

   By Mr. Allison......................................1241

ON BEHALF OF RESPONDENT:

   By Ms. Silberman....................................1250

   By Mr. Di Rosa......................................1281

QUESTIONS FROM THE TRIBUNAL............................1307

---

P R O C E E D I N G S

1
2    PRESIDENT RAMÍREZ HERNÁNDEZ:  Good afternoon.  So,
3  just to give you how the Tribunal intends to proceed, we
4  will hear from Claimant.  We will take the 20-minute break
5  agreed.  We will hear from Respondent.
6    And after that, the Tribunal will pose questions
7  to both Parties, maybe to one so--according to the
8  questions.  To let you know how we'll proceed.
9    So, Claimant, you have the floor.
10    CLOSING ARGUMENT BY COUNSEL FOR CLAIMANTS
11    MR. ALLISON:  Members of the Tribunal, Counsel.
12    We started this week asking why we are here.  And
13  now we need to ask what do we know.
14    We know that the Respondent can no longer pick and
15  choose among its many justifications for denying the Jamaca
16  de Dios expansion permit.  We finally heard what the real
17  reason is.  It's environmental fragility.  Respondent has
18  now seized on that phrase as the justification for why
19  Jamaca is the only mountain project within the La Vega
20  Province that cannot develop its property.  The only one.
21    But before we talk about environmental fragility,
22  let's quickly dispose of a few things.  Let's talk about
23  what this dispute is no longer about.  It's no longer about
24  slopes.  Respondent has abandoned its slope argument
25  despite the fact that all four rejection letters from the

---

1  Respondent cited that as the very first reason for why it
2  was denying the Ballantines' application to expand its
3  project.
4    Respondent cannot rely on that Article anymore.
5  Why not?  Because every mountain project in the area has
6  slopes that exceed 60 percent.
7    The Tribunal has Demonstrative 15.  The slope
8  percentages are uncontested.  Jarabacoa Mountain Garden,
9  43 percent slopes above 60 percent.  Quintas del Bosque II,
10  22 percent.  Paso Alto, 17 percent.
11    None of these projects were rejected because a
12  portion of their land had slopes in excess of 60 percent.
13  We heard Mr. Navarro testify yesterday that Article 122
14  prohibits building on land that is steeper than 60 percent
15  but does not prohibit building on land with slopes of less
16  than 60 percent.
17    So, Article 122 cannot be the justification why
18  86 percent of the Ballantines' Phase 2 development could
19  not be developed.
20    The Tribunal has seen the slope maps for the
21  Jamaca expansion request.  Navarro acknowledged that his
22  calculation was 19 percent and Eric Kay's was 14 percent,
23  but the difference was not material to the denial.
24    This is the map.  We've seen it before.  We've
25  seen Phase 1 with the steep slopes in the middle.  The

---

1  Ballantines did not build on those slopes.
2    We see Phase 2 with slopes primarily concentrated
3  in two sections up at the top.  We see the land where the
4  road was begun to cut before Michael was fined and the
5  project was shut down.
6    Respondent ran that slope argument as long as it
7  could.  It still tries to say that, "The Ballantines didn't
8  let us know that we weren't going to build on those
9  slopes."
10    But we've heard the statements from the
11  Ballantines.  They didn't intend to develop on that land.
12  And if there was any doubt, the June 13th letter
13  affirmatively states, "Nevertheless, according to the
14  aforementioned, the slopes where our project would be
15  located are under such percentage."
16    And any doubt should have been further erased by
17  Respondent's own August 2013 inspection report where the
18  findings were that a tour was made of the site where
19  various slopes in the area could be seen.  They go from
20  steep to very steep.
21    And so GPS points were taken in the area where it
22  is intended to develop the project, and they were viewed
23  with Google Earth.  The same Google Earth technology that
24  Respondent questioned Michael Ballantine using in
25  connection with his first reconsideration request was used

1  by the Respondent in response to the fourth reconsideration
2  after they had received inquiries from the U.S. Embassy and
3  from their own Center for Foreign Investment.
4       Those five Google map slope readings were appended
5  to the report, and the Tribunal saw them.  Not one of them
6  showed a slope in excess of 60 percent where it is intended
7  to develop the project.
8       But it wouldn't have mattered if those readings
9  did.  Navarro has now said, in his sworn testimony, that as
10 long as a developer can find 5 percent of a lot that has a
11 slope less than 60 percent, that lot can be developed and a
12 house can be built there.  He has to say that to justify
13 the approval of 115 lots in Jarabacoa Mountain Garden.
14      And so we come to environmental fragility.  What
15 does that mean?  It's not defined anywhere in Dominican
16 law.  And so Mr. Navarro insists that it means several
17 things.
18      The Tribunal has noted that the August 23rd
19 inspection report had some inconsistent findings and made
20 no recommendations.  Claimants invite and encourage the
21 Tribunal to review the multiple inspection reports to see
22 if any of the issues that Navarro now identifies are
23 reflected in those reports or to see if there were any
24 studies that were made with those reports that would
25 support any of the claims that Mr. Navarro now makes.

1       There are four separate denial letters that all
2  cite Article 122 as the first basis to deny the expansion
3  request.  They're in September 2011, March 2012,
4  December 2012 and, finally, the last denial in January 24
5  that also included the Baiguate Park.
6       Mr. Navarro's catalog of issues:  Altitude, soil
7  issues, runoff, landslides, rainfall, cloud forest.  All
8  those issues combine to make Jamaca de Dios Phase 2
9  environmentally fragile.
10      So, let's look at them.  First, it's too high.
11 It's the altitude.  At the time Jamaca was repeatedly
12 denied, no Dominican law addressed development at a
13 specific altitude.
14      Even now, Dominican law does not prohibit
15 development below 1300 meters above sea level.  Just as
16 with the slope law, you can't develop above 1300 meters,
17 but you can develop below 1300 meters, and Jamaca Phase 2
18 is below that, as is the recently approved La Montaña.
19      Altitude is not mentioned once in any of the many
20 inspection reports.  Not once.  Those reports have meaning,
21 and Respondent cannot now claim that altitude was a
22 critical factor when it didn't rely on altitude in its
23 multiple denials.
24      As I mentioned, La Montaña has a permit to build
25 to 1300 feet.  Paso Alto has a permit to build to

1  1190 meters.  And Rancho Guaraguao was allowed to build up
2  to 1890 meters above sea level without a permit in a
3  national park.
4       So, it can't be the altitude.  So, it must be they
5  were in the cloud forest.  They're a little related; you go
6  high and you're in the cloud forest.
7       First, this issue does not appear in this case
8  until the Respondent's Rejoinder.  The phrase "cloud
9  forest" does not appear in any denial letter, any
10 inspection report, or even the original Statement of
11 Defense.  This is all after the fact.
12      And Mr. Navarro deferred to his former colleague,
13 Professor Martínez, on this point.  And Professor Martínez
14 confirms that the cloud forest starts at 800 meters above
15 sea level.  He confirms that in both his Witness
16 Statements.
17      And, indeed, Respondent's expert, Mr. Booth, in
18 his PowerPoint yesterday, confirmed that the cloud forest
19 in the Dominican Republic begins as low as 350 meters above
20 sea level.
21      But even if we use Martínez' more conservative
22 level, every mountain project at issue here, with the
23 exception of Mirador del Pino, is in the cloud forest.  So,
24 it can't be the cloud forest.
25      But it rains too much.  And Navarro first tried to

1  argue that it rained more at Jamaca de Dios than at other
2  projects within a few kilometers.  But his support for that
3  was a map he put in his report that makes no mention of
4  rainfall, and then he later agreed that it rains in the
5  area 1600 to 1800 meters per year.
6       Again, none of the inspection reports or rejection
7  letters make any issue of rainfall as a factor that
8  justified refusal of the permit, and Dominican regulations
9  don't address now, and they didn't address then, rainfall
10 as a factor in consideration of mountain projects.
11      The soil is unstable.  We heard this one a lot.
12 And while we don't hear anything about soil stability at
13 the time, the phrase "clayey soil" does appear in one of
14 the inspection reports, and so Respondent pounces.
15      But what are "clayey soils"?  We heard from
16 Mr. Deming at Slide 4.  "Residual Soil in a Project 3 Cloud
17 Forest:  A cloud forest provides year-round moisture, which
18 accelerates decomposition.  Special engineering
19 considerations are needed for stability in the cloud forest
20 horizon because of the more clayey soil type and the higher
21 moisture content."
22      And so Respondent's own soil stability expert
23 confirms that it's the cloud forest that impacts the soil
24 in Jamaca, and it impacts all cloud forest projects.
25      And Mr. Navarro also confirms that the MMA never

1  did any specific soil test, measurements or diggings at
2  Jamaca as part of its many inspections.
3         At the end, try as it might, Respondent can point
4  to no evidence in the record to support the notion that the
5  soil at Jamaca de Dios is any different than the soil at
6  any other project, and its experts don't even try.
7         Navarro confirmed that mountains in and around
8  Jarabacoa have Class VII soils.  And no other mountain
9  project has been rejected or even altered on the basis of
10 its soil issues.
11        Navarro confirmed at 764 and 765:  "Just so the
12 record is clear, you didn't see any communications from the
13 MMA to the Ballantines at any point in which they said,
14 'How do you plan to deal with soil stability at your
15 expansion project'?"
16        "The letter provides an option to them of
17 relocating the project."
18        "I understand the letter says you can submit some
19 different property.  I'm asking with respect to the
20 property they had submitted, did the MMA ever write to them
21 and say 'What is your plan with respect to soil
22 stability'?"
23        "I have no knowledge of a letter of that nature."
24        But with unstable soil, there can be runoff or
25 landslides.  Earth movement is an issue that must be

1  addressed in mountain developments.  That's not an issue.
2  All developers have to deal with the possibility that
3  erosion will occur.
4         But there is no evidence that erosion issues were
5  considered by the MMA at the time the Ballantines' permit
6  was denied.
7         And evidence of erosion or concern about runoff
8  was expressly mentioned in the consideration of multiple
9  mountain projects in La Vega that were later permitted for
10 development.
11        The JMG original denial letter.  "Movement of the
12 earth would be needed to carry out the project, which could
13 potentially lead to erosion of the soil and, hence,
14 sedimentation in the water basin."
15        Indeed, Mr. Navarro himself observed landslides
16 and took pictures of them when he went to visit Jarabacoa
17 Mountain Garden before approving its permit.
18        The actual permit for Alta Vista, in December of
19 2012, says:  "Given the topical characteristics of the
20 terrain, particularly the phenomena of soil erosion at the
21 project site, plot division work on the land, the design
22 and future construction of the project, while bearing in
23 mind the potential risks of mass landslides and subsidence.
24 Therefore, future houses must have lightweight structures
25 according to the load-bearing capacity of the soil."

1         La Montaña, it's now permitted.  "The soil has
2  developed on metamorphic igneous rock with high elevations
3  exposed to mass erosions due to the high local
4  precipitation of 1600 millimeters on the range."
5         Sierra Fría, rejected first and then given Terms
6  of Reference.  "The construction of the project would cause
7  soil erosion and acidity."
8         Navarro confirmed.
9         "Did you ever see a letter to Jamaca that said,
10 'How do you plan to address water runoff at your expansion
11 project'?"
12        "I did not."
13        "Did you ever see a letter that said exactly
14 specifically, 'Where do you plan to build the road to
15 minimize the earth movement that we're concerned about'?"
16        "I did not."
17        Water and biodiversity, these were justifications
18 that Respondent has offered at some point for their denial,
19 and it remains unclear whether it's still an issue when
20 there's a hydrological basis for the denial.
21        But if we look at the very first inspection team
22 note when they went to visit JDD, they noted there was no
23 active water.  "Bodies of water inside the project area or
24 less than 2 kilometers away:  None observed."
25        It's also plain that there's nothing in the record

1  to support any contention that the--Jamaca is more
2  ecologically diverse than other mountain projects.
3         Mr. Booth, who testified about the ecology at
4  Jamaca de Dios, confirmed that he hadn't visited any other
5  projects in the area.
6         So, Respondent contends, instead of
7  environmentally, that the houses at Phase 1 were just too
8  nice.  They say the homes violated the promises made in the
9  Environmental Impact Study presented by Jamaca de Dios that
10 they would build mountain villas or cabins.
11        We had some debate about what those terms meant.
12 But, again, Respondent can point to no contemporaneous
13 expression of concern to the Ballantines about the style of
14 the homes that were climbing up the hill at Jamaca de Dios.
15 There's no post-permit inspection complaints about the
16 house.  No conditions were placed on the renewal of the
17 Phase 1 license when it was granted in 2013, and there was
18 no response to any of the many ICA reports submitted by
19 Claimants every six months.
20        Ultimately, Navarro is left to insist that the
21 Ballantines could not build their road to the top of
22 Phase 2.  This despite the quality of the Phase 1 road of
23 which the Tribunal has seen the video evidence.  This is
24 another new argument, although one rejection letter does
25 mention the road and calls it a path.

1    But Respondent's expert, Mr. Deming, does not
2  contend that the Phase 2 road was unbuildable.  He contends
3  that it would have environmental impact, although his views
4  on that are overstated as he projected a 10-meter wide road
5  and not the 6-meter wide road that the Ballantines planned
6  and had built in Phase 1.
7    You heard Mr. Kay's testimony that the Phase 1
8  road could be extended into Phase 2.
9    Now, the road would have impact.  There's no doubt
10  about that.  But not any greater impact than any other
11  mountain road.  Mr. Navarro himself in his Report states,
12  "In general, mountain projects require a great deal of work
13  to make all the areas accessible."
14    Mr. Navarro confirms there was no specific plan
15  for the JDD road he was evaluating.  But he now says the
16  road must be totally vertical, and by contrast, Mr. Navarro
17  apparently liked what he claimed was the preexisting,
18  non-permitted road at JMG, even though the records reflect
19  that only 25 percent of that road had been built.  The
20  Tribunal should review and recall the testimony of
21  Mr. Navarro with respect to the JMG road.
22    We saw the site plan.  The shaded gray areas are
23  where the slopes at Jamaca de Dios exceed 60 percent.
24  Excuse me.  Mountain Garden.  We see the contours and the
25  approved roads, and we see that the roads cross contour

1  lines.  Here they are blown up in color for the Tribunal's
2  convenience.
3    Now, the grade proportions of these roads, which
4  Navarro called "the roads cut by farmers," would have to be
5  astonishing.  He says a 7 percent grade is best, and
6  nothing over 15 percent would be safe.  Portions of those
7  roads, simple mathematics in that chart, show that these
8  roads would have grades well above 15 percent.
9    Despite that, Mr. Navarro now claims that no road
10  can be built in Jamaca Phase 2 because, "The only path to
11  get to the upper portion of the mountain is by breaking the
12  contour line."  But it's simple physics.  You must break
13  and cross contour lines in order to climb a road up a
14  mountain.  The road is another new argument.
15    So, why are we here?  Ultimately, Respondent's
16  defense is built on the notion that Jamaca somehow, despite
17  similar projects within a few miles, was so ecologically
18  unique that only its development needed to be completely
19  halted, completely shut down.  Not modified, not
20  conditioned, not restricted, not limited; halted, while at
21  the same time, every single other mountain development was
22  permitted or allowed to develop without a permit.
23    That notion defies common sense, and Respondent's
24  experts were clear.  They made no analysis of any other
25  projects other than Jamaca and, thus, couldn't provide an

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Page | 1198

Page | 1199

1  opinion as to whether Jamaca was different than any other
2  mountain projects with respect to the road, with respect to
3  the biodiversity, with respect to the ecology recovery
4  analysis.  Nothing.
5    Ultimately, compelling evidence exists in the
6  absence of evidence.  The lack of communication and
7  collaboration between the Ballantines and the MMA is stark
8  and unavoidable.
9    We've seen the evidence of the MMA working
10  cooperatively with other developers to facilitate the
11  issuance of their permits.  It did not do so with Michael
12  and Lisa Ballantine.
13    It did not write letters asking them to submit a
14  redesign of its site plan like it explicitly did for Sierra
15  Fría at A-32, QDB2 at C-116, and Mirador del Pino at R-167.
16  Instead, it told them to buy another site.  We heard
17  Mr. Navarro say that several times.
18    "So, they asked them to move the project.  But
19  they didn't say, 'You need to redesign the project within
20  the area you're submitting'; correct?"
21    "Correct."
22    The evidence is plain, and I just want to
23  highlight a few documents on this point.  La Montaña.
24  After rejection, the developer asked for reconsideration,
25  and it was granted.  He has a permit.  He states, "I

1  modified the Master Plan pursuant to the guidelines and
2  suggestions of the Ministry," Jarabacoa Mountain Garden.
3  It was rejected.  It asked for reconsideration, and it was
4  approved.  In that sense, and assuming the execution of the
5  previous suggestions, the commission deems it
6  environmentally viable.
7    Mirador del Pino, permit approved in 2012.  In
8  order to approve the Project Mirador, it is suggested to
9  include the follow dispositions.
10    This is ultimately where Respondent's efforts to
11  make the Jamaca permit review seem like any other
12  evaluation falls apart.  It didn't pursue its rejections.
13  It didn't offer suggestions or modifications, and it
14  continues to rely on ambiguous, nontransparent
15  articulations of fragility and risk.
16    It did not issue Terms of Reference to establish a
17  framework for a dialogue, and yet all the permitted
18  projects, even those that were originally denied, received
19  Terms of Reference.
20    And so did Sierra Fría, who was rejected for the
21  very same reason as Jamaca.  The letter to Sierra Fría:
22  "The project is located in an environmentally fragile area.
23  The project is located on a slope of more than 60 percent."
24  After this denial letter was sent, it's been issued Terms
25  of Reference, and they're under consideration by the MMA.

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

1  We've heard the testimony, unrebutted, of
2  Claimants' witnesses who have said the owner of that
3  project has confirmed that he's going to get his license in
4  2018.
5  Now, we received this letter because we asked the
6  Respondent to produce any letter in which they had denied a
7  project for slopes of more than 60 percent.  They produced
8  a letter, this letter.  It's almost verbatim of the letter
9  that came to the Ballantines the first time.
10  "Environmentally fragile.  Slope of more than 60 percent.
11  Look, we've got a letter that shows they're not alone."
12  So, why are we here?  Here are the projects.  Here
13  are the comparators.  Let's just talk about a few of them.
14  I do want to say that it's important to know that
15  we're here to talk about all these projects because
16  Respondent wants the Tribunal to consider this issue in a
17  vacuum.  They want you to consider their treatment of the
18  Ballantines as if you only have to look at them.  They want
19  to say, as we saw in their opening as they marched through
20  the request, the denial, the inspection, the second
21  request, the denial, inspection, four requests,
22  five inspections, four denials, "Look, we did it by the
23  book."
24  But you can't look at Jamaca de Dios in a vacuum.
25  That's not why we're here.

1  We're here to see how Jamaca de Dios was treated
2  as opposed to Dominican-owned projects that are
3  comparators.  These are all of them.  We've heard evidence
4  about all of them.  We've seen documents about all of them.
5  We marched through them with Mr. Navarro.  We presented
6  them in the opening.  They're in our submissions, but I
7  want to highlight just a few.
8  La Montaña.  Permit was approved for 25 lots
9  earlier this year.  Less than four miles from Jamaca with
10  slopes that exceed 60 percent.
11  We saw how and why the project was originally
12  rejected.  Mass erosion due to the rainfall.  Slopes
13  between 36 and 60 percent.  A series of streams having
14  clear and constant flows.
15  If the project were to be carried out, it would
16  include construction of an access road running
17  approximately 7 to 8 kilometers from Pinar Quemado to the
18  planned project site, as well as the construction of main
19  roads, internal roads, up to 130 meters above sea level.
20  Therefore, cutting and removing and moving soil
21  material does not guarantee final disposal according to
22  circumstances and operationality that would affect the
23  drains, depressions and natural and nascent undulations of
24  streams that, when there is runoff and infiltration, may be
25  altered and contaminated.

1  So, we have soil, we have rains, we have slopes,
2  we have water.  We have the road.  Sounds environmentally
3  fragile.
4  The impacts:  Loss of a forested area, loss of
5  biodiversity, loss of species' habitat, possible
6  disappearance of the El Rancho stream and the unidentified
7  stream.  Should the project be implemented, it would
8  considerably and negatively affect the dynamic of the
9  ecosystems that interact for the conservation of the
10  forest, especially the area's flora and fauna.
11  The detail contained in the La Montaña inspection
12  report, the identification of the concerns, dwarfs anything
13  we saw with respect to Jamaca de Dios.
14  We have the minutes of the Technical Committee.
15  Rejected.  23 streams flow from the zone, which are the
16  primary source of the Jarabacoa aqueduct.
17  But the developer wasn't phased.  He appealed.  He
18  wrote a letter.  He said, "We have the best intentions of
19  sustainably using the areas of that property and,
20  therefore, contributing to the conservation of the
21  mountains of the La Vega Province and the Jarabacoa
22  Municipality.
23  "I envision the La Montaña ecotourist project as
24  offering a unique vacation option in Jarabacoa with the
25  lowest density in all the national territory and minimal

1  impact in order to appreciate the beauty of the area.
2  "The aforementioned project will protect the
3  entire area that borders and forms part of the buffer zone
4  for the Baiguate Park."  And his permit was granted.
5  Rancho Guaraguao.  Developed without a permit at
6  the same time as Jamaca de Dios.  It's in the Valle Nuevo
7  National Park.  It's located in Constanza, the second
8  tourism pole created by the Dominican Republic, with
9  52 homes up to almost 1900 meters.  It too is an ecotourism
10  project that received a fine earlier this year after it was
11  identified as a comparator by Claimants in this proceeding.
12  We've seen pictures of the project.  We can see
13  the cloud forest in the pictures.  We can see construction
14  in the pictures.  We can see a development with a
15  basketball court and a tennis court.  We see homes on the
16  mountain.
17  Indeed, the Ministry of Tourism paved a road to
18  the front gate of Rancho Guaraguao, but now the MMA has
19  come out and said, "You must halt construction."
20  Jarabacoa Mountain Garden.  This contemporaneous
21  comparator and the disparate treatment it received compared
22  to Jamaca is stunning.  The MMA didn't care about
23  identified environmental concerns that are in the record.
24  They ignored a change in the pattern of the runoff into the
25  Baiguate River.  They ignored property on slopes in excess

1   of 60 percent.  They ignored the road steepness and direct
2   cuts across contour lines.
3           They ignored active water on the property.  In
4   fact, during the tour, they found ravines with permanent
5   water, and they had pipes in them.
6           We asked, "What was the objective of the pipes?"
7   But they did not know the explanation.  It's unclear
8   whether anyone did get an explanation.
9           They ignored the ecological destruction that would
10  occur.  Intervention on this land means the destruction of
11  the habitat due to the elimination of the vegetation, the
12  migration of the species of fauna associated with such
13  vegetation, and contamination of the water.
14          It ignored the visual evidence of erosion and
15  landslide that were photographically attached to the
16  inspection reports.
17          And indeed, it only looked at 5 percent of the
18  project.  "It should be noted that the tour took in
19  5 percent of the total surface area of said land due to the
20  fact that topography is irregular, which is why we decided
21  to leave.  As was said before, the land could be
22  impossible--impassable."
23          But apparently the topography is not too irregular
24  to build a series of roads totaling 4.5 kilometers.
25          The MMA accepted the promise of this developer too

1   to be good.  He submitted a descriptive report about his
2   project, and it's from Santiago Duran.  And he says:
3   "Taking advantage of the avenues that already exist, the
4   owners of the land has had a vision of dividing the land
5   into lots and bringing sources of revenue into the area by
6   promoting a lot division tourism--a lot division project
7   with ecotourism characteristics."
8           We heard a lot of confusion from Respondent about
9   "What does this vision mean?"  It's apparently the same
10  vision that Jarabacoa Mountain Garden's owner had and the
11  vision that we heard José Roberto Hernández testify to
12  yesterday.
13          Respondent is still accepting that--excuse me.  He
14  made another promise.  He said, "Despite its mountainous
15  characteristics, it has a high percentage, 60 percent, of
16  mild slopes, slopes of less than 15 percent.  The steeper
17  slopes are intended to be left as areas of protection and
18  beautification of the surroundings."
19          We've now seen Mr. Navarro's slope map that
20  identifies the slope percentages for Jarabacoa Mountain
21  Garden.  We discussed it yesterday, and he confirmed
22  78 percent of the slopes of Jarabacoa Mountain Garden were
23  in excess of 40 percent.
24          The developer here is saying 60 percent of my
25  slopes are less than 15 percent.  And it appears the

1   Respondent is still accepting that promise today.
2           In Mr. Navarro's report he quotes from this letter
3   and cites to it.  "The developers of this project agreed to
4   limit development to areas with soft slopes, about
5   60 percent of the land, and to maintain areas with stronger
6   slopes as protection areas and beautification of the
7   environment."
8           Either Mr. Navarro believes that anything less
9   than 60 percent slope is a soft slope, or he was simply
10  parroting the letter that Mr. Canela Duran wrote.
11          We have it again here.  This is the site plan.
12  All of these lots have slopes in excess of 60 percent, and
13  we learned that that doesn't matter.  We learned if you can
14  find a small area in any of these lots where you can put a
15  house that takes up 5 percent of that lot, you can build
16  there.  It doesn't matter.  These slopes don't matter.
17          They mattered to the MMA when they denied Michael
18  Ballantine.
19          Let's talk a little bit about comparators.  These
20  projects are all comparators.  Respondent says there's only
21  one real comparator, it's Aloma Mountain next door.
22          But as the promoters' descriptions of these
23  projects make plain, as we see in the documents that have
24  been submitted, they're all trying to sell subdivided
25  mountain lots for residences in gated communities for

1   vacationers and tourists.
2           JMG is a perfect example.  That same report we saw
3   yesterday describes the facilities that are going to be
4   offered in the project.  Lot sizes, 2000 square meters,
5   electricity, water, guarded entry, 24-hour security, common
6   areas for recreation, common green areas, maintenance of
7   the hillsides and erosion control, individualized property
8   deeds; a description of facilities that sounds almost
9   identical to what was offered at Jamaca de Dios.
10          Aloma Mountain we can be brief on.  We had a lot
11  of testimony about whether there was still a development at
12  Aloma Mountain or whether there wasn't development or only
13  three houses or structures built in violation of the permit
14  matter.
15          As to Aloma Mountain, we have this picture.  We
16  have the picture of the mountain in December 2015, and we
17  have the picture of the mountain in September 2017.  The
18  mountain has been deforested.  Aloma Mountain doesn't have
19  a permit, and it's developing.
20          We know why.  We saw this email.  It's a political
21  bout now, as laws can always justify an argument depending
22  on the agenda.
23          So, why are we here?  We're here to look at the
24  comparator projects.  Respondent doesn't want to look at
25  the comparator projects.  You didn't hear much about them

1  in their opening.  I expect you're going to hear more about
2  Mr. Ballantine and questions about his vision and
3  intentions than you will about these projects.  But that's
4  what this case is about.
5       Let's talk about the Baiguate National Park.  It
6  was enacted in 2009 as part of a--32 protected areas that
7  were created in a one-year span.
8       Mr. Martínez said it was intended to act as a
9  bridge to connect to other protected areas, although the
10 Baiguate Park connects to no other park.
11      The decree that establishes the Park is
12 unambiguous.  It "Creates the Baiguate National Park, with
13 the aim of preserving the vast carpets of pine trees and
14 beautiful gallery forests, which combine in the middle
15 course of this river, where the walnut tree still appears
16 as a species."
17      But we know that the Baiguate River, the Baiguate
18 Falls and the beautiful gallery forests that climb up from
19 the river are not protected.
20      Professor Martínez now insists that the real
21 purpose of the Park is to protect what he's defined as the
22 Mogote System.  That's his three-mountain system that
23 includes Loma Mogote, Loma Peña, and a third mountain I
24 won't try to pronounce.
25      But none of these mountains or the system are

1  mentioned anywhere in the text of that decree.  The Mogote
2  System does not appear in the decree, and it does not
3  appear in the 2013 survey of the Park that recommended
4  expanding the Park to actually including the namesake
5  Baiguate River and the Falls.
6       You can search that entire document.  The Mogote
7  System doesn't appear.  The Mogote System doesn't appear
8  anywhere in the Baiguate Park management plan.
9       Respondent produced no field notes, no technical
10 dossiers and no maps about how they defined, articulated,
11 created the Park.
12      Indeed, you saw, on redirect, the single document
13 that supports the creation of the Park was an article from
14 the year 2000 about vegetation and flora on the Mogote
15 Mountain.
16      So, this is the map.  We went over it yesterday.
17 And we see the Baiguate River flowing out of the Park and
18 continuing up to the falls between the Baiguate Park, the
19 Jimenoa monument, and the Ebano Verde Reserve.
20      But Martínez says he protected the river and the
21 falls with the boundaries he created.  He said what's
22 important to protect is that the source of the river is
23 protected.  This despite that the last 3 miles of the river
24 don't have protection.  Martínez admitted runoff from
25 either side of the Baiguate will end up in the river.  And

1  the MMA now admits that the Park should be extended to
2  include the river and the falls.
3       We saw the recommendation.  Extending the Park
4  would actually create the ecological corridor described in
5  the Gap Analysis and create the bridge to the Salto Jimenoa
6  National Monument just across the Baiguate River.  But
7  nothing has been done in the five years since the
8  recommendation was made to expand the Park.
9       Most tellingly, Mr. Martínez could not answer why
10 the Salto Jimenoa Monument boundaries exactly trace the
11 borders of Paso Alto.  This despite the fact that the
12 ridgeline of Loma Barrero is above Paso Alto and when so
13 many of the Park borders follow the ridgeline of the
14 mountains, except when they come sometimes to projects.
15      He did say, "I didn't work on that map."  And it's
16 true that this map is not his.  But the border map is, and
17 the preferential boundaries of Paso Alto are as plain as
18 day.
19      He insists no property interests were considered
20 when the boundaries were drawn.  He didn't know where
21 anybody was.  He had never heard of Jamaca de Dios.
22      But if we look at where the boundaries of
23 La Montaña, Quintas del Bosque, Paso Alto and Jarabacoa
24 Mountain Garden and the influential property owners that
25 abut the Park, Mr. Compagniet, Mr. Valerio.  That tells a

1  different story.  The boundaries of the Park border both La
2  Montaña and QDB.  We know that because we've seen the
3  communication between those property owners and the MMA
4  about how close they can get to the buffer zone.
5       And we saw the map.  It's Martínez' own map, and
6  he described the hydrological umbrella created by the
7  Park's borders because the borders are on the ridgeline,
8  and a bowl of protection is created.
9       But when the Park comes to its northern edge near
10 Loma Peña and Jarabacoa and Jamaca de Dios, it drops down
11 from the ridgeline.  That's because we have to protect the
12 Yaque River, the most important river in the country.
13      We see it in Martínez' map.  The boundary cuts
14 across halfway down the mountain, goes directly through
15 Jarabacoa Mountain Garden.  Mr. Martínez says, "I was
16 protecting the Yaque River."  But if we look, Quintas del
17 Bosque is almost on the Yaque River, and it was left out of
18 the Park.
19      At the end of it all, it doesn't make sense.  The
20 borders of the Park don't match the purported
21 justifications for the Park.  Dominican projects are out of
22 the Park, and Jamaca de Dios is in the Park.
23      And so what does that mean?  What does it mean to
24 be in the Park?  We still don't know whether development is
25 or is not permitted in the Park or what development is or

1    isn't permitted in the Park.

2        The week began with the Tribunal asking a question
3    to Respondent during opening.  "So, just to make sure I
4    understand the facts correctly, is there a prohibition on
5    all development due to the status of the Baiguate National
6    Park, or, under some circumstances, can you still build in
7    the National Park?"

8        "That's something I'd like to consult with the
9    team regarding, and it's for the following reason.  I know
10   that sounds like a very simple question to answer."

11       It's not.  And the conflicting testimony from
12   Respondent's witnesses and a lack of response from
13   Respondent's counsel still haven't answered the question.

14       What does it mean to be in the Park?

15       Well, we do know that the Baiguate Management Plan
16   does not define what ecotourism activities will be allowed
17   in the Park.  We do know that no Dominican regulation has
18   been passed defining ecotourism, although Professor
19   Martínez insisted that the country was bound by the U.N.
20   resolution on that issue.

21       We do know that the Respondent has specifically
22   defined development limitations in other parks, including
23   density restriction, limits as to house size, and
24   permissible construction materials.

25       And we do know that the Ballantines' property is

---

1    zoned for ecotourism and was defined by the MMA as an
2    ecotourism project as of 2014.  So, counsel was right, it
3    is not a simple answer.

4        Ultimately we do know that the Ballantines' permit
5    request was rejected for the very first time in
6    January 2014 on the basis that their expansion project was
7    located in the Baiguate Park.

8        We do know that the Ballantines learned of the
9    Park in September 2010 but had no reason to believe that it
10   would limit their development because it was not mentioned
11   by the Respondent in any communication with the Ballantines
12   over the next 3 1/2 years until January 2014.  This
13   included a renewal of the Phase 1 permit in which part is
14   in the Park.

15       When the Park was used to deny their permit in
16   2014, the Ballantines first suffered harm from its
17   discriminatory and arbitrary borders.  And they suffered an
18   indirect appropriation for which they are entitled to
19   compensation--expropriation for which they are entitled to
20   compensation.

21       And that's why Respondent calls the issue of the
22   Baiguate Park a red herring, because it knows it's an
23   expropriation, and it doesn't want to pay the Ballantines.

24       Thank you.

25       PRESIDENT RAMÍREZ HERNÁNDEZ:  Ready?  Oh, sorry.

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1        MR. BALDWIN:  Good morning, Mr. President, Members
2    of the Tribunal.  I'm going to talk briefly about the
3    environmental experts and then talk about jurisdiction, and
4    then Mr. Allison will finish up with the damages
5    discussion.

6        So, I have here what's pulled up from Page 1149 of
7    the transcript, and this is a question that Mr. Herrera
8    asked yesterday to Mr. Booth.  And I found this a very
9    striking exchange.  And I think this question, not the
10   answer--we'll get to the answer.  But this question
11   perfectly summarizes what Respondent is hoping to do in
12   this case and its strategy.

13       And it also shows the flaw in the strategy because
14   I think Mr. Herrera only asked Mr. Booth one question, and
15   this was the question:  "Is it important to have visited
16   other projects to determine the environmental impact of the
17   expansion project?"

18       Of course, if you're looking at the environmental
19   impact of one property, why look at the others?  However,
20   it's not the answer that's wrong, it's the question that's
21   wrong.  Because the question here is not whether or not
22   that the development of the Ballantines' property would
23   have some effect on the environment.  Any rational person
24   would say yes, of course it would have some effect on the
25   environment.

---

1        The question is whether that effect is similar,
2    the same, less than the other properties.  In particular,
3    with regard to whether or not the decision to deny the
4    Ballantines and allow the others amounts to discrimination,
5    arbitrary, any other of the things we've discussed under
6    the minimum standard.  Expropriation also has, of course, a
7    discrimination element to it, and, of course national
8    treatment.

9        So these other properties are key here.  And the
10   fact that the Respondent only suggested to these experts to
11   look at that really makes both Mr. Deming and Mr. Booth's
12   reports irrelevant.  But just to make sure, we're just
13   going to talk about them for a moment.

14       I seem to be having some computer problems here,
15   so just give me a moment.  I'm going to put this on
16   Mr. Allison's computer.  Hold on.  Okay.  We'll try this
17   and see how it goes.

18       So Mr. Deming.  As we stated, Mr. Deming did not
19   give any other information about other projects.  You could
20   tell from his testimony.  He admitted that, you know, he's
21   a U.S. guy.  He's talking about what you might do when you
22   build such a road in the United States.  Nothing about how
23   one gets built in other places, nothing about the Dominican
24   Republic.

25       If you look at Mr. Deming's Report, he never

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1   viewed possible routes for the road.  I mean, that seems to
2   be key.  If you're looking at what the road is going to do,
3   why wouldn't you map out some routes to see whether a road
4   is feasible.
5           He never even saw--he talked about development in
6   slopes over 60 percent.  And we've shown that there's--all
7   these other projects have roads.  In Mr. Kay's Report,
8   Appendix A to his Second Report, he shows that all these
9   roads had--all these projects had slopes over 60 where they
10  were building.
11          And Mr. Deming never bothered to find out whether
12  or not such a road could be built on Jamaca Phase 2.  And,
13  in fact, it was Mr. Kay's testimony--and, you know, he
14  wasn't asked about this by Respondent--that you could have
15  avoided slopes over 60 percent in building the Phase 2
16  road.  And I want to explain one thing about that.  Because
17  you look, and you can see the map of the project, and you
18  can see there's the black that shows the slopes over
19  60 percent.
20          But those slopes are based on contours.  So within
21  a certain segment of land, let's say 20 meters, a pretty
22  common contour.  If you take that 20 meters from top to
23  bottom, it may have a 60-percent slope.  But in that
24  20 meters, you may have flatter portions that are below 60,
25  and then you may have other portions that are above 60.

1   So when you see something has 60-percent slopes,
2   it doesn't state whether or not every piece--every, you
3   know, square meter of that--of that section has a 60-degree
4   slope.  Because it's not even.  The mountains are not, you
5   know, created that way.  Geological forces don't work in
6   perfect harmony.  So this is what you have.
7           Now, I do want to talk about the route he used.
8   Because you can see Phase 2 is pretty big.  And Mr. Deming
9   only decided to go where the yellow is.  And if you look to
10  the right, we have Demonstrative 01.
11          You can look that Mr. Deming decided to go and
12  look and basically pretty much follow the areas of the
13  heavy slopes as you see outlined there, or the slopes that
14  are more than the other slopes.
15          So I would say that, you know, we all know what
16  the slopes are.  And I think this shows what--I think this
17  shows what Respondent was doing at Jamaca, in addition to
18  the fact they didn't look at anything else.
19          Now, let's talk about Mr. Booth's report.  He said
20  that-you know, he admitted, too, that he had no information
21  about other properties.  Even my own client said "Asked and
22  answered," when I asked about the fifth time about
23  different things.  So he didn't have any information about
24  that.
25          If you look through Mr. Booth's Report--and I

1   didn't spend time with him on this because he didn't have
2   information about other properties.  It didn't matter.  But
3   if you actually look at the Report, he makes a lot of
4   discussions about development in a wooded area has an
5   effect.
6           He talks about, "Well, there's loss of bird
7   habitats.  There's soil erosion that happens when you cut
8   down trees."
9           A lot of it had to do with cutting down trees.
10  You know, when you cut down trees, there's a negative
11  effect on the environment.  Again, that's true.  But,
12  again, that is meaningless in this case unless you look at
13  it compared to the other properties.  So, yes, we agree
14  that cutting down trees and developing can have an effect
15  on the environment, which is essentially what Mr. Booth
16  says.
17          Now, I just pulled this out because this is one
18  example.  And Mr. Booth, who I have to admit to having a
19  certain affinity for, he talks a lot about how these
20  projects affect climate change and everything else.  Again,
21  all true.  But, you know, whether or not it's helpful to
22  the Tribunal is a different question.
23          But this is one of his opinions where he talks
24  about any forested area creates issues.  And he was talking
25  about how chopping down trees affects the bird population.

1   And he says, "Maintaining these bird populations is
2   important not only for their contributions to the
3   ecosystem, but also because unique bird species bring
4   ecotourism dollars to the neighboring region from bird
5   watchers eager to add species to their lifetime list."
6           Now, anybody that reads this would have to have my
7   affinity for Mr. Booth.  Because what he's essentially
8   saying is, you know, "Maybe you should think about not
9   developing any of your wooded areas so that you can take
10  advantage of the lucrative bird-watching industry tourism."
11  So--but it's not relevant to this case.
12          And just to put here, he does mention of the
13  20 bird species identified at Jamaca de Dios by
14  Mr. Richter, none, just for what it's worth, were the ones
15  that are actually threatened.  So it's not even an issue
16  with the birds.
17          I took this one picture from Mr. Booth's Report.
18  It's on Page 55.  And he has several pictures.  But if you
19  look at his description here in Photo 3, he says, "Panorama
20  looking down-slope and generally to the north showing
21  mosaic of highly disturbed areas with no trees to
22  grassy/pasture areas to the forest," et cetera.
23          What's interesting is he's on Phase 2 taking this
24  picture.  But if you look at what he's talking about where
25  he says "areas with no trees," you can see in the--sort of

1  the upper part to the right of there, you can see an area
2  where there's a lot of trees cut down.
3       As we've seen from other pictures, that's actually
4  Aloma Mountain.  So when he says here that you can see
5  "highly disturbed areas with no trees," he's not talking
6  about Phase 2.  He's talking about that area up there,
7  which is Aloma Mountain, which Mr. Richter reports--or
8  states in his Report that when he was there in August of
9  2017, the cutting down of those trees was occurring at that
10 time.
11      Now, Respondent didn't--did not cross-examine
12 Mr. Richter or Mr. Potes, both of whom submitted a Report
13 with a Reply.  I'm not going to go into those now.  But I
14 just--I would ask that the Tribunal look at those.  Because
15 both Mr. Richter and Mr. Potes talk about the other
16 projects.  They did have some access to the other projects.
17 So if the Tribunal actually wants an expert opinion that
18 both looked at Phase 2 and looked at those other projects,
19 then I suggest Mr. Richter's.  And he makes, you know,
20 observations about Aloma Mountain, Jarabacoa Mountain
21 Garden, Quintas del Bosque, and--all of which are--and
22 Rancho Guaraguao, all of which are highly relevant here.
23      So let's talk about jurisdiction again.  Now, I
24 didn't spend really any time talking about the--just
25 briefly talking about when the nationality issue matters.

1  But there was some questions about it from the Tribunal, so
2  I want to spend more time on it now.  I will say, before I
3  get into any of this, that I think the discussion of when
4  is not that important because I think that the evidence
5  shows--and we're going to go through it--that the
6  Ballantines, Michael and Lisa, each were--have always been
7  dominant and effective U.S. nationals.  But let's talk
8  about this since Respondent spent a lot of time on it in
9  their opening statement.
10      First off, there's been discussions of Nottebohm.
11 And, certainly, those things have relevance to the
12 analysis.  What they don't have relevance to is the
13 framework.  Because Nottebohm, for example, arises in the
14 context of investor--or I'm sorry, in the context of
15 diplomatic protection, a State invoking its sovereign
16 rights on behalf of an investor.  Those arise from a set of
17 international law that, you know, has--that has changed
18 since Nottebohm I'm sure, but that arises from
19 international law.
20      CAFTA, we have to look at the text.  The text of
21 CAFTA is what matters.  Now, international law has things
22 to say when the text is not clear, but it is the textual
23 analysis that we need to do.  So we're going to talk about
24 now.  We talked about this before.  We talk about this is
25 the definition of "investor of a Party."  And this is the

1  only place--the only place in CAFTA, in Chapter Ten, where
2  this dual nationally dominant and effective appears, and it
3  relates particularly to this definition.
4       Now, the CAFTA drafters could have put this
5  definition when they talk about what it means to be a
6  Claimant.  They could have put it when it talks about the
7  scope section, when they talk about when you actually have
8  a claim.  They could have made it clear in the text that
9  you have to maintain dominant and effective at particular
10 points, but they didn't.  They put it in one place, and
11 that's the investor of a Party.
12      So it's our view that this dual national provision
13 speaks to the definition of "investor of a Party."  When
14 you meet that description--in other words, when you are
15 attempting to make an investment, you are making an
16 investment, or you have made an investment--if at that
17 time, your dominant and effective locks in to where you
18 are.  So this says to us that that this is what it means.
19      Now--but what Respondent says is--Respondent--I'll
20 get to the slide in a second.  But Respondent does its
21 nesting dolls, and the U.S. submission does the nesting
22 dolls too, the Russian nesting dolls, and basically says,
23 you know, you have to take--you take investor of the Party,
24 and then every time that word "investor of the Party" is in
25 another provision of CAFTA--so if "investor of the Party"

1  is a definition, every time that definition appears
2  somewhere else, what Respondent is essentially saying is
3  you have to do the same nationality test every time.
4       So every time it appears, you do the same
5  nationality test.  Right?  Okay.
6       Now--so I took a look at the CAFTA text, and I
7  said, "Let's take the Respondent's approach of
8  incorporating the entire definition and doing what the
9  requirements of that definition are and let's do it to
10 other portions of Chapter Ten."
11      So let's look at this.  CAFTA's definition of
12 "investment" is--"investment" means "every asset that an
13 investor owns or controls directly or indirectly."  "Owns
14 or controls."  Okay.  So the question is, is--the term
15 "investment" appears all through Chapter Ten, of course.
16 Because, in fact, Chapter Ten is the investment chapter.
17      So if we take this, this means that to be a
18 Claimant--and as they point out, you only become a Claimant
19 when you submit the arbitration.  To be a Claimant, it
20 means an investor of a Party that is a Party to an
21 investment dispute.  An investment dispute.
22      And I think we would all know--I mean, it's sort
23 of so basic, I'm embarrassed to say it, but I think it does
24 need to be recalled.  In order to bring an investor-State
25 treaty claim, you have to have an investment.  Okay?

1    Now--but if we take this definition of
2  "investment" to mean something owned or controlled and we
3  read it in and we do our--I'm not going to do the nesting
4  doll thing that the Respondent did when they did theirs.
5  But if we do it, we can say, "Claimant" means "an investor
6  of a Party that is a Party to a dispute over an asset that
7  the investor owns or controls with the other Party." Okay?
8  You can read that in.
9    Now, what about when the State deprives--what
10  about if you had a case here where you had a Respondent
11  that actually followed expropriation rules and they come in
12  and they take physical title to your property. They take
13  physical dominion, take physical property. As a legal
14  matter, you have no ownership, no control over that
15  investment.
16    Now, under this nesting doll approach that
17  Respondent and the U.S. has advocated, you couldn't be a
18  Claimant because you don't have an investment dispute.
19  Because at the time you submit the claim to arbitration,
20  you don't have an investment because you don't own or
21  control that asset. Okay?
22    The same--and you can see the submission of the
23  claim to arbitration. It says, "In the event that a
24  disputing Party considers that an investment dispute cannot
25  be settled." "Investment" appears again.

1    The scope and coverage. So the idea of--the idea
2  of this chapter applying, the scope and coverage of the
3  entire chapter applying, it applies to covered investments.
4  If the investment is taken away, you don't even have an
5  investment--you may not--I'm going to give an example of
6  this. You may not have an investment even--you may not
7  even have an investment where--at the time that the claim
8  arises.
9    Now, you say, "Well, how can you not have an
10  investment at the time the claim arises?" Because if the
11  government comes in and they take your property, then when
12  they took the property, the claim arose, and so you have
13  one if the claim arises.
14    But let me give an expropriation example. Let's
15  say we had a Respondent that respected private property and
16  they come in and they expropriate your property, take
17  title, take possession of that property. Okay? And they
18  give you a judgment that you go--you know, you basically go
19  to court, like in the U.S. You know, when property gets
20  expropriated in the U.S., the government will give you
21  their estimation. You can go to the Court and you can get
22  a proper--if you don't agree, you can get a proper
23  expropriation amount.
24    Now, let's say that happens in the U.S. and your
25  property gets taken away, you lose it. You don't own or

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1  control it anymore.
2    So what happens? You go to the court. You get a
3  judgment of a certain amount of money. Now, let's say that
4  judgment is prompt, adequate, and effective. So you get
5  the money, but now you have a judgment. You get this
6  judgment. But you can't collect on the judgment. The
7  government won't pay. It decides not to pay.
8    CAFTA states that a court judgment is not an
9  investment. So now you're stuck with a court judgment.
10  The claim arises when the government won't pay this court
11  judgment.
12    But under this nesting doll thing, you can't even
13  bring--you don't even have a claim. Because at the time
14  the claim arose when the government had it, you don't have
15  an investment. Your investment is gone if you incorporate
16  that definition of "investment" in it.
17    So what the U.S. is suggesting, what Respondent is
18  suggesting is, in essence, ways--that there are many
19  examples if you do this nesting doll approach where you're
20  not going to have an investment. And you can see the
21  Russian word for "disaster" over there, "catastrophe," over
22  on the side. That's what you would have if you followed
23  this type of logic.
24    Now, as we've stated that the--it's--you know,
25  the--in addition to the--you know, we've seen the CAFTA

1  text says one thing. International law also doesn't
2  require that you have to be a--you know, dual nationality,
3  that you have you to be dominant and effective at the time
4  that you submit the claim to arbitration.
5    And just to give an example of that, the U.S.
6  Claims Tribunal--what the U.S. Claims Tribunals looked at
7  was--they said okay. You had to be when the--you had to be
8  a dominant and effective when the claim arose, and you had
9  to be dominant and effective on the effective date of the
10  Algiers Accord, which was 19 January 1981.
11    Now, Parties could bring claims after the Accord.
12  They had until 1982 and sometimes even longer to bring
13  these claims to the U.S. Claims Tribunal. So, if you
14  brought a claim in 1982, that would be okay because they
15  would look back and say, "Were you dominant and effective
16  in 1981?" and not even look at 1982. So it's not as if
17  there's some universal concept of international law that
18  requires this outside the text. Also, this just makes
19  sense.
20    Okay. Chapter Ten is about investment. The idea
21  is to encourage foreign investment. Okay. And that means
22  that you look at the dominant and effective nationality at
23  the time the investment is made.
24    Here you have the type of situation where
25  Respondent's formulation and the U.S. formulation would

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1  mean that you could have situations where you have a purely
2  domestic investment.  I invest in the United States, okay,
3  as a U.S. citizen.  Five years later, four years later,
4  whatever, I move to Canada.  I become a dominant and
5  effective Canadian, which I've thought about before, and
6  then I sue the U.S.  And I sue the U.S. over a domestic
7  investment because that's what it was when it was made.
8          Now, let's then get to the evidence here.  Because
9  I said I don't think it matters very much.  I think the
10  evidence of dominant U.S. nationality for both Michael and
11  Lisa is pretty substantial.
12          So when did they become Dominican citizens?  That
13  matters.  The Ballantines were in their 40s when they
14  became dual nationals.  Lisa was 42.  Michael was 45.  The
15  first denial--and they became citizens in 2010.  Thank you.
16  I knew that.  But in 2010.
17          Now, the first denial--when you're aware the claim
18  arose--happened in 2011.  So they spent 45 years in the
19  United States.  Okay.  They're here for a year.  Do they
20  all of a sudden become that?  The claim is filed in 2014.
21  Still, four years after they move--or after they become
22  Dominican citizens.  In those four years, was that 45-year
23  history and connection and cultural attachment to the U.S.
24  lost for this?  No.
25          You don't destroy a lifetime of attachment in--it

1  should be four years.  It says five.  But you don't destroy
2  a lifetime of attachment in five years.  That's just silly,
3  as we like to say on our side.
4          Now, why did Lisa Ballantine take Dominican
5  nationality.  On rebutted testimony, she says, "I became a
6  citizen of the D.R. to protect our investment.  I was
7  concerned our children could lose it."  Unlike Michael,
8  Lisa took Dominican citizenship only so that her children
9  would not lose her investment.  That was the reason.
10  Nothing about "I just felt this--you know, I felt like I
11  had to be Dominican and didn't want to associate with the
12  United States anymore."  She did it for--purely for
13  economic reasons, protection reasons.
14          Now, why did Michael Ballantine take Dominican
15  nationality?  This was in his examination.  He says, "I
16  obtained dual nationality because I was concerned about our
17  family and the investment.  And in case of my demise or
18  Lisa's, I felt like that would be a better process to leave
19  with my children in terms of probate."
20          And this is where he differs partly from Lisa.
21  "And I had faced discriminatory treatment prior to that and
22  some people wouldn't buy because I was an American, and I
23  thought that would help for business purposes."
24          So it was a commercial thing so that the people he
25  was dealing with economically in the Dominican

1  Republic--not government officials--that's not what this
2  testimony says--would do it.
3          He talked about how, you know, "Nobody wants to
4  buy from a gringo who is not even going to stick around.
5  We want someone that's going to be there."
6          That's why he did it.  Again, no attachment.  And
7  they haven't stated any other thing to state there was any
8  attachment.
9          Now, why does one take another nationality?
10  Mr. President on that second day, you know, was asking
11  Mr. Ballantine a question.  And getting a naturalization,
12  it's a--it's, for many people, a big step.  It's like
13  having another flag.  It has a lot of emotional--you know,
14  it entails an important decision.
15          Okay.  Now, I'm not sure that applies all across
16  the board.  And I'll just give an example.  Again,
17  Mr. Allison made me promise I wouldn't bring up Haitians.
18  But I do want to bring up immigration law.  Because in the
19  U.S., if you're a permanent resident, you can be a
20  permanent resident for 30 years.  And if you have a drunk
21  driving accident that ends up hurting somebody, or
22  sometimes even it doesn't, or a low-level battery even, you
23  can be deported for that crime.
24          Now, does that mean that permanent residents of
25  the United States that take U.S. nationality all do it

1  because it's a big emotional decision?  No.  They do it
2  because they say, "Look, I have family here.  I don't want
3  to risk having some drunk driving issue and then being
4  forced to never see my family again in the United States or
5  being forced to leave the United States personally."
6          I bring that up just to say there's lots of
7  reasons that people take it.  And it's not always--not
8  always an emotional issue.
9          As far as personal attachment goes, Michael
10  Ballantine testifies that they never assimilated
11  culturally.  This is a supplement statement at 4.
12  "Although we always tried to be respectful of Dominican
13  culture and its people, we did very little to assimilate in
14  the Dominican culture.  We never felt like we were
15  Dominicans, never acted like Dominicans, and nobody
16  perceived us at Dominicans."
17          And there is--I would challenge--you know, say is
18  there anything in the record to contradict this?  Now,
19  there's social media posts.  There's exuberant statements
20  that are made.  But this does not mean  that they had
21  assimilated into the culture.
22          And when Lisa Ballantine says, "I'm a Dominican
23  now," that's not an assimilation statement.  That's a
24  statement of fact.  But actual assimilation evidence, I
25  don't see any.

1   Now, we're going to--we talked about the social
2   media things that are whimsical and everything else.  But
3   there are several letters in the record that are important
4   because--excuse me.  They're emails.  People don't really
5   write letters anymore.  There are several emails in the
6   record.  And these are emails where Michael Ballantine is
7   writing to his father.  Lisa Ballantine is writing to a
8   close friend.
9   We would suggest that instead of social media
10  posts, it's these letters--these emails--excuse me--that
11  are relevant.  Because they're personal things said to
12  close friends that better--contemporaneously that better
13  express the thing.
14  So here's Lisa in 2003 (sic).  "I haven't really
15  made friends here in the D.R.  It is a different culture to
16  connect with, and I am an outsider."  This isn't done for
17  the arbitration.  This is her talking to a friend.
18  "There's a nice expat community"--so she's dealing with
19  expats--"but they are very transitory.  I am pretty lonely.
20  I work a lot, run a lot, knit a lot."
21  There are other emails to close friends.  This one
22  where Michael Ballantine, at C-63, refers to the D.R. as a
23  "foreign country."
24  In 2002, "Lisa"--I'm sorry.  2012.  Thank you.
25  "Lisa Ballantine revealed to a friend that she was dreading

1   her return to the Dominican Republic."  That one was in
2   2013, I think.
3   And Michael Ballantine, as I mentioned, wrote to
4   his father and told him that he "couldn't wait to get out
5   of this place."  And that's in Exhibit C-166.  And you see
6   the other exhibit numbers up there.
7   Now, Mr. Di Rosa asked Mr.  Ballantine a couple of
8   questions.  And, you know, Mr. Ballantine says, "Oh, we
9   didn't have a Dominican home."  Mr. Di Rosa, says, "Well,
10  what do you mean?  What's a Dominican home?"  You know, I
11  think he probably had a lot of expectation for that
12  question.
13  Because you go--like you see somebody say,
14  "Dominican home."  You're, like, "Oh, they don't--well,
15  there's no Dominican homes.  They're just homes."
16  But this is Mr. Ballantine's answer.  "Dominican
17  homes are often designed where there is a separation where
18  there's a maid--separation where there's a maid and
19  servant's area."
20  And I apologize for this transcript.  I don't know
21  if Respondent had the same problem.  But the final version
22  on the second day was missing this national--this
23  nationality stuff, but I think they're fixing it.
24  So I had to use the draft.  "Ours is a big
25  American open floor plan.  We speak English.  We made food.

1   We entertained like Americans.  The food we ate.  Our home
2   was totally American.  And it was an obstacle to sell it
3   because it was constructed differently."
4   And there's testimony in the record that Lisa
5   Ballantine designed the home.  In fact, that testimony is
6   used to show a connection to the Dominican Republic by
7   Respondent in their opening that Lisa Ballantine--in
8   their--in their Rejoinder where, you know, Lisa Ballantine
9   designed that home.
10  Again, Mr. Ballantine had written in his thing
11  that they didn't act Dominican.  We saw that a minute ago.
12  So Mr. Di Rosa again, "What does it mean to act
13  Dominican? You know, do you"--I mean, he didn't say this,
14  but you can imagine what--you know, what the thinking was
15  there.
16  Well, this is what Mr. Ballantine said.  "Well, on
17  a lot of levels, there's cultural norms and the way people
18  interact with each other.  For instance, conflict, how to
19  enter into a conflict, to avoid it, how to resolve it.
20  There are some cultural things, holidays and the way people
21  relate.  It's a high-context culture where what's not said
22  is often more of the message.  Just acted like an American.
23  I would confront things head on."
24  Now, all of us in this room deal with
25  international issues.  We deal with different--from people

1   of different cultures and backgrounds.
2   Of course, people--of course, there's a way that
3   different people act.  It doesn't mean everyone acts that
4   way, but there's a way--you know, there's particular ways
5   that, you know, Japanese people tend to act versus the way
6   a Turkish, you know, businessperson might act.  So this is
7   just common sense.
8   Let's look at the center of the Ballantines'
9   economic, social, and family life, and let's look at family
10  first.
11  The children were born in the United States.  The
12  children did live for a few years in the Dominican Republic
13  while Michael Ballantine was developing and selling Phase 1
14  and preparing for Phase 2.
15  But they left in 2007 and 2010.  So the dates that
16  Respondent thinks are relevant here are--the kids weren't
17  even here.  They were all in the United States.  And they
18  left to go to school.  The testimony is that the children
19  left to go to school.
20  Now, Rachel Ballantine did come back with her
21  husband Wesley because, as we know, they were prepping and
22  sort of getting the stuff that they needed done for the
23  construction operation because Wesley was going to manage
24  the construction operation.  So they were in town in 2013
25  for a short period of--relatively short period of time.

1  But besides that, everybody gone.
2          And I--you know, we've looked at this slide
3  before.  But just, again, it's not only the children.  It's
4  everyone else.  No connection to the D.R. in terms of
5  family at all.
6          Now, what about economic connections?  Well, the
7  economic connections are to the United States, not to the
8  Dominican Republic.  The Ballantines always had U.S. credit
9  cards.  They never had Dominican credit cards.
10         Now, again, people that travel know when you use a
11 credit card--when I go and use a U.S. credit card overseas,
12 it's extra, you know, money that's associated with it.
13 There's transfer issues.  You know, it creates an issue.
14 It would be nice to have a credit card from every single
15 place that you go.
16         Never bothered to get a Dominican credit card.
17 They used their U.S. credit cards.  They always had bank
18 accounts in the United States.  Always maintained bank
19 accounts in the United States.
20         Michael Ballantine had an IRA account from 2009
21 onwards in the U.S.  And they had 529 college savings
22 plans, which I would advise to anybody to get if you're in
23 the United States because it allowed their children to
24 leave college debt free which, in this day and age, is
25 quite a miracle.

1          Personal tax returns.  They filed personal tax
2  returns in the U.S. every year.  Every year.  They listed
3  U.S. addresses as their residence.  Now, the Respondent
4  takes issue about them, you know, being in an airport
5  hangar.  But the fact of the matter is, they
6  didn't--there's lots of expats.  There's expats who file
7  U.S. tax returns, and they don't have a U.S. residence.
8  And that--you know, there's ways to do that on a tax form.
9  The Ballantines did not do that.  And, also, they haven't
10 filed personal Dominican tax returns.
11         Lisa Ballantine's economic connections.  Let's
12 look at that first.  Lisa was involved in a non-profit.
13 Now, Respondent in the--as I mentioned in the opening, in
14 the "no good deed goes unpunished" category, tries to go,
15 "Oh, look, you know, she's got this non-profit.  She's in
16 the Dominican Republic.  That's a Dominican connection.
17 You know, that's some connection to the Dominican
18 Republic."
19         Well, that's not entirely true.  As you see from
20 Lisa's Reply Statement here at Paragraph 4, the non-profit
21 was actually headquartered in the United States, not in the
22 Dominican Republic.
23         And she says here, "I had established and was
24 running a non-profit organized in and based out of the
25 United States called FilterPure.  In the D.R., I was

1  working and partnering with local NGOs to develop their
2  water programs."
3          She was working with people, NGOs and others in
4  the D.R.  But the entity was in the United States.  And she
5  also states here in Paragraph 5--she states, "99 percent of
6  donations came from U.S. donors, so much of my time was
7  spent in the U.S."
8          So her economic--I mean, first off, there's a
9  question as to whether or not a non-profit is even an
10 economic connection.  The Tribunal can make that
11 determination.  But let's put that to the side and just
12 hypothetically state that it is, her economic connection in
13 this case is to the United States, even if some of that
14 work is done in the--even if, you know, that work is
15 done--part of that work is done in the Dominican Republic.
16         Economic connections to the Dominican Republic.
17 Michael Ballantine's economic connections to the Dominican
18 Republic--and we're going to get into some of these in a
19 moment--are loan agreements, contracts, bank accounts.
20         Now, I think we have to think about different
21 types of investors here.  You know, if you're an investor
22 that has shares in a company and you're sitting in your,
23 you know, nice cabana in the United States and never really
24 going to the foreign country because, you know, you're just
25 a shareholder, it's operated and managed by someone else,

1  you're probably not going to have any economic ties other
2  than that investment itself with that host state.
3          But what happens when you're in the host state
4  managing the investment, totally managing it, and it's the
5  type of investment, a housing project with a restaurant, an
6  HOA, and everything else that you have to be there for?
7  Well, you're going to have economic ties to that country.
8          So, yes, you're going to do loan agreements.
9  You're going to do contracts.  You're even going to have
10 bank accounts because you need bank accounts to be able to
11 do business there.  And because you're living there, you
12 need a bank account just for the sake of living there.
13         Any managing investor, not a passive investor.
14 Any managing investor would have these same--there is no
15 economic connection that I see in anything that Respondent
16 says.  Nothing that is different than any managing investor
17 that had to be on-site for their investment would have.
18 Nothing else besides those things related to this.
19         So the economic connections with the D.R. should
20 not even be a factor.  Why should those factor in to a
21 dominant and effective nationality when he's required to
22 have those economic connections as a result of his
23 investment?  Shouldn't be considered.
24         Social considerations.  Let's look here at what
25 Lisa says in her Paragraph 7 here.  She says, "Beyond this

1  charitable work, my cultural connection to the D.R. is
2  limited."  She had American friends with whom she was part
3  of a Bible study group.  This is in the D.R. she's talking
4  about.  "And Michael and I had American friends with whom
5  we socialized frequently."
6      She goes on to say, "I had few Dominican friends."
7  That's what she says.  Her friendships and their--and she
8  wasn't called.  This is unrebutted testimony.  So the
9  friendships she had were mainly with U.S. people and a few
10 Dominicans.  And that's nothing--that doesn't say anything
11 about Lisa.  It's because there is a cultural divide.  It's
12 hard to bridge that cultural divide.
13     When you're an outsider, as she says she felt, and
14 you go into a foreign country--and it's a--really a lot
15 different culture than you're used to, it is going to be
16 hard to have those kind of close friends and close
17 connections.
18     The Ballantines attended American church.  Lisa
19 says in the same paragraph here--she says, "We attended an
20 American church in Jarabacoa when we were in town."
21     Now Respondent's counsel on opening day says, "Oh,
22 American church.  What is an American church?  How do you
23 have an American church in a place?"
24     Well, let me say that my mother is Lebanese.
25 She's a Maronite.  When growing up, we went to Maronite

---

1  churches in the United States.
2      So it's not as if you go to a place like the
3  Dominican Republic you can't have an American church.  If
4  you have Americans there and they sort of form a church and
5  most of the people are American and they do it in the style
6  of an American church, that's an American church.
7      Connections with groups.  Okay.  As far as the
8  Dominican Republic goes, Michael was connected with the
9  U.S. Chamber of Commerce--the American Chamber of Commerce,
10 AmCham.  Lisa, none.  None in the D.R.  And yet she was
11 still involved in the rotary group in the U.S.  So her
12 connections with clubs or groups was the U.S.
13 Nothing--unrebutted testimony--nothing with the Dominican
14 Republic.  No clubs.  No cultural attachments related to
15 clubs.
16     What about other attachments?  Now, the--you know,
17 I didn't want to put them all here and bore the Tribunal
18 with a long, you know--you know, a long reciting of the
19 different places.  But, obviously, they're in the Witness
20 Statements.  They're in our papers.  So I won't go over
21 them again.  But here's two big ones, I thought.
22     One is maintaining U.S. health insurance.
23 Obviously, an expensive venture, maintaining U.S. health
24 insurance the whole time.  Also having a gym membership the
25 whole time.  If you were moving to a country permanently,

1  not really having any connection to the former country, why
2  would you, you know, want to have a gym membership?  They
3  probably use their gym membership more in the U.S. while
4  being in the D.R. than I do my gym membership here in the
5  United States.
6      Now, let's talk about use of the U.S. passport for
7  travel.  And Respondent admits this too.  If you look at
8  Respondent's opening slide, they state that the--that the
9  Ballantines used the Dominican passport for coming into the
10 Dominican Republic.
11     So--but, as has been testified to, the U.S.
12 passport was used when traveling anywhere outside of the
13 Dominican Republic.  That includes the United States, but
14 it also includes the international destination.  And the
15 D.R. passport, as Respondent admits, is only used when
16 coming into the Dominican Republic.
17     Now, you can argue about, you know, different
18 things.  But, you know, every time--they made 30 trips in
19 and out of the United States in those years of 2010 to
20 2014.  $10 each.  You can do the math.  That probably saved
21 them alone the cost of their citizenship just by saving
22 that money and using that passport when they came in.
23     Now, the Ballantines have stated that they always
24 intended to return to the United States.  That it was never
25 their intention--Respondent is going to put up--I'm sure

---

1  they have it already set to go.  They're going to put up a
2  thing where the Ballantines say, "Oh, we're"--not the
3  Ballantines.  But there's a report and, you know, other
4  things that are said.  And they go, "Oh, we're selling our
5  possessions and going to the Dominican Republic."
6      What you won't see in that statement--even
7  assuming that the statement--you know, the statements can
8  be interpreted in that manner, what you don't see is
9  another part of that which is "never to return."
10     "I'm selling my possessions and moving to Hong
11 Kong."  Does that mean that I am not going to come back to
12 the United States?  No.  It's a statement of what you're
13 doing.  You're moving to the place.
14     They don't say in there, "And we're never coming
15 back to the United States because we have this strong
16 cultural connection to the Dominican Republic, a place that
17 we know relatively very little about."  That's not what
18 they did.
19     It was an exciting time.  We're moving to a
20 different place.  We're going to, you know--you know, start
21 a new venture.  You know, we're going to start an
22 investment, an enterprise.  That's what those statements
23 are meaning.
24     And, in fact, they did return.  Not into the
25 situation they wanted to, but they did actually end up

1 returning.  As soon as the commercial project was over and
2 they could do all the things they needed to unwind and make
3 sure the homeowners were protected, they got out of there.
4       Let's look at Respondent's evidence for a moment.
5 This is going to, you know, perhaps seem like a little bit
6 of hyperbole.  But there's very--when you really get down
7 to it, there's very little evidence in Respondent's
8 evidence that actually has any probative meaningful value
9 to this Tribunal, and certainly in connection with the real
10 questions at issue here.  So let's look at it.
11       Respondent's evidence of the Ballantines'
12 attachment to the Dominican Republic was explained in its
13 opening, and we're going to go through these.
14       They say:  And then, upon arriving in the
15 Dominican Republic, here's what the Ballantines did."
16       Now, what do you think they did?  Do you think--a
17 little bit of anticipation here.  Did they become Taíno
18 shaman?  Did they do some other thing?  What did they do?
19       Well, they built a house.  So people moving to the
20 Dominican Republic built a house.  I mean, I guess that's
21 good, because they needed a place to live.
22       They opened bank accounts.  You're in a place
23 where you're going to be staying.  You open a bank account.
24 I still don't see any connection--any particular attachment
25 to the Dominican Republic.

1       They met their neighbors.  They met their--I mean,
2 what a, you know, Dominican attachment is that, that you
3 met your neighbors?  They made friends, a lot of American
4 friends, as Lisa Ballantine testified.  But they made
5 friends.
6       This is overwhelming?  Respondent thinks this is
7 overwhelming evidence of Dominican connections.  They
8 joined a church, an American church, and they enrolled
9 their children in a local school?  I don't--I mean, Lisa
10 did homeschool the children for a while, but I don't know,
11 when your children are there, how you do anything other--if
12 you're not going to homeschool them, then enroll them in a
13 school.
14       And they created a charitable venture designed to
15 help their new community.  So, again sort of implying that,
16 well, Dominican people--such a connection to them, that
17 this charitable thing was designed to help the new
18 community.  This is the evidence.
19       We're going to look at a couple of these.
20       First, the Ballantines built a house.  They did,
21 in fact, build a house.  That's a picture of it.  But--and
22 this is C-180--they also decided to sell their house in
23 2012.  Not 2014, when they left, but they started the
24 process to sell their house in 2012, you know, evidencing a
25 desire to leave and to cut the connection even as of 2012.

1       They did meet their neighbors.  That's, in fact,
2 true.  And I give Respondent credit for the truth of this
3 statement.  And here's what is said.
4       The quote--the citation to that on the slide that
5 was used for this was to Michael Ballantine's statement at
6 13, and he says, "To be good neighbors, we immediately
7 allowed the landowners to our west--members of the
8 Rodriguez family--to use this 2005 Road to access their
9 farms.  We let the Rodriguezes use the 2005 Road without
10 issue for six years."  This is meeting the neighbors.
11       They made friends.  We've talked about this
12 already.  A lot of American friends, a few Dominican
13 friends.  They joined a church.  It's an "American church,"
14 U.S. church, I would say.
15       Now, the President mentioned this the other day.
16 And that is that the steps that were taken to acquire the
17 dual nationality should have no place in the evaluation of
18 whether there's a dominant and effective nationality.
19 Because it is that dual nationality that triggers the
20 examination, but it is not the examination.
21       In other words, in order to acquire the dual
22 nationality, it's already assumed that you're going to have
23 to take the legal steps to acquire this dual nationality.
24 So we're going to look at the sites here that Respondent
25 uses.  And I didn't even include them all.

1       But their section on dominant and effective
2 nationality is replete with documents and so-called
3 evidence that is just describing the legal steps the
4 Ballantines did to get that nationality.  And here it all
5 is.
6       They renewed their permanent residency, they
7 emailed the attorney about Dominican passport, applied for
8 naturalization, gathered and submitted document.  This is
9 all from Respondent's papers in their opening.
10       Sworn statement of domicile required.  They
11 identified Dominican references.  They passed a Dominican
12 history exam.  They passed a Spanish proficiency exam.
13 They swore an oath.  Respondent spends lot of time talking
14 about they swore an oath to be faithful to the Dominican
15 Republic.  Yes, dual nationality is assumed before you
16 undertake a dominant and effective nationality test.
17       Now, here's another thing.  So--there was a
18 question too about contracts.  And the issue was--this was
19 taken from Respondent's opening, Slide 32.  And in that
20 slide, okay, there's a--the quotes--the material in quotes
21 up here is what Respondent said.  And they said, "Look at
22 how many times the Ballantines"--not both the Ballantines.
23 And you see when it's both the Ballantines or only Michael.
24 They say, "Look at how the Ballantines used their Dominican
25 nationality."

1      So I just wrote after the quote "in the D.R."
2 Okay? So they voted. Yes, they voted, but they voted in
3 the D.R.
4      Now, the one where the quote is allowing the whole
5 thing is they do admit that they used the Dominican
6 nationality when they entered the D.R. So if you look at
7 Slide 32, you'll see respondent admitting that when they
8 used the Dominican nationality for passport purposes, it
9 was to enter into the D.R.
10      They used it to bring legal claims in the D.R.
11 There's no evidence that they brought a legal claim in
12 Chicago and used their Dominican nationality for that legal
13 claim. And they used it to apply for a business license in
14 the D.R. And they used it to enter into contracts and loan
15 agreements in the D.R. And these are all Michael--the last
16 three are Michael only.
17      And, again, I think these--these things, or the
18 last three particularly, are not relevant. Because they're
19 what needs to happen for Michael to manage his investment.
20 The investment is assumed in a CAFTA dispute.
21      I'm almost there.
22      So what about the contracts with the daughter?
23 There was a lot of mention about, well, it wasn't only with
24 the local people in town. He made a contract with his
25 daughter that--also where he said he was a Dominican

national.

1      Now, you'll recall that Michael Ballantine
2 testified that one of the reasons he did, so that he wanted
3 the commercial aspects, the people he was dealing with for
4 the project, to see him as a Dominican. It didn't work.
5 We've seen the gringo video. But that's what he wanted.
6 He wanted that to happen.
7      So, what is this contract with the daughter that
8 is talked about here? Well, it's a power of attorney where
9 Rachel Ballantine is giving Michael Ballantine power of
10 attorney with respect to Aroma de la Montaña. Okay? And
11 it's to acquire things for the company, obtain, receive.
12      Now, we all know what a power of attorney is used
13 for. Is this some private contract that's used between
14 Rachel and Michael that no one else will see? No. This is
15 what Michael Ballantine needs to bring to vendors, to
16 businesses, to everybody else, to be able to show that he
17 has power to deal with the things.
18      He's not bringing these to people in the U.S.
19 He's bringing these to Dominicans, to that. So that's why
20 his Dominican nationality is used in here. This isn't a
21 private contract.
22      Social media postings are not probative. They
23 express whims or satire. And, you know, as the President
24 of--the Prime Minister of Nepal can attest, they are not

1 always entirely serious. And, in any event, Lisa's social
2 media posts show a repeated reference to the U.S. as being
3 her true home.
4      Respondent's evidence of family ties. Children
5 left in 2007 and 2010. No others.
6      Habitual residence is discussed in the things, but
7 at all relevant times, according to Respondent's relevant
8 times, they had residences in both the U.S. and the D.R.
9      And so I will pass it back to my colleague,
10 Mr. Allison, who has a very short presentation on damages,
11 but I can assure you we will be under our time.
12    MR. ALLISON: Mr. Chairman, Members of the
13 Tribunal, we've had four expert reports and two witnesses
14 who have debated damage. So I will endeavor to be brief.
15 I simply wanted to discuss a few issues about quantum.
16      We've seen the standard that Metalclad v. Mexico
17 puts forward in which the award in investor-state
18 arbitration should wipe out the consequences of the illegal
19 act.
20      And, of course, other Tribunals have said there's,
21 of course, uncertainty in projections of future profits.
22 They're inherent, and it's inevitable, but they need to be
23 based on informed estimation. Those citations, of course,
24 are in our pleadings.
25      So the first element of the Ballantines' damages

1 is the lost profit from the Phase 2 lot sales. We've seen
2 discussions of this. They were going to put 70 lots over
3 283,000 square meters, which would leave 25 percent of the
4 land for the road, for green space, and for the hotel they
5 planned. Now, we've heard a lot about whether or not the
6 projections that Mr. Farrell made with respect to the
7 Phase 2 lot sales were accurate. But as the documents in
8 evidence before the Tribunal show, the Ballantines had
9 Phase 1 lots in Zone C, which is the higher part of
10 the mountain, between $78 and $107 per square meter
11 between 2012 and 2014.
12      Mr. Farrell, using his altitude analysis, started
13 the Phase 2 lot sales at only $64 per square meter. He
14 then described how he applied an 8 percent altitude
15 adjustment as you went from Zone D to E and Zone E to F,
16 and he had price appreciation over the five years he
17 projected for the sale of those 70 lots. Infrastructure
18 costs, cost of sales, subtracted from that, and he
19 discounted the stream of that revenue back to present value
20 at $12.75 million.
21      Now, you heard a lot from Mr. Hart about the tax
22 contracts and the real contracts. And I expect we may hear
23 some more about that as we go on today.
24      But one of the things Mr. Hart didn't like was
25 that the real contracts were presented to the Tribunal as

1 an exhibit to this proceeding as opposed to an exhibit to
2 Mr. Farrell's report.  And he and counsel were hoping to
3 play gotcha and claim after all the submissions were in
4 that they had never been submitted in evidence, and thus,
5 there was no proof that the contracts really existed.
6       But they are in evidence, as is the schedule of
7 the lot sales that Mr. Farrell used to perform the analysis
8 that's comprehensively described in this document and is
9 attached to his expert report.  You've seen it.  Schedule 1
10 to his report goes through his analysis.
11       The Claimants encourage the Tribunal to review
12 Exhibit C-162, which is every contract that's written on
13 that schedule.  The schedule is the last three pages of the
14 contract.  It identifies a zone analysis undertaken by
15 Mr. Farrell.  It identifies the contracts, and shows the
16 contracts for the Phase 1 lot sales, every contract.
17       Mr. Hart's report and his PowerPoint yesterday, of
18 course, were filled with references to the tax documents.
19 And now it's not disputed that the Ballantines submitted
20 different contracts to the Dominican tax authorities.
21       The affidavit of Mr. Balbuena spoke to Dominican
22 custom in that regard.  We heard the testimony of Michael
23 Ballantine with respect to that.  The Respondent chose to
24 withdraw their request to cross-examine Mr. Balbuena.
25       But Mr. Hart didn't withdraw or change any of his

1 report's calculations when he said he heard the testimony
2 that the higher-priced contracts were, indeed, the real
3 contracts that reflected the consideration that was
4 actually exchanged between the buyer and the seller.
5       All of his analysis relies almost exclusively on
6 the numbers that are in those tax documents and the Jamaca
7 financial statements that reflect them.  The financial
8 statements flow throughout his report, but it's undisputed
9 that the financial statements include the lower tax
10 document numbers.
11       He continues to make statements about the
12 historical performance of Jamaca de Dios based on the tax
13 numbers that he knows are not the actual cash flows that
14 Jamaca received.
15       He's right.  In accounting, on Page 17, he says,
16 "There can only be one actual transaction and only one real
17 contract."  And here, there is only one real contract.  And
18 Mr. Farrell used the appropriate contract when he did his
19 analysis, and Mr. Hart used the tax contract when he did
20 his analysis.
21       Lost profits from the Phase 2 home construction.
22 The testimony is unrebutted.  We heard about Wesley Proch
23 coming to the Dominican Republic to act as the construction
24 manager.  Jamaca de Dios was going to be the general
25 contractor on the Phase 2 homes.  The evidence of their

1 experience is in the record, what they did to create that
2 plan.
3       Mr. Farrell took those projections, imputed
4 overheard costs, and cited all the inputs that he put into
5 his report using local comparables, discounted that back to
6 present value, $5 million.
7       Now, Mr. Hart says Jamaca would have needed
8 financing to fund the construction of these homes.  And
9 thus, he didn't--Mr. Farrell didn't include any financing
10 in his projections, and thus, they're unreliable and need
11 to be tossed out.
12       Now, Mr. Hart acknowledges the vast majority of
13 the capital expenditure expenses he uses in his report
14 come--relate to the home construction.  And he acknowledges
15 that the buyers would ultimately pay for the construction
16 of these homes, but his analysis inappropriately delays the
17 receipt of those construction cash flows by a year beyond
18 what's already in Mr. Farrell's Report in order to create
19 and magnify the cash flow deficit he projects.
20 Mr. Farrell's report already delays construction cash flows
21 for 18 months from the date of the lot sale.
22       Mr. Hart confirms he performed no analysis as to
23 what financing costs may have been, if they were needed.
24 But they weren't needed.  The Ballantines had cash from
25 Phase 1 performance.  They funded the entirety of Phase 1

1 without financing.  They had Phase 2 lots ready to be sold
2 across the street from Phase 1, and they had a waiting list
3 of 100 people.
4       Paso Alto.  We heard the testimony of Michael
5 Ballantine about his intention to buy Paso Alto.  We also
6 have the unrebutted Witness Statement of Omar Rodriguez in
7 the record, who made clear that he and his partners were
8 looking forward to co-venture with Michael and the Jamaca
9 brand.
10       This was an already permitted development.  We've
11 seen a lot of testimony about Paso Alto, a beautiful
12 property that spans the ridgeline of Loma Barrero.  It has
13 lots on both sides of the mountains, beautiful views, and
14 it had 52 lots available for sale.
15       Now, because it was not as developed as Jamaca de
16 Dios and didn't have the Jamaca de Dios brand associated
17 with it, Mr. Farrell used much more conservative pricing
18 despite the fact that it was at the top of the mountain.
19 He starts his lot sales at Paso Alto at only $30 per square
20 meter and rising to $60 per square meter.
21       Again, infrastructure costs and the costs of sales
22 associated with those lot sales are subtracted from his
23 Report.  And the evidence is plain that Jamaca did not move
24 forward with that transaction because their Phase 2 permit
25 was denied.

1   We heard about two standalone buildings.  The
2   Mountain Lodge, we saw the beautiful pictures from the
3   marketing brochure of the Mountain Lodge.  Also in the
4   record are the engineering drawings and the architectural
5   plans that were fully developed for that.
6       David Almanzar described the soil tests.  There
7   was a soil test in this case, but it had to do with the
8   soil at the Mountain Lodge and how they were going to
9   ensure that it was appropriate for the condominium
10  building.
11      They wanted to build it.  It was ready to be
12  built.  They couldn't get an approval to the modification
13  of their Phase 1 permit.  Phase 1 was already permitted.
14  There were two lots the Mountain Lodge was going to be on
15  that were approved for development.  But to get the
16  modification to the permit in order to build a different
17  structure, they went to the MMA and they said, "Can we have
18  our permit?"  The evidence of the purgatory that that
19  application fell into is in the record.
20      Two elements of loss related to these projects:
21  Not only the lost sale revenue of the units, but also lost
22  rental revenues from a rental management program that
23  Jamaca had established, had a contract with HMS, and the
24  revenue from that plan discounted back forward
25  2.93 million.

1   A few other contentions from Mr. Hart, just
2   briefly.
3       Mr. Hart, I don't think, has an agreement with the
4   "but for" causation analysis that Mr. Farrell stated in his
5   report that he used and then repeated with Mr. Di Rosa that
6   he used, but he simply has a different view as to what
7   damages flow but for the denial of the permit.  That's his
8   opinion.  He's entitled to present it.
9       Mr. Hart believes that damages are speculative,
10  but all defense damages experts do, and his opinions are
11  largely based on his overwhelming reliance on the tax
12  documents.  He uses those to apparently now claim that
13  prices don't rise as one goes up the mountain, which, of
14  course, is a counterintuitive assertion and not reflected
15  in the actual documents of the real contracts.
16      Mr. Hart also believes the Ballantines failed to
17  mitigate damages but confirmed before the Tribunal that he
18  was offering no opinion about certain factual events that
19  he had to assume to make his contentions.
20      Largely, he wants to contend that the Ballantines
21  didn't have the land that they--shouldn't have bought the
22  land that they had for Phase 2 because the Park was decreed
23  in 2009.  We've heard a lot of testimony about when the
24  Ballantines learned of the Park and when the Ballantines
25  should have known that they weren't going to be able to

Realtime Stenographer                         Worldwide Reporting, LLP
Margie Dauster, RMR-CRR                        info@wwreporting.com

Realtime Stenographer                         Worldwide Reporting, LLP
Margie Dauster, RMR-CRR                        info@wwreporting.com

Page | 1258

Page | 1259

1   build in the Park.  We still don't know whether or not they
2   can build in the Park.
3       The prejudgment interest and the discount rate
4   disputes between the Parties are modest.  The quantum
5   summary is attached to the Report of Mr. Farrell.  This is
6   from his Reply Report, with the only change being the
7   prejudgment interest that has been updated as to
8   September 1st, 2018, at $8.722 million.  The dispute as to
9   prejudgment interest is a slight dispute as to the
10  appropriate rate and as to how it is compounded.  This
11  doesn't include the moral damages or the fees and costs.
12      The evidence here of discrimination, we believe,
13  is overwhelming.  Claimants affirm their application for
14  moral damages based on the evidence of the treaty
15  violations they faced and the emotional toll that they
16  endured as individuals here.  They were subject to
17  harassment, mob action, death threats, property
18  destruction, and the loss of reputation.  That evidence is
19  in the record and in the Witness Statements, and it's
20  before the Tribunal.
21      The Claimants affirm their request for attorneys'
22  fees and cost, which will be submitted at the instruction
23  of the Tribunal.  And the Claimants would like to thank the
24  Tribunal, opposing counsel, the PCA, and all Parties for
25  their effort and participation this week.

1       Thank you.
2       PRESIDENT RAMÍREZ HERNÁNDEZ:  Thank you,
3   Mr. Allison.
4       So, let's reconvene at 2:15.
5       (Brief recess.)
6       PRESIDENT RAMÍREZ HERNÁNDEZ:  So, ready?
7       MS. SILBERMAN:  Thank you, Mr. President.
8       CLOSING ARGUMENT BY COUNSEL FOR RESPONDENT
9       MS. SILBERMAN:  Good afternoon to you and to the
10  Members of the Tribunal.
11      Over the course of this proceeding, the Dominican
12  Republic has taken the Ballantines' assertions seriously.
13  It has engaged with their assertions, analyzed their
14  arguments, and it has refuted them carefully, meticulously,
15  and always with evidence.
16      But no matter what the Dominican Republic
17  establishes, explains, or demonstrates, the Ballantines
18  have refused to adapt their narrative, even when that
19  narrative is demonstrably false.
20      Just this morning, the Ballantines' attorneys
21  asserted yet again that "Altitude is not mentioned once in
22  any of the main inspection reports.  Not once."
23      You know this is false.  I showed you on Monday.
24  And if you want to see--if you have your slide deck from
25  Monday, just turn to Slide 37--137.  There's a reference to

1 altitude right there on the page in a quote from Exhibit
2 R-4 which is the very first inspection report that the
3 Dominican Republic submitted to the Ballantines before this
4 Tribunal was even constituted.
5     Now, the Ballantines' steadfast refusal to accept
6 reality is something that the Ministry of Environment has
7 now had to experience twice over, first in the permit
8 application process and now again in this proceeding.  But
9 this has gone on long enough.  It has cost the State far
10 too much money.  This practice has to end today, here with
11 this Tribunal.
12     Now, as Mr. Di Rosa will explain in just a little
13 bit, the Ballantines have no real case.  All of the
14 hallmarks of a true legal case are missing.  And so today,
15 instead of responding to these inconsistencies or the
16 repeated misstatements, we're going to focus on the
17 questions that the Tribunal has been raising over the
18 course of this past week.  We'll begin, though, with a few
19 fundamental tenets that govern this proceeding.
20     The first is that Chapter Ten tribunals are
21 tribunals of limited jurisdiction, and the Ballantines bear
22 the burden of proof.  The third is something that the
23 Ballantines' own counsel said in opening, which is that
24 analysis should be based on truth.
25     Now, the relevant questions on jurisdiction are

1 something that we already discussed on Monday.  There are
2 two that you need to focus on.  The first is, did the
3 Ballantines qualify as Claimants when they submitted their
4 claim to arbitration; and, second, did the Section A
5 obligations apply toward the Ballantines at the time of the
6 alleged breaches?
7     I showed you on Monday how these questions derived
8 from Article 10.16.1 of DR-CAFTA and won't be going through
9 that again today.  But I did want to respond briefly to the
10 Ballantines' counsel's argument that "It's not as if
11 there's some universal concept of international law[1] that
12 requires this outside the text."
13     He was referring to the notion that the
14 Ballantines need to meet the nationality requirements of
15 the treaty at the time of submission of the claim to
16 arbitration.  And there is, in fact, an international
17 concept that requires this outside of the text of the
18 treaty.  And we have explained this in our pleadings.
19     So, for example, how Respondent's legal authority,
20 Number 19, which is Achmea v. Slovak Republic, in Paragraph
21 267 states, "It is an accepted principle of international
22 law that jurisdiction must exist on the day of the
23 institution of proceedings."

_____
[1] English Audio Day 5 at 02:23:00

1     As stated by the ICJ, "The Court recalls that
2 according to settled jurisprudence, its jurisdiction must
3 be determined at the time of the act instituting
4 proceedings was filed."
5     Now, these questions ultimately turn, first of
6 all, on dominant nationality as of 11 September 2014, which
7 is the date on which the Ballantines submitted their claims
8 to arbitration.  And the second question turns on the
9 Ballantines' dominant nationality between the 12th of
10 September 2011, which was the first alleged treaty
11 violation not barred by the three-year time limitation set
12 forth in Article 10.18.1.
13     And the second date of March 11, 2014, which, as
14 we've explained multiple times and the Ballantines have
15 never contested, is the latest possible date on which any
16 event giving rise to a claim could have occurred in
17 accordance with Article 10.16.3 of the treaty.
18     Let's turn briefly to the Ballantines' theories on
19 jurisdiction.  You heard some of these again today.  For
20 example, they asserted yet again that an assessment of
21 dominant nationality is unnecessary.  And their theory is
22 the same one that had been advanced in the pleadings, is
23 that dominant and effective nationality becomes relevant
24 only if the investor has dual nationality at the time that
25 the investor has made an investment in the territory of a

1 Party.
2     And the Ballantines say that this is relevant
3 because, according to them, the vast majority of the land
4 at issue in this investment dispute was acquired well
5 before the Ballantines became dual citizens.
6     The problem, though, is that when Mr. Ballantine
7 was testifying the other day, he changed and corrected one
8 of his statements, and ultimately it has a bearing on this
9 assertion here.  Now, this assertion is flawed from a legal
10 perspective.  The theory cannot be squared with the text of
11 DR-CAFTA.  But since we went through that in the opening on
12 Monday, I won't go through it again now unless you have any
13 questions.  So I just want to alert you to the portion of
14 the transcript in which Mr. Ballantine addresses this
15 point.
16     So he says, "I would add as well, we didn't even
17 have titles to this property."
18     "I'm sorry, say that again?"
19     "I would add, we did not have titles to this
20 property."
21     "You didn't have titles?"
22     "We gained titles actually in August of 2010,"
23 which is six months after the Ballantines naturalized in
24 the Dominican Republic.
25     Mr. Ballantine continues, "Without a title, you

1  don't actually own the property."

2          So there goes the first theory.

3          Now, their second theory is that there are no

4  critical dates.  You heard this one again today.  The

5  Ballantines assert that the Tribunal should examine their

6  entire life, which for some reason is singular despite all

7  of the references to the Ballantines being separate people.

8  And for the record, we agree that the Tribunal needs to

9  evaluate each of the Ballantines' dominant and effective

10  nationalities separately.

11          The Ballantines say that Tribunals have made it

12  clear that it's important to look at a Claimants' entire

13  life in evaluating its truly dominant nationality.

14          I mentioned this in the opening and wanted to just

15  show you on a screen.  So this is the slide that the

16  Ballantines showed you in their opening.  I believe it was

17  Slide 10.  And you can see that the sentence sort of starts

18  in the middle there.  It says, "this date," "indeed," and

19  there's something else highlighted.

20          On the next slide, you see the quotes that I read

21  to you the other day, which explain that in this particular

22  case--it was an Iran-U.S. Claims Tribunal case--the

23  Tribunal had confirmed that it only had jurisdiction when

24  the dominant and effective nationality of the Claimant is

25  that of the United States--this was a case against

---

1  Iran--during the relevant period from the date the claim

2  arose until 19 January 1981.  Those two dates are

3  determinative of the jurisdiction of the Tribunal.

4          It continues.  "Obviously, to establish what is

5  the dominant and effective nationality at the date the

6  claim arose"--so as of a specific critical date--"it is

7  necessary to scrutinize the events of the Claimant's life

8  proceeding this date."

9          And then you get to the passage quoted by the

10  Ballantines.

11          Now, earlier this week, the Tribunal had a

12  question.  It stated that at the end of this proceeding, it

13  will need to come up with a test that it will need to

14  apply.  And the idea was to help the Tribunal identify what

15  this test would be, first of all, for determining dominant

16  and effective nationality and then dominant nationality

17  itself.

18          It appears that the Parties agree that dominant

19  and effective nationality are two different concepts and

20  the Ballantines haven't contested that "effective

21  nationality" means "genuine nationality."  This is

22  something that the Dominican Republic has stated in its

23  Statement of Defense and also in its Rejoinder, and the

24  Ballantines haven't refuted that.

25          So the issue then is, what does "dominant

1  nationality" mean?  And the Parties generally seem to agree

2  on this as well.  The issue is, is the dual national

3  foreign enough to render international a dispute with the

4  Respondent State?

5          I believe the Ballantines put it in their

6  Rejoinder on Jurisdiction as what the Tribunal needs to

7  determine is whether the Ballantines were foreign

8  investors.  Were they foreign to the Dominican Republic?

9          Now, in analyzing this, the primary question to be

10  asked is what nationality is indicated by the applicant's

11  residence or other voluntary associations.

12          As mentioned, this comes from the U.S. Digest

13  of--it comes from the State Department's Digest of U.S.

14  Practice in International Law.

15          What we really want to focus on today is merits

16  issues.  First on the questions posed by the Ballantines,

17  some of which the Tribunal has asked us over the course of

18  the week, and then questions that must be posed to the

19  Ballantines.  But I'll start with the former category.

20          So the first question is:  Why was it not possible

21  for the Ballantines to build a real estate project on their

22  site?  There were several reasons for this.

23          First of all, there were natural limitations.  And

24  you heard Engineer Navarro explaining some of these during

25  his testimony this past week.  He said, "Jamaca de Dios'

---

1  soil is not consolidated.  Because of the elevation, the

2  slope has more pressure from the top.  And so the soil has

3  no capacity to withstand a deep and significant

4  intervention.  When we combine this with the meteorological

5  conditions, the rainfall, the soil in that area is more

6  fragmented by the chemical action of the water.  And

7  because of the physical water action, we see landslides in

8  the area."

9          He continued, "The vegetation is typical of the

10  rainforest, and that means that the area always has

11  moisture, humidity, regardless of the fact that it is

12  vertical raindrop or not.  And in the case of Jamaca, you

13  have a combination of clay and meteorized rock, rock that

14  has been impacted by rainfall, so it's very loose.  Clay is

15  unstable.  You cannot put any civil works on top of it.  So

16  clay absorbs water and it expands.  And it also releases

17  water when it dries out.  So, this soil cracks and this

18  creates landslides.  So, there's a combination there of

19  limestone and clay.  The soil in Jamaca is very unstable

20  for civil works to be constructed on it."

21          Now, in addition to these natural limitations,

22  there are also various legal limitations.  These were

23  mentioned to the Ballantines in the--each of the

24  reconsideration responses that they received, but I'll

25  mention just the two principle ones here.

1    First of all, there was Article 122 of the
2  Environmental Law, which was a law that was promulgated in
3  the year 2000 and predated any investment or any
4  acquisition of ownership or title of this land by the
5  Ballantines.
6    And it states that "intensive tillage, or any
7  other work which increases soil erosion and sterilization,
8  is prohibited on mountainous soil where slope incline is
9  equal to, or greater than, 60 percent."
10    Now, the second principle legal limitation is the
11  existence of the Baiguate National Park, which was created
12  by means of Decree Number 571-09 in August of 2009 and
13  Article 14 of that decree states, "That the Baiguate
14  National Park is created and that this conservation unit of
15  the National System of Protected Areas shall be thoroughly
16  studied in order to develop its potential in the areas of
17  culture, recreation, and biodiversity, with a view toward
18  outfitting its bathing sites, and making use of those
19  places with the best conditions for being earmarked for
20  mountain ecotourism and scientific research in addition to
21  other activities that are compatible with its management
22  category"--it's a Category II park, which means that it
23  protects biodiversity--"and the main vocation of its
24  resources."
25    Now, just a clarification regarding Article 122 of

1  the Environmental Law, and this was a question that was put
2  to Engineering Navarro.  And the question was:  So under
3  Article 122, you are not allowed to build whenever this is
4  a slope that exceeds 60 percent.  Does that imply that
5  automatically you can build whenever this is no slope that
6  is above 60 percent?
7    Here's what he said:
8    "The answer is no.  The environment is analyzed
9  based on several variables.  If I have a high level of
10  rainfall, clay soil, and slope, and there the determining
11  factor would be gravity, the more slope you have, the more
12  influence gravity will have.  But if I have those
13  conditions, I need to analyze that altogether to be able to
14  determine if an area that has less slope has the same risk
15  as an area that has more slope."
16    The risk can still exist.
17    Now, another question we've heard come up a lot is
18  why was the Park, Baiguate National Park, not mentioned in
19  certain correspondence to the Ballantines.  The answer is
20  that it didn't need to be.  There were all of these other
21  problems that rendered the project not viable.  And so just
22  as this Tribunal would not need to go into all of the many
23  flaws in the Ballantines merits case, if it ultimately were
24  to determine that it lacked jurisdiction to hear those
25  merits claims, the Ministry is not required to identify

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1  every single defect in a project when it communicates its
2  decision to the applicant.
3    And incidentally, the Ballantines' own witness,
4  Mr. Graviel Peña, explained to you earlier that he wrote
5  the inspection form that was used in the site visit.  That
6  was Exhibit R-108.  You'll remember and can see on the
7  screen--this is the five-page printed form with handwritten
8  notes by Ministry technicians.  It poses 39 separate
9  questions about different environmental issues.  And there
10  were some annotations in the Spanish version that may not
11  have registered.
12    What's interesting about this document is that it
13  goes through in order and it starts with topography of the
14  land.  The very first question that it asks is how steep
15  the slopes are.  After that, there's a question about how
16  much earth removal will be carried out in the construction
17  phase, the magnitude of the impacts of the
18  construction/facility, and whether the project will
19  contaminate the soil or subsoil.
20    It's only in Question Numbers 24 and 25 that you
21  get to protected areas.  So it seems to be entirely
22  appropriate that the Ministry would consider these issues
23  first before getting to the Park.  And, notably, this
24  doesn't say that the Park was not an issue.  This just
25  flags it for later, additional consideration.

1    Now, the fact that the Park wasn't mentioned in
2  certain correspondence doesn't mean that the Park wouldn't
3  be an obstacle to approval.  So if Terms of Reference had
4  been issued, the Park still could become an obstacle to
5  getting a final permit during the course of the
6  Environmental Impact Assessment.  Because one of the things
7  that needs to be addressed in an Environmental Impact
8  Assessment is whether or not the area falls within any
9  protected area and if, it does, if it complies with the
10  management plan for that protected area.  So not mentioning
11  the Park doesn't mean this would have been okay.
12    Now, why did the Ministry not propose that the
13  Ballantines change the project?  Because it's not the
14  Ministry's job.  The Ministry's job is to evaluate the
15  projects that come in.  And the presumption is that the
16  project is not going to be approved.  The onus is on the
17  applicant to overcome that presumption, which is part of
18  the precautionary principle, and it needs to prove to the
19  Ministry that what the applicant would like to do is
20  environmentally sound.
21    Remember, the presumption is that there should be
22  no intervention unless the applicant can prove that it's
23  safe.  Now, this is explained both in Mr. Navarro's First
24  Statement that the Ministry's decisions relate to the
25  specific project as submitted, and also in Article 40 of

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1  the Environmental Law, which focuses on the project, not a
2  specific site.
3       So it says, "Any project, infrastructure
4  construction, industry or any other activity which, due to
5  its characteristics, might affect the environment and
6  natural resources in one way or another shall obtain the
7  environmental permit or license from the Ministry of the
8  Environment."
9       Now, when the Ministry receives a first request
10 from an applicant that wishes to pursue a project that may
11 have some sort of environmental impact, the first step in
12 the environment permitting process is to request Terms of
13 Reference.  The Ministry then conducts a preliminary
14 analysis to determine the category of project that should
15 be assigned or to determine if the project is unviable and
16 will not continue at all in the permitting process.  Two
17 days ago, Zacarías Navarro explained that if there's
18 certainty that a project cannot be approved, it's rejected
19 in the prior analysis phase.
20      Now, in a way, that benefits the applicant because
21 putting together a lengthy Environmental Impact
22 Assessment--as you saw, the one that the Ballantines
23 submitted was 119 pages and took them more than a year to
24 complete--I guess exactly a year to complete--it costs a
25 lot of money.

1       So, if the Ministry knows in advance that the
2  project isn't going to be viable, it says the project is
3  not viable at this site, which is what the Ministry did
4  here.
5       Now, if there is a doubt as to the magnitude of
6  the impact the project will cause, the project moves to the
7  next phase and Terms of Reference are issued for an
8  Environmental Impact Assessment to be conducted and
9  presented to the Ministry.  And both Zacarías Navarro and
10 José Roberto Hernández, who was an applicant--he was the
11 developer from Quintas del Bosque--they testified that the
12 Ministry may and sometimes does establish limits on the
13 project.
14      Further, after the Environmental Impact Assessment
15 is filed with the Ministry, the Ministry may impose
16 additional restrictions to the project that can be
17 developed.
18      It is testified in Mr. Navarro's First Report at
19 Paragraph 35, "It must be clarified here that the Ministry
20 evaluates and decides in an integral manner on projects
21 submitted to the Ministry.  In practice, no partial
22 authorizations are issued.  A developer has the possibility
23 to submit a proposal that meets the environmental
24 conditions and the appropriate land use for the area.  The
25 Ministry can then establish more explicit restrictions and

1  if the developer meets them, then the Terms of Reference
2  can be issued."
3       So it's not a matter of the Ministry coming up
4  with suggestions for what the project should be.  The
5  Ministry is either saying there is no way this entire
6  project can go forward, which is what happened with the
7  Ballantines' Project 3, or it can impose restrictions on
8  what the applicant wants to do and say, "We're willing to
9  hear a bit more about this, but you still need to prove to
10 us that the application can be granted."
11      Now, the real estate project wasn't viable on this
12 particular site, the proposed Project 3 site.  And the
13 president of the Tribunal put this question to Mr. Navarro.
14      He said:  "What you're saying is that there was no
15 possibility whatsoever here with this proposal?"
16      And Mr. Navarro answered: "Yes, with that
17 proposal, there was no possibility for approval."
18      Now, that doesn't mean that all development
19 possibilities were necessarily out.  Ms. Cheek, you asked
20 about this the other day.  So on this particular land,
21 there could have been recreational activities, which would
22 include ecotourism or any other activity that can be
23 conducted without endangering biological wealth, the
24 particular type of biological wealth that the park
25 preserves.  In addition, there could be activities that do

1  not involve intensive tillage or otherwise increase soil
2  erosion.  So that would be the issue with Article 122 of
3  the Environmental Law.  But, again, the idea of the
4  Ministry is not to go and tell a person what they can do.
5       If someone wants to build a skyscraper in the
6  middle of Central Park and that's not environmentally
7  viable for whatever reason, the Dominican Ministry were
8  deciding on that application, it wouldn't go back and say,
9  "You can open up a food truck."  That's not the Ministry's
10 job.
11      Now, what should the Tribunal make of the
12 Ministry's correspondence with other projects?  Well, all
13 of the instances of alleged cooperation between developers
14 in the Ministry that the Ballantines have cited have to do
15 with limitations that are placed on the project as they
16 were advancing in the evaluation process.
17      And as you look at this correspondence--first of
18 all, you should look at it.  You should review it in
19 context.  Review it chronologically and bear in mind what
20 the correspondence says.  Is there a suggestion that's
21 being made from the developer to the Ministry, as there
22 was, for example, in Quintas del Bosque II?  Is there a
23 question to which the Ministry responds?  What's the date?
24 Is it after the March 2014 deadline that I mentioned
25 earlier?

1    And then as you review it, ask yourself, have the
2 Ballantines told me enough about this that I can conclude
3 (A) that there was differential treatment of like situated
4 projects and (B) that this differential treatment was
5 unjustified?
6    As the U.S. stated in its non-disputing party
7 submission, the Ballantines bear the burden of proof in
8 both of these respects.
9    Now, that brings me to the merits questions for
10 the Ballantines.  These are things that haven't been asked
11 and that the Ballantines can't really answer.
12    So, first, why did the Ballantines purchase land
13 before confirming with the Ministry that that land could be
14 used for a real estate project?
15    You heard from Mr. Hernández yesterday that he had
16 done something like this.  He entered into a contingent
17 agreement with the landowner.  He said, "I will purchase
18 this land, but I'm going to make this contingent upon
19 receiving a permit from the Ministry.  Why spend the money
20 if your project can't be approved?  It only seems prudent."
21    Why did the Ballantines wait for the Ministry to
22 mention the Park?  As you'll recall, the Ballantines were
23 informed by their environmental consultants in September of
24 2010 that the Baiguate National Park could have been an
25 issue.

1    You've seen the emails.
2    "Mr. Ballantine, as agreed, I attached the map of
3 the location of the protected areas in the area surrounding
4 Jamaca de Dios.  Lots 67 and 90, as you may observe, are
5 located within the protected area that's called the
6 Baiguate National Park."
7    Mr. Ballantine then responds asking about the
8 coordinates of the Park.  He's given the decree.
9    "Mr. Ballantine:  The boundaries of the Park are
10 provided by Decree Number 571.09 signed by Leonel
11 Fernández."  There was no notice issued.  The environmental
12 consultants were able to find the decree and determine the
13 coordinates.
14    And then:  "Good afternoon everyone, I have
15 followed attentively the queries that you have concerning
16 the declaration of protected area, Baiguate Park, which
17 affects the Jamaca project."
18    Why didn't the Ballantines mention this?  Why
19 didn't they mention it to the Ministry?  They knew that it
20 affected the Park?  Their environmental consultants told
21 them so.  They just--they didn't raise it.  Why did the
22 Ballantines fail to propose an amended project?
23    You've seen them insist time and again in the
24 pleadings that they were willing to do anything--anything
25 the Ministry said.

1    So why not propose an alternate plan?  Why insist
2 every single time even after being told about the existence
3 of the Park under the exact same project?  Why not ask the
4 Ministry if there was anything that could be approved?
5 You've heard about this Mountain Lodge, for example.  But
6 the Ballantines didn't even ask the Ministry for Terms of
7 Reference.
8    They've stated that they couldn't because
9 supposedly they hadn't gotten the no-objection letter from
10 the Municipality.  But that didn't hold them up in
11 connection with Project 2.
12    For Project 2, they applied to the Ministry first.
13 And as Michael Ballantine explains in his First Witness
14 Statement, it was after that that the no-objection letter
15 came in.
16    So why didn't they do it?  Why did the Ballantines
17 refuse to consider another site?  This came up during
18 cross-examination.  Mr. Di Rosa put it to Mr. Ballantine
19 that, "You know, you could have bought land somewhere else,
20 right?"
21    Mr. Ballantine said he was not going to bring the
22 mountain to Mohammed.
23    But it would seem that he's the mountain in this
24 scenario, the one who was supposed to move.  And that's
25 just not correct.  No one has a right to a governmental

1 permit.  Especially an environmental permit.  You need to
2 obtain permission and to prove that that permission is
3 warranted.  Why did the Ballantines neglect to quote
4 Article 122 of the Environmental Law even once in this
5 proceeding?
6    It wasn't in any of their pleadings, not even the
7 Notice of Intent.  Didn't appear in their opening
8 statement.  They haven't quoted it at all.  And yet they
9 purported to tell you what it says.
10    Why did Michael ultimately--only learn of such
11 article when his permit application was rejected?  This
12 came out on cross-examination too.
13    The question was:  "At what point did you become
14 seized of Article 122 of the law?"
15    And he says:  "September 12th, 2011."
16    Which was the date of the rejection letter.  Why
17 didn't he know about that before then?
18    Other local developers were familiar with this
19 law.  You heard testimony again from José Roberto
20 Hernández.
21    He says, "In 2007 we delivered the request for the
22 Environmental Impact Assessment."
23    And then he was asked by the Ballantines' counsel,
24 "When you built these houses in 2007, were you familiar of
25 the law--the Environmental Law that governs, let's say, for

1  example, the slopes?"

2       "I did.  I knew of the law."

3       Why did the Ballantines fail to proffer testimony

4  from their Dominican environmental lawyer?  This too came

5  out on cross-examination.

6       The question was, "Is there a reason that your

7  lawyer, Freddy González, the one who said that the road

8  would have the biggest environmental impact--was there a

9  reason that he didn't provide a witness testimony in this

10 proceeding?

11      "Well, we brought forth 20 witnesses."

12      "So you thought the headmaster of the school where

13 your children went was the more relevant witness than your

14 environmental lawyer?"

15      Why did the Ballantines fail to proffer testimony

16 from any of their environmental consultants?

17      "None of your environmental consultants, either

18 Empaca Redes people or Antilia people, are among the 20

19 witnesses that you presented?"

20      "No."

21      Why was there no testimony from any of the

22 Ballantines' engineers?

23      "Did you have an engineer involved in the

24 construction of the first road?"

25      Well, there was a man named Rafael Peralta, who is

1  supposedly a licensed engineer recognized by the Dominican

2  Republic, and an American engineer whose name is Chad

3  Wallace.  They were the ones who built the road, according

4  to Mr. Ballantine's testimony.

5       That was the first time we had heard about them.

6  They weren't mentioned in any Witness statement, and they

7  didn't provide any testimony in this proceeding.

8       There was testimony from Mr. Kay.  But Mr. Kay, as

9  you'll recall, revealed that he's not an engineer despite

10 the fact that Mr. Ballantine in his statements and the

11 Claimants in their pleadings referred to him repeatedly as

12 "the Ballantines' engineer."

13      When asked, "Are you an engineer?" he said, "I am

14 not.  I'm a facilitator."

15      "What sort of academic training do you have?"

16      "Not all that much."

17      So have the Ballantines established any of their

18 treaty claims?  The answer is no.  You need to have

19 evidence to establish treaty claims.  You need to have a

20 consistent story.  You need to have more than your friends

21 testifying on your behalf creating an echo chamber about

22 any documents or any basis to back it up.  And as you

23 consider these issues and try to evaluate what little

24 evidence there is, here's some things that you should bear

25 in mind.

1       First of all, in the environmental context, the

2  absence of scientific certainty is not a valid basis for

3  attacking the propriety of a measure intended to prevent

4  environmental harm.

5       So, you've heard all sorts of arguments,

6  especially through cross-examination of the experts, trying

7  to attack them.  Are you sure a landslide is going to

8  happen?  How can you be certain that this is different from

9  one project or another?

10      This is the precautionary principle that we've

11 been explained and emphasizing over and over again.  The

12 idea is that the absence of absolute scientific certainty

13 is not enough to say that you cannot take this measure that

14 is intended to prevent environmental harm.  We act

15 cautiously.  We assume that there is risk unless it can be

16 proven that no risk exists.

17      Now, another important consideration is that--and

18 I'm quoting from a Stanford law professor--"Many people

19 have an amazing ability to shove their environmental values

20 into a remote corner of their conscience when their

21 economic interests are at stake."

22      You've heard a lot of sort of "not in my backyard"

23 arguments.  These are arguments about: Why do I have to be

24 the one to bear the brunt of environmental protection?  Why

25 am I the one that's affected?  What possibly could be so

1  unique about the Jamaca de Dios site that the government

2  had to step in and say nothing can take place here?

3       And, again, the government wasn't saying nothing

4  can take place.  It was saying that this particular project

5  could not take place.

6       Now, this argument doesn't work in the

7  environmental context for the following reason, which is it

8  leads to the tragedy of the commons.  If everyone says "No,

9  no, no.  My property isn't unique.  You don't need to do

10 anything here," then we no longer will be able to have any

11 resources to protect.

12      So I continue quoting the Stanford law professor.

13 "Anyone who has studied the environment for very long

14 understands the tragedy of the commons.  The idea is that

15 when a resource is freely available to everyone in common,

16 everyone has an incentive to take as much of that resource

17 as they want, even though the collective result may be the

18 destruction of the resource itself.  Society as a whole

19 would be better off restraining consumption and preserving

20 the resource.  But the rational action for each individual

21 is to consume to her heart's content.  Because no one can

22 bind anyone else's actions, not consuming simply makes one

23 a patsy.  To each individual, moreover, her own actions

24 seem insignificant."

25      And then there is the problem that "holding back

1  will lead to a marginal improvement, if any, in the
2  condition of the resource.  So there's this sense that the
3  high road leads to nowhere and the cumulative results of
4  reasonable individual choices is a collective disaster."
5        This is why we have environmental regulation.
6  This is why in the Dominican Constitution natural resources
7  are a constitutional right of every Dominican citizen,
8  including the Ballantines.  They're a shared resource that
9  the government protects.  And the government is there to
10  say, "No environmental impact unless a person can prove
11  that it's going to be safe."
12        Now, importantly, despite all of the things that
13  you have heard about the various names that the Ballantines
14  throw out, they cannot establish nationality-based
15  discrimination.  I showed you this conclusion on Monday in
16  the opening, and the Ballantines haven't said anything to
17  refute it.
18        The problem with Project 3 was with the proposed
19  site and the project that the Ballantines wanted to conduct
20  on that site.  It did not have anything to do with the
21  Ballantines themselves.
22        The evidence of this is that the Ministry invited
23  the Ballantines on two different occasions to propose an
24  alternate site for the project.  And in addition, in
25  parallel, the Ministry renewed the Project 2 permit.

1        On top of that, the Ministry duly conducted five
2  different site inspections, went out whenever the
3  Ballantines asked, and had three different ministers
4  involved in the approval--sorry--the review of this
5  particular permit request and had 21 technicians go out and
6  review.
7        If there were a problem with the Ballantines, why
8  waste all of those resources?  It just doesn't make sense.
9        Now, I showed you this chart again on Monday.
10  Nothing has changed.  When you compare the treatment that
11  was granted to Jamaca de Dios Project 3 and its only
12  genuine comparator, which was Aloma, you see that it's the
13  same.
14        So for Project 3, the developers were the
15  Ballantines, were dual nationals of the Dominican Republic
16  and the United States.  The location of the proposed
17  project site was in the Cordillera Central Mountain Range,
18  right next to Aloma.  The altitude was 820 to 1260 meters
19  above sea level.  The slope distribution was that
20  18.7 percent of the land exceeded 60 percent.  The soil
21  type: igneous, volcanic and metaformic.  The site was
22  inside the Baiguate National Park.  A permit was requested.
23  Permit was denied.
24        For Aloma.  Juan José Domínguez, who's a Dominican
25  national, son of the Mayor of Jarabacoa and brother-in-law

1  of a former president, had the land right next door.  The
2  altitude was 990 to 1220 meters above sea level.  Slopes
3  were slightly lower, only 4.89 percent of the land exceeded
4  60 percent.  The soil type was exactly the same.  It too
5  was inside the Baiguate National Park.  Permit was
6  requested and permit was denied.
7        Now, Mr. Dominguez had a reconsideration request.
8  It was denied.  The Ballantines had three reconsideration
9  requests that were duly evaluated.  And in addition to
10  this, when the Aloma permit was requested, the Ministry
11  went out to conduct its site inspection and found that
12  Mr. Dominguez had opened up a road and fined him for this.
13  Fined him--it was either $6,000 or $7,000, and the
14  Ballantines were fined $1,300 for opening a road without a
15  permit.
16        Now, just to give you a flavor of some of the
17  issues with the other projects that are related to the
18  Park.  The Ballantines have a timing problem.  They keep
19  directing your attention toward the map.  I showed you the
20  other day that they were directing you toward the flat
21  version of the map.  And when you look at the version that
22  shows the ridges of the mountains, you can understand why
23  someone seemingly next door to a different project may have
24  been included, may not have been included.  It's because
25  they're on one side of the mountain or the other.

1        So there are some other problems with this.  The
2  Ballantines' maps, their pictures, don't take account of
3  time.  So, for example, La Montaña asked for Terms of
4  Reference in the year 2016, which was seven years after the
5  Park was created.  And it's only logical that because La
6  Montaña knew of the boundaries of the Park that it would
7  request to go right up to the buffer zone, right up to the
8  permitted edge.
9        So if you look at La Montaña on a map, you think,
10  "Oh, this is close, and maybe that was included in the Park
11  for some reason or another."
12        La Montaña came afterwards.  You don't see that on
13  their map or their pictures.
14        Quintas del Bosque I.  That's separated from the
15  Park by a road.  Mr. Hernández explains that in Paragraph
16  20 of his Witness Statement.  Quintas del Bosque II also
17  asked for Terms of Reference in 2014.  So, again, it seems
18  only logical that Quintas would request a permit to create
19  a housing project outside of the Park, and that's why its
20  boundaries would not be comprised within the Park.
21        And you will find that in the Quintas del Bosque
22  II Request for Terms of Reference, which is dated
23  February 25, 2014.  It's Exhibit C-13.
24        Jarabacoa Mountain Garden asked for Terms of
25  Reference in 2012.  Again, seems only logical that it would

1  request a permit outside of the National Park.  And then
2  Paso Alto is separated from the Monumento Natural Salto
3  Baiguate by a road.  And that very road is what is
4  mentioned as a border in the actual text of the decree.
5       Part of Paso Alto is comprised within the buffer
6  zone of the Monumento Natural Salto Baiguate.  But the
7  project existed since 2006.  So much like the original
8  Jamaca de Dios project, Project 2, it already received a
9  permit when the monument was created and it's partly
10 included in the monument's buffer zone.
11      You'll find that on Page 15 of the First Martínez
12 Statement, and there's also a map at Annex B of
13 Mr. Navarro's statement, and Exhibit R-77 is the decree.
14      Now, the contention regarding Paso Alto would have
15 to be that the Dominican Republic not only created the
16 Parque Nacional Baiguate as part of a conspiracy against
17 the Ballantines, but also modified the borders of the
18 Monumento Natural Salto Baiguate to affect Paso Alto.
19      Now, Mirador del Pino is in a completely different
20 mountain across the Jarabacoa Valley.  It asked for Terms
21 of Reference in 2010.  That's Exhibit C-45.
22      But back to Aloma, which is the only genuine
23 comparator.  The Ballantines showed you the same pictures
24 again that they have shown many times before that we have
25 disproven with the Google Earth images, and we also have

1  testimony now from the Ballantines' own witness.
2       So the question was put to Mr. Peña whether there
3  was any real estate development.
4       "Have new how houses been built in Aloma?"
5       "There's a house that belongs to the owner of the
6  development."
7       Then we tried Mr. Kay.
8       "Mr. Kay, there is only this housing construction
9  in Aloma Mountain; correct?"
10      "As far as I know, correct."
11      "And, Mr. Kay, What you have here are basically
12 the same structures taken from different angles; correct?"
13      So they were referencing photos.
14      "That would be correct."
15      Now, the fact that there is no nationality-based
16 discrimination is really important.  Because it's only
17 nationality-based discrimination claims that are permitted
18 under Chapter Ten of DR-CAFTA.  Both the United States and
19 Costa Rica explained this in their non-disputing party
20 submissions, and it is the only reading of the treaty that
21 follows the principles of treaty interpretation.
22      So the treaty, as you know, has a most-favored
23 nation clause, and it has a national treatment clause.
24 These are two specific types of discriminatory treatment,
25 both of which are based on nationality.  And pursuant to

1  the principle of expresiones exclusio alterius--sorry, I
2  can't do it with Latin--it means that the listing of
3  certain factors means necessarily the exclusion of others.
4       So, the identification of a most-favored nation
5  clause or a most-favored nation obligation and of a
6  national treatment obligation means that all other types of
7  discriminatory treatment are excluded from the other
8  obligations set forth in CAFTA.
9       Now, to continue analyzing the Ballantines'
10 claims, I'm going to pass the microphone over to
11 Mr. Di Rosa who will walk you through the many reasons why
12 these claims fail.
13      MR. Di ROSA:  Mr. Chairman and Members of the
14 Tribunal, good afternoon.  This morning the Claimants said,
15 "We expect the Respondent will want to talk mainly about
16 the Jamaca project, and they will mainly want to talk about
17 Mr. Ballantine," as if, you know, we're skirting the issue.
18 And that's precisely what I plan to talk about because this
19 case is about their project.  It's not about everybody
20 else's project.
21      Like a magician whose art is the art of
22 misdirection, they say, "Don't look at this--don't look at
23 this project," which is the one that matters, "but look at
24 all these other projects."  And that's something that is
25 entirely designed to mislead the Tribunal.

1       So we want to walk you through a few broad
2  conclusions that can be drawn from the testimony this week
3  and in general from the evidence in this case.  The first
4  conclusion is that the Ballantines are not entitled to a
5  favorable award for the various reasons that I will
6  discuss.  But I want to start with this quote from the
7  Maffezini v. Spain Case.  And I'm quoting here.
8       "The Tribunal must emphasize that Bilateral
9  Investment Treaties are not insurance policies against bad
10 business judgments."
11      And that's exactly what the Ballantines are trying
12 to use this treaty for.  It was their own bad judgment that
13 caused them to generate the problem that they now have.
14 You heard Mr. Ballantine in his testimony say that he had
15 no background whatsoever in real estate business, no
16 background in construction, no background in any sort of
17 project of this nature.  His entire experience was in the
18 printing industry, which has absolutely nothing to do with
19 this project.  He had never done any business abroad.  He
20 had never lived abroad.  But he said he went to the
21 Dominican Republic, and he had a vision when he saw this
22 mountain.
23      And we asked him, "Did you--did you check with
24 anybody whether you could do anything with this property?"
25 And he happily admitted that he had not done any

feasibility study, that he had not hired any environmental

consultants, that he had not done any commercial

feasibility study, that he had not engaged any lawyer, had

not--done no legal due diligence or any due diligence of

any sort really.  He just decided--and he said this.

He said, "I had a vision like Walt Disney.

I"--you know, "I thought it would be fun.  I thought it

would be an adventure.  I decided to go for it."

These are all his own expressions.

And in those circumstances, how can he possibly

expect the Dominican Republic to now pay for his own

business misjudgment, his own lack of due diligence, his

own obstinacy due to his vision?

And what he ended up constructing was hardly what

one would call ecotourism.  Now, he himself ultimately

admitted that some of these properties don't really qualify

as ecotourism.  And this morning opposing counsel said that

the Dominican Republic is objecting because they are nice

houses.

That's not why the Dominican Republic is

objecting.  The Dominican Republic is objecting because

they were destroying the mountain and they were purporting

to construct on a part of the mountain that was going to be

extremely dangerous.  That's really ultimately what this

case is about, is about whether the property was, in fact,

a property on which--on which they could build the type of

project that they had in the lower mountain.

And you heard Mr. Ballantine say that he wanted to

put 70 of those houses up on the top of the mountain.  And

the Ministry decided that simply was not going to be safe

for all the reasons that you heard.

So what the testimony this week has exposed is

that this is a problem of the Ballantines own making.  The

case has also exposed that this is really abusive[2] misuse of

an investment treaty.  Investment treaties simply are not

designed to address this type of situation.  We'll come

back to this topic, but I'd like to talk a little bit about

evidence.

We told you at the beginning of the week that they

had a nice story, but they had no evidence.  And that

became even more evident in the course of this week.  They

purported to challenge the methodology of the Dominican

Republic's experts, which is nothing short of perverse

given that they presented an engineering expert who doesn't

have more than a high school degree.  They presented an

environmental consulting expert who is a lawyer and who is

on their payroll and who offered money to a Ministry

official to testify, which she declined to do.

---

[2] English Audio Day 5 at 03:09:22

And you saw Mr. Farrell, their damages expert, who

happily conceded that he hadn't looked at anything that's

relevant.  And they all happily conceded they don't have

attachments to their--to their Expert Reports.  That's a

truly bizarre thing.  They have a bunch of Expert Reports

and don't have a single exhibit or very few.  There are

some photographs.  We'll come back to that.  But they don't

have real support.  That's like writing an entire Ph.D.

thesis without putting a footnote in it.  How can that

qualify as evidence?  Ultimately, their evidence consists

of their own testimony and of expert testimony that can't

be corroborated or tested.

Today you saw opposing counsel cite to Mr. Farrell

in their opening statement.  They had quotes from

Mr. Farrell on the screen.  But Mr. Farrell on

cross-examination admitted that he had based his views and

his conclusions and his calculations on what Mr. Ballantine

had told him.  So it's a completely circle--circular type

of evidence, and their documentary evidence consists of

photographs and maps.

And the photographs you--you saw Mr. Kay, the

so-called engineering expert, also admit happily that he

had measured some of these slopes using photographs.  And

the angle of the shadows is sort of like the Egyptian

sundial of clinometry.  And you can't measure things and

purport to come into an arbitration like this with evidence

of that nature.

It's completely making a mockery of this

proceeding to base so much of their case as they do on the

issue of slopes.  And they present these photographs, many

of which Mr. Kay also happily conceded, you know, he has

not taken himself.  And they could have been pictures from

Cambodia or the Congo as far as one could tell.

In contrast, Mr. Deming, the Dominican Republic's

expert, testified that he--he used a topographic map.

That's at Exhibit PD-006 in Slide 28 of his presentation

yesterday.  He said that he had used--that he had measured

the slopes with an instrument called a Brunton Pocket

Transit.  He talked in his Expert Report at Paragraph 17

about the Brunton Pocket Transit device.  And he mentioned

it also in the--in his testimony.  And the Ministry, for

its part, used an instrument called a clinometer.

And you can see that at R-105.  There's a revised

version of R-105 at Page 3 where they talk about the use

on-site of a clinometer to measure slopes.  And when asked

about Exhibit 114 in his testimony this week, Mr. Navarro

also mentions that a clinometer had been used to measure

the slopes.

So I think that the Tribunal has to ask itself:

What evidence can it possibly base this award on?

1    There's no real evidence that the Tribunal could
2    actually point to in an award to justify a decision to rule
3    in their favor.  The court issue, in our view, is that
4    there was no impropriety in the Ministry's decision to deny
5    the permit.  We'll come back to that.  But the--there's
6    also absolutely no evidence that they were able to produce
7    concerning this massive conspiracy that they so fancifully
8    alleged throughout the case.  They didn't say much.  In
9    fact, they didn't say anything at all about it this
10   morning.  So we assume that that's been adequately
11   dispelled.
12       They have not proven any discrimination, much less
13   discrimination based on their U.S. nationality, which is
14   what the treaty requires, as the U.S. Government has also
15   agreed in its non-disputing party submission.
16       They haven't proven that there's been more
17   favorable treatment.  There's been different treatment, but
18   not more favorable treatment.  And the differences are
19   justified for the reasons that my colleague, Ms. Silberman,
20   mentioned today.
21       They take several--you know, they cherry-pick
22   several issues and they isolate them.  And, you know, when
23   you do that, obviously, you can make it look bad.  But when
24   you really dig under the surface, you see that there are
25   critical differences of the sort that Ms. Silberman just

1    showed you.  And their whole case seems to be based on that
2    sort of strategy.  And same thing on nationality.
3        They say, like, "Oh, well, you know"--they focused
4    on the bank accounts.  And, you know, that can't possibly
5    signal that they're dominant and effective--I mean, that
6    their dominant nationality is Dominican.
7        And, you know, obviously, if you isolate every
8    single factor that you take into account for that
9    determination, then, you know, you can easily disparage the
10   argumentation.
11       But the whole point of both the nationality--the
12   dominant nationality analysis and the environmental
13   analysis is that it doesn't lend itself to this
14   simplification, these binary constructs that I mentioned in
15   the opening statement.  They simply don't.
16       And they like to say, "Well, it's convenient for
17   them now to invoke the altitude and so forth."  And, you
18   know, we--the documents actually show that none of this is
19   an ex post facto invention as they are alleging.  But, you
20   know, they say, "Oh, now they focus on altitude and
21   here's"--you know, "here's what they say about altitude."
22       And nobody ever said that it's about one thing.
23   And that's the point that's been repeated over and over
24   again, is that these environmental determinations are based
25   on a number of factors that interrelate in very complicated

Realtime Stenographer                    Worldwide Reporting, LLP
Margie Dauster, RMR-CRR                   info@wwreporting.com

Realtime Stenographer                    Worldwide Reporting, LLP
Margie Dauster, RMR-CRR                   info@wwreporting.com

Page | 1298

Page | 1299

1    ways.  And the Claimants simply refuse to accept that.  And
2    instead they--they reduce it to a caricature by taking
3    these issues like the slope and so forth and just drawing
4    these facile comparisons.
5        Now, why else do the--are the Ballantines not
6    entitled to award?  They have deceived the Dominican
7    authorities in a number of respects.  They deceived the
8    environmental authorities.  They deceived the immigration
9    authorities.  They deceived the tax authorities.  And I'll
10   walk through briefly each of those.
11       The documents show, and Mr. Ballantine confirmed
12   in the cross-examination, that when they applied for the
13   first permit, the lower road--the lower mountain road
14   permit, they had requested permission for a road for
15   purposes of a reforestation project.
16       They never mentioned that they planned to do a
17   housing lot project, even though Mr. Ballantine knew that
18   from the beginning.  In fact, that was his vision from the
19   get-go.  So, essentially, they got the initial permit by
20   false pretenses.
21       Then they--once the road was already built, they
22   applied for the housing lot project.  At that point, the
23   road is already built, so the Ministry can't really do much
24   about it.  And what do the Ballantines do?  They apply for
25   a--you know, a series of mountain cabins that were going to

1    be built of wood and lightweight materials.  That's what
2    they told the Ministry consistently, even as late as the
3    Environmental Impact Assessment.
4        And then they built these three-story McMansions
5    that we showed you that even Mr. Ballantine was forced to
6    concede was not ecotourism in any way, shape, or form.
7        They also deceived--ultimately, they also deceived
8    the immigration authorities because they have insisted here
9    and they've testified under oath that the reason they
10   engaged in--the reason that they acquired the Dominican
11   nationality was purely for commercial reasons and purely
12   for business reasons and so forth.
13       But we showed you in the opening the oath that
14   they took of allegiance to the Dominican Republic where
15   they emphasized that they were embracing the culture of the
16   Dominican Republic and expressing other forms of affinity
17   to the country that they now simply deny, even though when
18   they did that--when they took that oath, presumably, they
19   were supposed to tell the truth, just like they were here.
20   They both can't be--you know, they can't both be the truth.
21   So, you know, there's clearly some deception going on
22   there.
23       And, finally, with the tax authorities.  We
24   mentioned this point in our pleadings, and it's been
25   discussed by Mr. Hart as well.  We tried to address it on

1  cross-examination, and we were told that the Tribunal
2  didn't see the relevance.  So I want to explain what the
3  relevance is there.
4          They are claiming in this case, based on what they
5  call the real contracts, the--you know, the prices that
6  they claim they sold the lots for.  Now, we're saying--and
7  they say they did that--you know, that the tax
8  contracts--the parallel contracts that were submitted to
9  the tax authorities, they said, "Oh, don't worry about
10 those.  Everybody does that.  It's a--you know, it's a way,
11 essentially, that people, you know, pay taxes on the
12 assessed value of the--of the property."
13         And our issue is twofold.  First, that they
14 base--they purport to base their claims--their damages
15 claims on these contracts that they call the real
16 contracts, but that doesn't match anything.  If you look at
17 all their documents that presumably are true and faithful
18 to what actually happened, which were the contemporaneous
19 documents which they swore under oath were true, like their
20 financial statements, like the--their income tax returns
21 for Jamaca in the Dominican Republic and for Mr. Ballantine
22 in the U.S., they all match the tax contract numbers.
23 That's our problem.
24         We were trying to show you that it's relevant
25 because at the time they submitted those tax returns, they

1  swore that they were true, and now they're swearing that
2  the other contracts are true.  And, again, they can't both
3  be true.  That's our problem with that.
4          So they have engaged, essentially, in deception on
5  the tax front as well because they have--you know, they
6  have told the tax authorities one thing, and they have
7  paid--and this is the issue.  You know, the assessed value,
8  you can say--they presented an expert on this business of
9  the--you know, of the practice--what they called the
10 practice of submitting these parallel contracts based on
11 the assessed value.
12         But if you re-read Mr. Balbuena's Expert Report or
13 Witness Statement, whatever it is, you will see he never
14 says it's legal.  He just says it's a common practice.
15 Now, it's a common practice with respect to the payment of
16 the transfer tax.  That's what--that's what you're--you
17 know, you're reducing by submitting the parallel contract
18 that has the lower price.
19         But in your income tax return, both in the U.S.
20 and in the Dominican Republic and probably in every country
21 in the world, what you report on that income tax is your
22 actual revenues, your real income.
23         And they swore under oath, both to the Dominican
24 authorities and the U.S. tax authorities, that their income
25 was X, and the X matches more with the tax contract prices

1  than with the up--the higher contract prices.
2          And when we tested the contract pricing, it's
3  a--you know, it's a house of cards really, because it's
4  not--there's no evidence that that was actually the income
5  they received.  They had the contracts, sure.  You know, a
6  contract can say anything.  But, you know, was the contract
7  actually performed?  And, you know, we had slides showing
8  you that the contract prices weren't all actually paid.
9  But they don't have any systematic, you know, presentation
10 of--you know, of calculations or evidence of any sort that
11 show you what the actual income that they earned from those
12 contracts.
13         So all the contracts add up to a certain figure.
14 But did they actually collect that?  They didn't.  And when
15 I tested Mr. Farrell on that, you know, again, he happily
16 admitted that he had not tested it in any way.
17         You know, "Did you check these contract prices
18 against any bank accounts?
19         "No."
20         "Did you check it against any financial
21 statements?"
22         "No."
23         So it's not based on anything.  You know, it's
24 just documents.  I mean, it's just words on a page.  It
25 doesn't have any support and any genuine evidence.

1          Another issue and another reason that they are not
2  entitled to a favorable award is because they, again, are
3  abusing the system.  And in doing so, they have managed to
4  defame a lot of people.  They have managed to insult the
5  entire country of the Dominican Republic.  They have
6  misrepresented their own motives for acquiring the
7  Dominican nationality.  You know, Claimants' counsel made a
8  big deal today of the fact that the Ballantines were in
9  their mid-40s when they acquired the Dominican nationality.
10         That's--you know, if anything, that's evidence
11 that they truly believed in acquiring the Dominican
12 nationality and embracing it.  Nobody in the Dominican
13 Republic asked them to do this.  There was no Dominican
14 authority that forced them to do this and no Dominican
15 person at all that forced them to do this.
16         They voluntarily, in their mid-40s, decided to
17 fully embrace the Dominican nationality.  They moved there.
18 They moved all their money there.  They started a project
19 there.  They moved their kids there.  They acquired
20 permanent residency.  They then acquired the nationality.
21 Then they acquired their children's nationality.  And they
22 loved the Dominican Republic, and you see that in all their
23 declarations.  And they loved the Dominican people.
24         And then what happened?  What happened is that he
25 couldn't build his--you know, his Disney World on the

1  mountain.

2        And, you know, that's--that's something that--you

3  know, it's like a child who all of a sudden isn't allowed

4  to play with a toy anymore.  And so he threw the adult

5  equivalent of a tantrum, and he started pressing really

6  hard for his--you know, his pet project to be approved.  He

7  didn't want to do it anywhere else.  He wanted it exactly

8  where he wanted it because of his vision, and he would not

9  accept--he would not accept no for an answer.

10        And at that point, he starts to claim that he's

11  not Dominican anymore.  But at the relevant times, he had

12  fully embraced the nationality.  He voluntarily

13  consciously--you know, his U.S. nationality is something

14  that he inherited at birth.  He didn't choose that.  And

15  the fact that he chose it late in life, you know, if

16  anything, is more reflective of a true intention to acquire

17  another country's nationality.

18        The other thing that's incredibly offensive is his

19  assertion that he acquired the Dominican nationality as a

20  souvenir.  No country's nationality is a souvenir.  I

21  assume Mr. Ballantine knows there are hundreds of people

22  who die every year trying to get into the United States to

23  give their children the U.S. nationality.  Nationality is

24  not a joke.  It's not a souvenir.

25        Another reason why the Ballantines are not

1  entitled to an award is because, if anything, they were

2  treated more, rather than less, favorably than other

3  investors and Dominican investors.

4        And let me explain why.  My colleague already

5  mentioned the fact that they had multiple reconsiderations.

6  Probably in large part because they were American, they got

7  these reconsiderations.  I cannot image the Environmental

8  Protection Agency or the Ministry of the Interior in the

9  U.S. sending out a team to reinspect, you know, a site--a

10  project site that they had already rejected, much less two

11  or three times and four times with senior people going, as

12  the Dominion Republic did.

13        If anything, that probably reflects that they

14  were--they were trying to bend over backwards to give

15  Mr. Ballantine due process, precisely because he was

16  American.  And that resulted in five different site

17  inspections and three different reconsiderations.  And the

18  inspection by the Technical Evaluation Committee, which is

19  a highly unusual event--the whole--you know, the whole

20  senior team from the committee went out personally to

21  inspect the site.

22        And that, you know, if anything, reflects more

23  favorable treatment.  You know, they did do a management

24  plan in the end for their property, even though, you know,

25  the Ministry under normal circumstances would not have done

1  it quite when it did.  Again, trying to work with the

2  Ballantines, they did produce a management plan.

3        They renewed the permit, as Ms. Silberman

4  mentioned.  They didn't--you know, this was in 2013.  They

5  didn't need to do that.  But they did possibly

6  because--precisely because he was American.  And, you know,

7  they could have revoked the license at that time,

8  particularly given that they had misrepresented a lot of

9  things.  And particularly, as we'll show you, there were

10  serious doubts about--even the lower mountain project in

11  terms of--in terms of safety and such.

12        Our second conclusion--our second point in

13  conclusion, I should say, is that the Ministry of the

14  Environment is entitled to deference.  The Ministry--and

15  let me just show you a quote from the AES v. Hungary Case.

16        The Tribunal said, "The Tribunal has approached

17  this question on the basis that it is not every process

18  failing or imperfection that will amount to a failure to

19  provide fair and equitable treatment.  The standard is not

20  one of perfection."

21        And that's an important point because

22  environmental regulation by its nature is difficult.  It's

23  imperfect.  That doesn't mean that it shouldn't be

24  undertaken.  And when it does get undertaken, it should not

25  be second-guessed by non-experts and by Tribunals and such

1  unless there's a genuinely compelling reason to do that.

2        And we had talked about--we had talked about

3  Daniel Kahneman and his book "Thinking Fast & Slow."  In

4  that book, he also talks about something called "the

5  hindsight bias."  The hindsight bias is a bias where, you

6  know, in retrospect, things like look like they--you know,

7  they should have been done differently.  But at the time,

8  you make the best decisions with the information that you

9  have, and you have to weigh different considerations and

10  different--and competing priorities.

11        And the Ministry in developing countries like the

12  Dominican Republic don't have too many resources.  So, you

13  know, these things are challenging.  And there are things

14  that don't get done when they need to get done.  That's

15  normal in probably every country.  And there are certain

16  things that possibly don't get done perfectly.  There are

17  mistakes made, sure.  That happens in every country.  But

18  the point of this quote here is that--precisely that, that

19  the standard can't be one of perfection for States under

20  these treaties.  Because if they did, then they would be

21  unable to regulate and to act in the public good.

22        Now, even Phase 1 posed safety risks.  And I'll

23  explain why this is relevant.  This is an inspection report

24  from the Ministry that was submitted in March--in March of

25  2011.  Apologies for the duplication of the specific date

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

1   there.  This is Exhibit R-004.  And in the conclusion--I'm
2   just going to read the whole thing because all of it is
3   highly relevant.
4       It says, "Conclusion.  Institutional weakness and
5   the voracity[1] of economic interests combine to deliver a
6   heavy blow to nature in the Municipality of Jarabacoa, and
7   currently plans are in place to construct a similar project
8   to the one under construction, without having completed the
9   one for which a permit was granted in an environmentally
10  fragile zone.  It is not necessary to be a genius in
11  environmental sciences to see this.  This zone of high
12  environmental fragility and of high natural risk should not
13  be inhabited by humans given that it is unstable and highly
14  dangerous."
15      So here you have a Ministry official expressing a
16  view several months before the permit denial that they
17  really shouldn't have even got the lower mountain permit.
18  And it's not hard to see why.  As this report stated, you
19  don't have to be a genius in environmental science to see
20  why that's a problem.  And we'll show you some photographs
21  to illustrate.  But importantly--and they keep saying,
22  like, "Oh, you know, all of a sudden erosion is a big
23  thing.  The soil is a big thing."

_____
[1] English Audio Day 5 at 03:34:01

1       It always was a big thing.  It was a big thing
2   even for them.  In their own Environmental Impact
3   Assessment, they warned not just of the impact of erosion
4   but what they themselves called the high impact erosion for
5   the Phase 2 project.
6       So you see this--they say, "There are six
7   high-significant impacts, of which two are negative.  And
8   those two are change in land use and the increased erosion
9   caused by earthmoving and vegetation removal."
10      So they themselves flagged erosion as a serious
11  problem.
12      And then they're own so-called engineer, Mr. Kay,
13  warned of the erosion risks for Phase 2 as well.  And he
14  said, "Miss-directed [sic] water has the potential to cause
15  erosion damage and to over-saturate sensitive slopes."
16      That's exactly what Mr. Navarro was saying.  You
17  oversaturate a sensitive slope that has a lot of clay
18  content in the soil and the water gets absorbed, and then
19  it's susceptible to sliding, and that causes landslides.
20  The higher up you are, the more sensitive it is, and the
21  more dangerous it is if a landslide actually happens.  You
22  don't have to be an environmental science genius to figure
23  that out.
24      Now, look at this property, you know, sort of
25  perched on the edge of a fairly steep hill.  And this one.

1   It's hard to imagine that this house here is not just one
2   strong hurricane away from blowing down that mountain.
3   Again, you don't have to be--that's just common sense in a
4   country like the Dominican Republic that has frequent
5   hurricanes and increasingly powerful hurricanes, as we all
6   have seen recently.  And there's also a lot of seismic
7   activity in the Dominican Republic, as Mr. Navarro
8   testified.
9       So this cannot possibly be a safe structure, even
10  on the lower mountain, which is what this is.  And they
11  want to put these type of structures, you know, far higher
12  up, and not just a few of them, but 70 of them.
13      There's a few others.  This is the Aroma Mountain.
14  It's also perched on the edge.
15      And the other thing that was alarming that came
16  out in this testimony this week is that Mr. Ballantine is
17  the one who basically built the road himself.  He designed
18  it.  Remember I asked him about, you know--he decided--he
19  testified in his written testimony that he had decided that
20  8 percent was the right incline for the road on the
21  mountain.
22      And then when I asked him how he figured that out,
23  he said that he had researched it.  And then when I said,
24  "What, did you Google it?"  And he said, happily, "That's
25  exactly what I did."

1       And then Mr. Kay, who also has only a high school
2   degree, was the person who took the rest--you know, the
3   rest of the[4] road project all the way through.  And that's
4   not just alarming, that's terrifying.
5       I thought I should mention that those photographs
6   that I just showed you--you may have seen in the news just
7   in the last couple of days the landslides that took place
8   in Sapporo, Japan, where houses that look very much like
9   this, on a mountain that looks very much like this,
10  basically got washed out down the--due to a landslide, and
11  dozens of people are buried in those houses under a pile of
12  rubble.
13      And if you haven't seen those photos, I encourage
14  you to look at them because they--they're--you know,
15  they're very similar to these, and they're a very strong
16  reminder of the fact that what we're talking about here is
17  not just legal, it's not just academic, it has very real
18  consequences for real people.
19      I don't think anybody could really conclude from
20  the evidence that's in the record and from the testimony
21  that you heard this week that the Ministry somehow acted
22  irresponsibly or arbitrarily or capriciously in denying
23  the--you know, the permit for the second phase, for what we

_____
[4] English Audio Day 5 at 03:38:49

1  call the Project 3.

2      It just couldn't be done safely.  That was the

3  issue, and that's the core issue that the Claimants seem to

4  be eager to avoid a discussion of instead of drawing your

5  attention to the competing projects.

6      The other important point that I wish to stress

7  before going on to the next point is that the Claimants are

8  the ones who have a burden of proof here.  And that's a key

9  issue because they really haven't produced anything.  So

10  even if you have some doubt as to whether there's some

11  basis on which to issue an award in their favor, they

12  simply have not carried their burden of proof.  And as a

13  result of that, that's another reason why they are not

14  entitled to an award.

15      And even if the Ministry did make some mistakes,

16  they certainly would not rise to the level of a violation

17  of international law.  It was the Ministry doing its job,

18  and perhaps certain mistakes were made.  But on the core

19  issues, there's really nothing that you can seriously

20  challenge.

21      It certainly does not reach the level of

22  impropriety that you would need to find a violation of the

23  minimum standard of treatment, for example.  It's a very

24  high threshold for a fair and equitable treatment

25  violation, even under the autonomous standard, let alone

1  under the minimum standard of treatment under customary

2  international law.

3      Now, a third point.  The Tribunal should err on

4  the side of the protection of the environment.  This is

5  what the Parties to the DR-CAFTA want you to do, expect you

6  to do.

7      And you see this in a number of provisions of

8  DR-CAFTA.  You have DR-CAFTA Article 10.11, which is

9  investment and[5] environment.  "Nothing in this chapter shall

10  be construed to prevent a Party from adopting, maintaining

11  or enforcing any measure otherwise consistent with this

12  chapter that it considers appropriate to ensure that

13  investment activity in its territory is undertaken in a

14  manner sensitive to environmental concerns."

15      And that's exactly what we're talking about here.

16  It's a measure that the Ministry took to make sure that

17  this investment that Mr. Ballantine wanted to make on the

18  mountain was undertaken in the manner that was sensitive to

19  environmental concerns.  That's exactly what the Ministry

20  was doing.  And this clause and other clauses in this

21  treaty, like this one from Annex 10--did I skip one?  No.

22  Annex 10-C of Paragraph 4(b), it should say at the top.

23  Apologies for that error.

_____

[5] English Audio Day 5 at 03:43:07

1      It says, "Except in rare circumstances,

2  non-discriminatory regulatory actions by a Party that are

3  designed and applied to protect legitimate public welfare

4  objectives, such as public health, safety, and the

5  environment, do not constitute indirect expropriations."

6      This is another signal from the treaty negotiators

7  telling you you can't find indirect expropriations unless

8  it's in rare circumstances.  In other words, they were

9  signaling the treaty should show a certain measure of

10  deference to governments in their regulation of certain

11  areas including the environment.  It's another way that the

12  treaty negotiators were saying to tribunals such as this

13  one, "Look, you know, we really want you to pay attention

14  to these issues and to protect our right to regulate on

15  environmental issues."

16      Again, the DR-CAFTA Article 17.1, a third

17  provision, levels of protection.  "Recognizing the right of

18  each Party to establish its own levels of domestic

19  environmental protection and environmental development

20  policies and priorities, and to adopt or modify accordingly

21  its environmental laws and policies, each Party shall

22  ensure that its laws and policies provide for and encourage

23  high levels of environmental protection, and shall strive

24  to continue to improve those laws and policies."

25      Now, what do these clauses say collectively?  At a

1  minimum, these clauses have to mean that this Tribunal has

2  to err on the side of protecting the environment rather

3  than take--adopting a decision that ultimately would have

4  an adverse effect on the environment.

5      If you were to--if you were to rule in favor of

6  the Claimants in this case, what kind of message would that

7  send to environmental regulators, not only in the Dominican

8  Republic but in all of the DR-CAFTA countries?  What kind

9  of chilling effect would it have on their measures?

10      Why does Mr. Navarro and Mr.--why do Mr. Navarro

11  and Mr. Martínez have to be--have to be brought here and

12  raked over the coals for five, six hours in a row?  Why

13  should these people's technical decisions be

14  second-guessed.  You saw Mr. Navarro.  You saw Mr. Martínez

15  and how--how knowledgeable they are about these issues.

16  They should be deferred to on these technical issues.

17      Just a few words by way of conclusion,

18  Mr. Chairman and the members of the Tribunal.  While we're

19  on the subject of Mr. Navarro and Mr. Martínez, public

20  servants everywhere are generally underpaid, undervalued,

21  underappreciated, but they often make enormous

22  contributions.

23      Take Mr. Navarro and Mr. Martínez.  You saw them

24  testify this week.  You saw their Expert Reports and

25  Witness Statement.  And you saw how well prepared they are,

1  how well educated, how well trained, how experienced, how
2  knowledgeable, how thoughtful, how articulate they were.
3      The Minister described--Minister Fernández Mirabal
4  described them as glorious.  And opposing counsel mocked
5  that description, but I think it's quite apt.
6      These are the people who are genuinely doing God's
7  work by protecting the environment, devoting their lives to
8  protecting nature.  It is their works that the Tribunal
9  should be protecting rather than the work of a bored
10 millionaire from the United States who is searching for an
11 adventure and has a vision.
12     The world is seeing a lot of perturbing changes
13 and perhaps none more perturbing than climate change, and
14 climate change will bring with it--is bringing with it
15 significant and acute new environmental challenges.  And it
16 is precisely public servants like Mr. Navarro and
17 Mr. Martínez who will help us face those challenges going
18 forward.
19     So, Mr. Chairman and Members of the Tribunal, they
20 say that the cure for an obsession is to get a different
21 one.  Allow Mr. Ballantine to go find a different
22 adventure, and let Mr. Navarro and Mr. Martínez do their
23 job.  We all need that right now.
24     Thank you.
25     PRESIDENT RAMÍREZ HERNÁNDEZ:  Thank you very much.

1  Could we take a five-minute break before we start
2  questions, please.  So, five minutes.
3      (Brief recess.)
4      QUESTIONS FROM THE TRIBUNAL
5      PRESIDENT RAMÍREZ HERNÁNDEZ:  So, we're ready.
6      ARBITRATOR VINUESA:  Thank you, Mr. President.  I
7  will formulate a few questions.  What I will do is I will
8  give the opportunity--if I go to Claimants with a question,
9  I will leave just a few minutes to the other party to have
10 some sort of comment, and the other way around, just to be
11 fair and have a chance to listen to both sides.
12     I have a first question directing to Claimants'
13 counsel, and we hear, during this week, Mr. Ballantine's
14 reasons why he became a Dominican national.  And, of
15 course, today we--also again Claimant was referring to
16 that.
17     My question to counsel is if you could put those
18 reasons, which it sounds very subjective to me, within an
19 objective legal context.  Just to make me--to make me,
20 myself, clear, could you discriminate amongst subjective
21 from objective criteria.  You mentioned both, but just to
22 have a--
23     MR. BALDWIN:  Yes.  Thank you, Professor Vinuesa.
24     I think that we discussed this a little bit on the
25 first day, and I think this is a good opportunity for me to

1  clarify a little bit because I think that when I looked
2  back on that answer, it wasn't as clear as I would have
3  liked it to be.
4      If you look at the--I'm going to go to the Iran
5  Claims Tribunal because this is where we have the biggest
6  body of these cases.  If you go and you look at the Iran
7  Claims Tribunal cases, and also if you look at
8  Judge Brower's, you know, very famous book on the Iran
9  Claims Tribunal, you see that the test is essentially an
10 objective one, except that the subjective elements are
11 present and form part of that analysis.
12     So, I think they're both essentially related.  I
13 think that when I was talking on Monday about objectivity,
14 I think what I really meant to say was that a sub--you
15 know, that the Tribunal, when they're looking at a
16 subjective statement, should put that in the objective
17 framework of looking at the test.
18     But certainly because this has to do with
19 attachments, I think, you know--just for example, to step
20 back for a moment.  Habitual residence is a pretty easy
21 objective standard.  Here are the facts.
22     I think in terms of some of the other
23 things--attachments, I think that the view of the Claimant,
24 or Claimants in this case, is, in part, going to be
25 subjective.  So, I think--and this is confirmed by

1  Judge Brower in his Iran Claims Tribunal book, that it's
2  essentially an objective test but with subjective elements
3  to those--to that test.
4      ARBITRATOR VINUESA:  Okay.  Thank you very much.
5      Would you like to have a very brief comment?  Very
6  brief.
7      MS. SILBERMAN:  Yes, please.
8      So, I understood your question slightly
9  differently.  I understood your question to be asking if
10 the Claimants could be providing any basis for making
11 objective the subjective reasons for which someone would
12 seek Dominican nationality.
13     And the Ballantines have asserted that there were
14 business reasons why they had obtained Dominican
15 nationality and there was succession planning, and the
16 Dominican Republic has pointed to the objective fact of the
17 Ballantines' statement in the naturalization application
18 that they were seeking Dominican nationality because they
19 identified closely with Dominican culture.
20     Choosing one's nationality, of course, is a
21 subjective event, but it can be corroborated through
22 objective evidence.  And here there's no evidence
23 whatsoever of--apart from testimony, of this succession
24 planning theory.  There's no citation to any law.
25     The business reasons argument doesn't really make

1  sense because the Ballantines thereafter went on to obtain
2  Dominican nationality for two of their children, and the
3  Ballantines' daughter, Rachel, is the owner of the Aroma
4  Restaurant and she didn't obtain Dominican nationality.
5  So, if there was a business reason for Jamaca de Dios, it
6  would seem to follow there would be a business reason for
7  Aroma.
8          So, the subjective reasons that have been offered
9  to the Tribunal, out of those three, only one is really
10 corroborated, and that is the identification with Dominican
11 culture.
12         The Ballantines also state on their website that
13 they spent a transformative year in the Dominican Republic
14 and that they--they love Dominican culture.  So, that's the
15 way that the Ballantines are putting themselves out.
16         ARBITRATOR VINUESA:  I have a second question for
17 counsel for Claimants.  And this refers to the applicable
18 law to define the test of dominant and effective
19 nationality.
20         And the question is:  Could you isolate dominant
21 and effective nationality from applying custom
22 international law?
23         MR. BALDWIN:  Can you say a--I got the--all up
24 until the very last part.
25         ARBITRATOR VINUESA:  I'm asking you if you can

1  isolate defining or determining dominant and effective
2  nationality from applying international law--custom
3  international law.  I mean, your test will be different
4  from custom international law, or are you applying
5  something else?
6          MR. BALDWIN:  I think that there's
7  two sides--there's two parts to that, Professor Vinuesa.  I
8  think the first thing is the timing issue that we've talked
9  about is textual because that's the agreement.
10         I think when you get to the test itself, because
11 CAFTA is silent as to the test, it's at that point that I
12 think you look to customary international law and other
13 sources of law, some soft law sources as well, to see how
14 that test should be conducted.
15         I think that the Parties and the Respondent will
16 correct me if I'm not right about this, but I think the
17 parties have generally agreed that the factors that the
18 Iran Claims Tribunal looked at, which also were sourced
19 essentially from the earlier cases, it wasn't an invention
20 of--it wasn't an invention of the A/18 Tribunal.  It
21 came--it was there previously.
22         I think we agree generally on the framework.  But
23 I think that framework--I think that you could maybe, you
24 know--you could maybe make some distinctions between
25 customary international law and other sources of

1  international law.
2          But I think that the--that certainly the factors
3  you use aren't in CAFTA, and so I think you have to go to
4  customary international law to find those factors.
5          ARBITRATOR VINUESA:  Any brief comment?
6          MS. SILBERMAN:  Yes.  This, of course, is a
7  customary international law concept that has been developed
8  over the course of many years.  The notion of dominant and
9  effective nationality grew out of diplomatic protection,
10 which is a customary international law issue.
11         And to look to customary international law, it
12 seems to be consistent with Article 10.22 of DR-CAFTA on
13 governing law, which instructs the Tribunal to decide
14 issues in dispute in accordance with DR-CAFTA itself and
15 applicable rules of international law.
16         ARBITRATOR VINUESA:  All right.  Thank you very
17 much.
18         Now, I have a question to both Parties.  I would
19 like to hear comments from both Parties in reference to
20 Environmental Law 64-00.  In relation to interpretation of
21 application of Article 122, we think the general structure
22 and objectives of that law, if the Precautionary Principle
23 is within or is not over there.
24         And sort of second question is:  Is it possible to
25 isolate the application of Article 122 in Chapter 2, which

1  is de los suelos in Spanish, from Chapter 1 of the same
2  Title IV, which is named the de la norma comunes?
3          Should I repeat it?  Because I wrote it down.  It
4  sounds rather tricky.  It's tricky, actually.
5          Is it possible to isolate the application of
6  Article 122 in Chapter 2, de los suelos, from Chapter 1 of
7  the same Title, which is on de norma comunes?  It's like a
8  chapeau from Chapter 2.
9          And the first part was the general context of
10 Article 122 in applying and interpreting Article 122 on the
11 general objectives of the Environmental Law.
12         Whoever wants to start.  No one?
13         MR. ALLISON:  I'd be happy to start.
14         ARBITRATOR VINUESA:  All right.  Fine.
15         MR. ALLISON:  Thank you.
16         ARBITRATOR VINUESA:  Thank you.
17         MR. ALLISON:  The way I believe the Article 122 is
18 both written and has been interpreted by the witness who
19 testified today is that the text of the law does not
20 prohibit development on slopes below 60 percent, but it
21 does prohibit development on slopes in excess of
22 60 percent.
23         I also believe the witness testified that simply
24 because there are slopes less than 60 percent, Article 122
25 does not authorize construction.

1   But Article 122 is not a barrier to construction.
2   ARBITRATOR VINUESA:  Claimant--sorry.  Counsel.
3   Sorry.  What I mean to ask you is how you interpret
4   Article 122 within the context of the whole Environmental
5   Law.  This is chapeau previous to Chapter 2, which is
6   Chapter 1 in Title IV.  That's what I mean.
7   MR. ALLISON:  Sure.  Well, Article 122 is
8   applicable, but it is not to the exclusion of Article 1.
9   ARBITRATOR VINUESA:  Okay.  Thank you.
10   Do you have any comments?
11   MS. SILBERMAN:  Yes.  During your question, you
12   also mentioned that the Precautionary Principle wasn't
13   stated expressly in Article 122.  It is, however, stated
14   expressly in Article 8 of the law, and Article 8 is
15   in--underneath the chapeau of Title 1, Chapter 1, "Basic
16   Principles."
17   So, Article 122 would be interpreted in accordance
18   with these basic principles, which would include the
19   Precautionary Principle.
20   ARBITRATOR VINUESA:  All right.  Thank you.
21   I have a very last question.  And it's for both.
22   And I think it's--I would like to hear first Respondent.
23   But whatever wants to start.
24   And the question is:  Has the creation of the Park
25   diminish and/or destroy an owner's right to their property

within the Park?
2   And then the second question:  What development
3   building rights have the Ballantines at the time of the
4   Park creation, taking into account the compatibility of an
5   Environmental Law application vis-à-vis the decree of
6   creation of the Baiguate Park.
7   Should I repeat it?
8   MR. BALDWIN:  Yes, if you could.  Sorry,
9   Professor.
10   ARBITRATOR VINUESA:  Yes.  Has the creation of the
11   Park diminish and/or destroy owner's right to the property
12   within the Park?
13   And then what development building rights have the
14   Ballantines at the time of the Park creation, taking into
15   account the compatibility or the application for
16   Environmental Law vis-à-vis the decree creating Baiguate
17   Park?
18   MR. ALLISON:  We'll let the Respondent.
19   ARBITRATOR VINUESA:  All right.  That's what I
20   meant.  You can take two seconds off--two minutes.
21   MR. Di ROSA:  Mr. Vinuesa, we're having a little
22   bit of trouble parsing the question grammatically.  I don't
23   know if you can reform--
24   ARBITRATOR VINUESA:  In Spanish?
25   MR. Di ROSA:  Perhaps, or just reformulate it in

1   English, or whatever is comfortable for you.  I apologize.
2   ARBITRATOR VINUESA:  I won't feel insulted
3   actually.  I thought it was quite clear.  I would presume
4   that you don't want to understand the question.  But I will
5   not go into that.
6   What I'm asking here is whether the creation of
7   the Park itself diminished or altered the rights of those
8   who had property inside the Park.
9   This is the second portion.  It's a little bit
10   more complicated.  It would also be in Spanish.  And my
11   question is:  What would be the rights for the developments
12   that the Ballantines would have at the time of creation of
13   the Park?  And this is linked to the application of the law
14   on environment vis-à-vis the creation of the Park.
15   MR. Di ROSA:  Mr. Chairman, we're going to have
16   our Dominican lawyer answer the questions since she's well
17   equipped to do so.
18   ARBITRATOR VINUESA:  All right.  Sure.
19   MS. TAVERAS:  Professor Vinuesa, with regard to
20   the last question, property rights over the--whatever area
21   is included in the Park remain.  Under Dominican law, if
22   there is no decree of declaratoria pública, property is not
23   lost.  And that hasn't occurred in this case.
24   The only thing that's limited is the use, but
25   property rights remain.

As to what rights the Ballantines had at the time
2   of the creation of the Park, in 2009, at least from the
3   evidence that we've seen the Claimants submit, C-31, more
4   than half of the real estate that they are claiming was
5   going to be developed in what they call Phase 2, we call
6   Project 3, was not even acquired.  And they did not have a
7   permit to develop.  So, they had no expectation that they
8   would be allowed to develop there.
9   ARBITRATOR VINUESA:  All right.  Fair enough.
10   Thank you.  But I think it was clear in English.  I was
11   frightened.  I do understand it.
12   Do you need clarification?
13   MR. BALDWIN:  No, I don't think so.  I've had
14   three opportunities now to hear it and read it.
15   The creation of the Park by itself caused--did not
16   diminish the value of the Ballantines' land at all because
17   the creation of the Park--although the creation, as we
18   argue, was discriminatory and arbitrary, the Park itself,
19   when it was created, didn't do that, no more than when Law
20   122 was passed did it--I mean, the Ballantines bought after
21   the law--but no more than that, you know, would have
22   diminished there.
23   But the issue is, is that it's the application of
24   that National Park law, the law that created the protected
25   areas.  It's that application to the permit request of the

1    Ballantines that caused the loss.

2         Now, there's various reasons for that.  And I

3    think the first one counsel for Respondent has stated is

4    that there are uses for those properties.  And, in addition

5    to the official sanctioned uses for those properties, we've

6    seen, with Rancho Guaraguao and with the development

7    activities going on on Aloma Mountain, that the--that, you

8    know, there's opportunities that are given to others to

9    develop in these National Parks, even without a permit.

10        So, it becomes a--it diminishes--it diminished the

11   value of the Ballantines' land, in that fourth denial,

12   the National Park was used as a basis to deny that.  And

13   that's when the discriminatory and the arbitrary nature of

14   the Park sort of sprung into play.

15        Because as the Respondent itself admits,

16   ecotourism is allowed in the Park.  So--and the

17   Ballantines, as you'll recall, when the Empaca Redes people

18   told them--told Mr. Ballantine about the creation of the

19   Park, it says, you know, ecotourism project "such as yours"

20   are allowed in the Park.

21        And just one other point to that is that another

22   thing that the Empaca Redes people told them, and

23   Respondent has admitted as well, is that the defined uses

24   of the area in the Park--in other words, ecotourism is

25   allowed in the law.

1         There are then--there is then a Park Management

2    Plan that gives a little more granularity as to what you

3    can do.  And we've seen that map that shows that ecotourism

4    is allowed.  It actually shows the area where you can do

5    the ecotourism.

6         The issue here for the purposes of the

7    Ballantines' legal claim is that Park Management Plan

8    didn't come out until just very shortly before, I think,

9    the Statement of Defense.  And so it was well after the

10   2014 time period when the Ballantines brought their claim.

11        So, at the time in 2014 when the Ballantines had

12   brought their claim, their property had been denied on the

13   basis of National Park, and you were already five years

14   into it with no guidance as to what can be allowed.

15        But the critical point is the diminution of the

16   value of the property did not occur until the permit was

17   rejected.

18        ARBITRATOR VINUESA:  Thank you very much.

19        MR. Di ROSA:  Mr. Vinuesa, would we be able to

20   respond very briefly to that?

21        ARBITRATOR VINUESA:  Yes.

22        MR. Di ROSA:  They raised a number of points.

23   First of all, when the Park was created, they did not have

24   any permits certainly, and they didn't even have a lot of

25   the land.  Some of the land was purchased afterwards.

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

1         And they--

2         ARBITRATOR VINUESA:  Sorry.  If we can review

3    whatever so it's just--

4         MR. Di ROSA:  My point is simply that they assumed

5    the risk because they were aware of the existence of the

6    Park.  They were told by their environmental consultant.

7    You see that at Exhibit R-269 and Exhibit R-270.  In

8    September 2010, they were already aware of the Park's

9    creation and of its limitations.  So, you know, they can't

10   be heard to complain about it if they subsequently, you

11   know, were inclined to put up a project there.

12        They also assumed the risk that the permit would

13   be denied.

14        ARBITRATOR VINUESA:  I'm sorry.  That's out of

15   what I was asking.  So, thank you very much.  But we have

16   lots of material.  Do you want to comment on that?

17        MR. ALLISON:  No.  Other than I disagree with his

18   characterization of the evidence.

19        ARBITRATOR CHEEK:  Thank you.

20        So, if I could follow up on this line of

21   questioning but perhaps ask, hopefully, a slightly

22   different question, which is that it sounds like both

23   Parties are in agreement that once the Park was created,

24   that the property rights remained and so the property still

25   had value.

1         Let's assume for the sake of argument that through

2    bona fide environmental regulatory activity, the Dominican

3    Republic decides that no activity can take place on this

4    land.

5         Once the Dominican Republic decides that no

6    activity can take place on the land, at that point is there

7    a diminution in value?  And if so, is there any obligation

8    to compensate for that diminution in value?

9         MR. BALDWIN:  We're happy to answer for the

10   Claimants' side.  Oh, you want to wait.

11        MR. Di ROSA:  Ms. Cheek, our position would be,

12   and certainly in this particular case, they would not

13   be--there--they would not be entitled to any compensation

14   under the treaty simply by virtue of the operation of the

15   three-year statute of limitations under Article 10.18 in

16   DR-CAFTA.

17        Whether they would have a right to compensation

18   under Dominican law is a separate issue on which we would

19   have to get back to you, unfortunately.  You know, we're

20   not in a position right now--since neither of the partners

21   on the team here are Dominican lawyers, we can't really

22   opine without consulting.

23        If you wish, we could consult with the environment

24   lawyers who are here, and we can try to revert to--a little

25   later in the session, if that would be helpful.  Thank you.

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

1    ARBITRATOR CHEEK:  Okay.  Thank you.  I think
2  that's sufficient for now.
3    And did Claimant wish to comment?
4    MR. ALLISON:  No, other than our answers to your
5  question are yes and yes.
6    ARBITRATOR CHEEK:  Okay.
7    MR. ALLISON:  Thank you.
8    ARBITRATOR CHEEK:  So, I did have a second
9  question that goes to the regulatory criteria used to make
10  a decision that I believe--and I apologize for not using
11  the exact words of Respondent--but that there is no way
12  that the Ballantines' project for what they call Phase 2
13  could move forward.
14    And when the Ministry decided that there was no
15  way that the project could move forward--well, let me state
16  one more premise, which is that also, let's accept for the
17  sake of argument that there was an obligation on the
18  Ballantines' part to know what the criteria was that would
19  be applied so that they could put forward a project that,
20  in their view at least, might meet the criteria.
21    And so my question is:  Where does one look to
22  find the criteria?  Where does the Ministry of the
23  Environment look to to identify the criteria that they will
24  apply to decide that a project cannot go forward because
25  the risk to the environment is too great?

1    And perhaps that's Article 122.  Perhaps that is
2  something else.
3    MS. TAVERAS:  The main criteria that the
4  environmental agency applies in the application of
5  Law 64-00 is Article 8, which is the Precautionary
6  Principle.
7    And obviously on the basis of technical
8  considerations, then they would adopt whatever they believe
9  is the appropriate decision.  There are also guidelines and
10  regulations.  Right now the guidelines in force were
11  adopted in 2014.
12    ARBITRATOR CHEEK:  And are part of those technical
13  requirements, guidelines and regulations, Article 122 also
14  of Law 64-00?
15    MS. TAVERAS:  Of course.
16    ARBITRATOR CHEEK:  And what else?
17    MS. TAVERAS:  Article 110, which prohibits human
18  settlements in areas of risk.
19    ARBITRATOR CHEEK:  So, I don't want to cut you
20  off, Ms. Taveras.  But would one look, then, to the
21  Environmental Law as a whole to be able to identify the
22  requirements?
23    MS. TAVERAS:  Yes.
24    ARBITRATOR CHEEK:  Did Claimant have any comment?
25    MR. ALLISON:  Claimant just notes that the

1  guidelines referenced by the Respondent were enacted in
2  2014, and, thus, couldn't have been the technical
3  guidelines used in 2011 at the time when the Ballantines'
4  permit was first denied.
5    MS. TAVERAS:  May I respond to that?
6    ARBITRATOR CHEEK:  Please.
7    MS. TAVERAS:  At the time of the evaluation of the
8  project, there were guidelines.  Then, the version of 2011
9  would have been in force.
10    And in addition to that, the law of protected
11  areas would also be applied.  Zacarías, in his Report,
12  explains the applicable guidelines.  Zacarías⁶ Navarro.
13    ARBITRATOR CHEEK:  Okay.  Thank you.
14    And one final question.  Perhaps Claimant can
15  respond--oh, I'm sorry, did you--
16    MR. ALLISON:  No, no, no, that's--
17    ARBITRATOR CHEEK:  One further question--perhaps
18  Claimant can respond to this first--which is that there's
19  been a lot of talk about comparators and relevant
20  comparators.
21    I was wondering if you could speak to how you
22  think we should evaluate the criteria of being on
23  Category 2 National Park land as part of a relevant

_____
⁶ English Audio Day 5 at 04:24:15

1  criteria for determining whether projects are in like
2  circumstances or not.
3    MR. BALDWIN:  I think with regard to the
4  Category 2 National Parks, I think you would have to--it's
5  the Dominican Republic that establishes the categories of
6  the park.  And they've decided that Category 2 is a
7  particular type of park, meaning that the characteristics
8  or the manner of protection is the same.
9    So, I think once you have that framework with
10  regard to the--then you have to find somebody operating in
11  one or developing in one.  And then you look, and I think
12  in this case you would look and say whether they're
13  operating with a permit--with impunity or granted a permit,
14  I think you would look at the type of operation, and you
15  would do it.
16    It would be our argument that even Ocoa Bay is a
17  comparator because this is tourism, this is buildings being
18  put up, anything that people--just like with the hotel and
19  the rental properties that the Ballantines were going to do
20  that they're doing.
21    We think even Ocoa Bay, even though it's in a
22  flatter land, it's near the water.  But it's a Category 2
23  National Park.  It permitted, and it was permitted for
24  hotels and structures and houses and pools and everything
25  else.

1  Now, the obvious--the more easier one then would
2  be Rancho Guaraguao because in this case, it's ecotourism.
3  The Ballantines' project is ecotourism.  They're both in
4  National Parks.  Rancho Guaraguao is in a higher thing, but
5  they're doing the same thing, they're selling houses.  And
6  we've seen some of those houses at Rancho Guaraguao as part
7  of an overall development project.  So, to those, those
8  would be a competitor.
9  But I think the process, Ms. Cheek, to answer your
10  question, would be, the relevant legal framework is
11  Category 2, and then you would look at whether the
12  businesses have similarity in the type of activities that
13  they do.
14  My colleague wants me to mention that projects
15  that aren't in parks are comparators.  I think, you know,
16  your question was about the parks.  Obviously, we have lots
17  of other comparators that aren't in parks, but I understood
18  your question just to be limited to the parks themselves.
19  Is that correct?
20  ARBITRATOR CHEEK:  My particular question was
21  about the parks.  And I do understand Claimants maintain
22  their position that for like circumstances, we should look
23  at a broader range of comparators, not just those within
24  Category 2 Parks.
25  MR. BALDWIN:  Yes, because one of the denials was

1  also on the basis of Law 122 and the slopes that were
2  mentioned there as well.
3  So, projects that aren't in national--because the
4  first three denials were on that basis.  So projects, you
5  know, Quintas del Bosque and La Montaña and these other
6  ones also are comparators but of a different legal
7  framework.
8  So, those are comparators, essentially to the
9  legal framework that's established under Article 122.  Then
10  when you're under that legal framework, you look at
11  businesses that have similarities, and our comparators are
12  ones that would have those similarities.
13  ARBITRATOR CHEEK:  Thank you.
14  Did Respondent have any comment?
15  MS. SILBERMAN:  Yes, just to clarify that as
16  Professor Martínez explains in his First Statement in
17  Paragraph 44, the designation of Category 2 comes from the
18  International Standards.  The International Union for the
19  Conservation of Nature.
20  There is an exhibit, Exhibit R-52, which states
21  that the purpose of a Category 2 or National Park is "to
22  protect natural biodiversity, along with its underlying
23  ecological structure and supporting environmental processes
24  and to promote education and recreation."
25  And it's because of that that the difference

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

1  between Ocoa Bay, which is not a mountain project and, for
2  example, a project within Baiguate National Park wouldn't
3  necessarily be the right comparators because there are
4  two different areas that are protected for two different
5  reasons and have two different ecological structures behind
6  them.
7  ARBITRATOR CHEEK:  Thank you.  That's all the
8  questions I have, Mr. President.
9  PRESIDENT RAMÍREZ HERNÁNDEZ:  Okay.  I have
10  three questions.  One for Claimants, one for Respondents,
11  and one for both.
12  So, let me go first to the Claimants, and I will
13  allow Respondent to make a comment, as well as Claimants to
14  the questions I make to Respondent.
15  Let's assume, for the sake of my hypothetical,
16  that there's a Mexico Dominican Republic free trade[7]
17  agreement which has the same provision about nationality
18  that we are discussing in this case.
19  I'm about to become 50, so let's say that I have a
20  middle age crisis.  And among the many things that I don't
21  know how to do, many things in life, is I don't know how to
22  dance merengue, and I don't know how to play baseball.
23  So, I decide to go to the Dominican Republic

1  because I want to be like Sammy Sosa or Manny Ramirez, and
2  I want to be like Wilfredo Castro, and so I want to learn
3  how to dance and I want to learn how to play baseball at
4  this time in my life.
5  So, I go there.  I leave everything behind.  I go
6  there to live.  I want to--let's say that in order to
7  become or take classes in an instruction facility in the
8  Dominican Republic, I need to become--I need to be a
9  national of the Dominican Republic.  So, I mail the
10  documents and become a national of the Dominican Republic
11  so that I can play--get this instruction from a very famous
12  Dominican manager in baseball.
13  And throughout this process, I buy some land in
14  the Dominican Republic that at the end, sometimes--at some
15  point, the Dominican Republic authorities say, "Well, your
16  land is in a National Park and you cannot build."
17  How is that different, this hypothetical, to a
18  scenario where I go and I state that, "My only reason is to
19  invest and that I will do it because I will not want to
20  lose the entire investment"?
21  The point is--and in one of your slides, the
22  Claimants say, "Economical consideration related solely to
23  investment should not be a factor."
24  So--and you also mention in your presentation,
25  is--the idea of a chapter is to encourage foreign

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR

Worldwide Reporting, LLP
info@wwreporting.com

1  investment, not domestic investment.
2        So, how come the fact that you became an investor
3  or became a national to be an investor will not be a very
4  relevant factor in determining whether you have a dominant
5  Dominican Republic nationality?
6        And I'm talking because we already talked about
7  objective criteria.  But wouldn't this be different from
8  the example where I took a nationality because I wanted to
9  learn baseball and learn how to dance, as opposed to I did
10 everything to invest, I did everything related to
11 investment, so how come a chapter related to investment
12 that talks about protection of investment not be relevant,
13 the fact that I acquired nationality because I wanted to
14 invest?
15        MR. BALDWIN:  I think my first response,
16 Mr. President, would be that under your hypothetical
17 scenario, you would definitely not be dominantly and
18 effectively Dominican.  So, let me say that.
19        I think there's a very basic reason for this, and
20 it goes precisely to Professor Vinuesa's, I think, first
21 question.  And that is the--although the--we look for the
22 analysis of the dominant and effective nationality issue
23 under customary international law and some other sources of
24 law, and that's where we get the factors that arise from
25 that test.

1        But in CAFTA, dominant and effective nationality
2  arises differently than it does in Nottebohm and other
3  instances where it arises as a matter of diplomatic
4  protection.  And this is precisely--precisely because
5  Nottebohm--I'm sorry, not Nottebohm.  Because CAFTA--when
6  dominant and effective nationality is put in CAFTA, it's
7  put in the context of an investment regime.  It presupposes
8  an investment in CAFTA.
9        So, when you're looking at CAFTA--and you don't
10 look at CAFTA dominant and effective nationality the same
11 way even though the same factors that are pulled from
12 customary international law are relevant.  When you look at
13 how you assess the probative value of those factors, you
14 don't look at that.
15        And the reason that's our position is, again, if
16 you separate a passive investor who just buys shares, never
17 goes into the company.  Let's do that.  Every managing
18 investor, every investor that's working some project or
19 investment in that host country will have these economic
20 ties.
21        So, we're not suggesting that, you know, they
22 shouldn't be discussed.  It's fine for Respondent to
23 discuss it.  I understand why they're trying to make that
24 seem like some big connection.
25        I think the point that was made this morning was

1  that the probative value of that are slim.  Because it is
2  precisely for the reasons that CAFTA presupposes, which is
3  an investment in the country, as to why those economic
4  things are made.
5        And the thing I would ask the Tribunal is--and
6  this is where the Tribunal will decide how it views the
7  positions put forward between the Parties.
8        Because if--if--if the Tribunal views some
9  economic connection as something not necessary for the
10 management of the investment, then I think the Tribunal
11 would be right to consider--I think it would be a very
12 minor consideration, but I think the Tribunal can say,
13 "Look, here's an economic connection, but one that's not
14 tied to the actual presupposition of the CAFTA investment.
15        Here I think the economic conditions that we--that
16 I talked about earlier and that we've talked about in the
17 papers are things that necessarily arise only from the
18 investment, and that's precisely what CAFTA talks about.
19        So in the framework of CAFTA, differently than how
20 you might do it in a diplomatic protection thing, this sort
21 of economic connections presuppose; therefore, it makes it,
22 you know, I would say irrelevant.
23        But even if you don't agree with me, it certainly
24 lessens the relevancy of it when Mr. Ballantine has to open
25 up a bank account to do it.  He has to buy--he may not have

1  to buy a house, but he has to live somewhere because he's
2  down there managing the project.
3        So, these sort of economic connections are a
4  necessity tied to that.  So that's the framework that we
5  would put that in.
6        PRESIDENT RAMÍREZ HERNÁNDEZ:  Respondent.
7        MR. Di ROSA:  Mr. Chairman, when an investor such
8  as Mr. Ballantine goes to a different country, and amongst
9  the many things that he does, he decides that he wants to
10 be a Dominican investor, then it seems to us that's highly
11 relevant by definition, right?
12        He has testified extensively that they acquired
13 the Dominican nationality for business and commercial
14 purposes.  That's been their main argument all week long.
15 And certainly that would seem to be one of the factors that
16 has to be taken into account.
17        Under the DR-CAFTA nationality provisions, you
18 have to be dominant and effective national of the other
19 state at two critical times, when the claim arose, when the
20 claim was filed.
21        That means that as of 2011, they had to be
22 dominant U.S. nationals, and they weren't.  At that time
23 they had--all their--you know, all their lives essentially
24 centered in the Dominican Republic.
25        They say they traveled a lot to the U.S., and

1  that's fine.  That happens fairly frequently with people
2  who are dual nationals.  But they were permanent residents
3  in the Dominican Republic, and there are objective criteria
4  that have to be assessed as of that point in time of the
5  two critical dates.
6         And as of those two points in time, they had--they
7  had moved all their activities, so to speak.  You know,
8  their finances were centered in the Dominican Republic.
9  Their lives were centered in the Dominican Republic, and
10 then they took other steps like acquiring permanent
11 residency, and then, finally, acquiring the nationality
12 voluntarily.
13        And if their reason was precisely to become
14 Dominican investors, then surely that's relevant.
15        PRESIDENT RAMÍREZ HERNÁNDEZ:  Okay.  Now I have a
16 second question, but this goes to the national treatment
17 claim, and I go to Respondent.
18        Let me go to your Statement of Defense in
19 Paragraph 148.  And I think Claimant has--I think both
20 Parties agree--and correct me if I'm not being
21 truthful--agree with what is the standard to be applied on
22 the national treatment.
23        And the first element is whether the domestic
24 investor is an appropriate comparator.  The second element
25 is whether the disputing investor was, in fact, accorded a

1  less favorable treatment than its domestic.  And the third
2  element is whether any preferential treatment that may have
3  existed was justified on the basis of legitimate policy or
4  legal reasons.
5         So that's the standard.
6         Claimant argues that all of these projects are in
7  like circumstances, and based on that, they are arguing
8  that the treatment was less favorable because all the
9  projects were able to get the permit as opposed to
10 Claimants.
11        Now, I go to your presentation today, Page 66,
12 where you say elements that differentiate the treatment
13 before these.  And my question is:  Weren't you required,
14 in order to prove that these projects were not in like
15 circumstances, or the third element, which is that they
16 were--any differential treatment was justified, and you
17 have raised the environmental reasons as a reason to
18 justify a legitimate policy, the different treatment.
19        Weren't you required to put evidence on why these
20 other projects were not in like circumstances, one; and,
21 second, whether there was--these projects had a legitimate
22 policy reason, which you have reinstated throughout this
23 hearing, which is the environment.
24        MS. SILBERMAN:  So, Mr. Chairman, as the United
25 States stated in its non-disputing party submission,

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1  because a Claimant bears the burden of proving its claims,
2  that includes the burden of proof on national treatment.
3         And I can direct you toward the exact paragraph,
4  if that would be helpful.
5         PRESIDENT RAMÍREZ HERNÁNDEZ:  And I go to that,
6  because I thought that that was going to be your answer.
7         So you--the Claimant comes forward--and I'm trying
8  to understand how the burden of proof plays here, and
9  that's where the question is going.
10        The Claimant says, well, the reasons they gave me
11 was the slopes, the environmental fragility, the natural
12 risk.  They put forward and say, well, these are the
13 projects that are within some radius.  And how can the
14 Claimant know that there were different conditions on the
15 other project?  They come forward with evidence, saying,
16 "Well, this is how it plays."
17        So, in the sense, haven't they discharged the
18 burden by saying, "Well, these are all these projects.  The
19 stated reasons are the same.  Both of them--all the
20 projects talk about environmental fragility, all of them
21 talk about natural risk."
22        So the Claimants have said, "Well, all of them are
23 in like circumstances."
24        So wasn't your burden to say, "Well, they were
25 not," for all the reasons you have stated, which was the

1  environmental conditions in Jamaca were very different from
2  the other ones.
3         And the other--the only environmental conditions
4  that are similar or that are like are the Aloma.  So even
5  to--even to prove that Aloma had the same circumstances,
6  wouldn't you have needed to supply evidence and say, "Well,
7  this is because"--and talk about soil.  Wouldn't you need
8  also to have put evidence to say, "Well, the soil is the
9  same"?
10        So that's why--I mean, you are raising as a
11 difference the comparators on the environmental elements.
12 So wouldn't you be required to prove that all these
13 environment elements are similar here and different in the
14 other projects?
15        MS. SILBERMAN:  So as the United States explains,
16 the Claimant is required to establish that there is
17 unjustified differential treatment between investors who
18 are in like circumstances.
19        So the burden is not on the Respondent to provide
20 justification.  The Claimant has to establish with evidence
21 that there was--that there were two investors in like
22 circumstances that were treated differently, and that the
23 treatment--that the difference in treatment was
24 unjustified.
25        Now, to the extent that there's a question about

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

Realtime Stenographer
Margie Dauster, RMR-CRR
Worldwide Reporting, LLP
info@wwreporting.com

1   whether there's any evidence that the Dominican Republic
2   has put in, the big chart that Mr. Di Rosa showed on the
3   first day, Appendix A, was an appendix that was provided
4   with the Dominican Republic's Rejoinder in its proceeding,
5   and it included documents that supported the items that
6   were in this very large table. They were all of the
7   A documents, and many of them were used in both Parties'
8   cross-examinations and in some of the openings and closing
9   statements. So there is evidence supporting all of these
10  items in the chart.
11          What we've explained is that mere differential
12  treatment isn't sufficient to establish that there has been
13  a violation of national treatment. And the Ballantines, to
14  the extent that they have even identified differential
15  treatment--it's not really clear because they sort of
16  jumble everything together--they certainly haven't proven
17  unjustified treatment on the basis of nationality.
18          MR. BALDWIN: Of course, the ultimate burden of
19  proof on the claim lies with the Claimant. But, the--with
20  regard to the particular national treatment issue, you
21  know, the Claimant has to show the comparators, has to show
22  the differential treatment.
23          And at that point, to the extent that the State is
24  going to argue that there's justified reasons for that,
25  that's where the State has to do it. Because even though

1   the Claimant ultimately carries the burden of proof for its
2   claim, here the State is asserting that there was a
3   justification.
4           That's different. And when the State asserts that
5   justification, the State has to prove it. Because in
6   addition to the fact that the Claimant ultimately carries
7   the burden for its claim, a party offering up a position or
8   a piece of evidence has the burden to prove that position
9   or that piece of evidence.
10          And so to the extent that the Respondent says,
11  "Well, no, there were justifications for treating one
12  different than the other," that's an allegation. That's a
13  position taken by the Respondent. And the burden for that
14  position--not for the overall claim, but the burden for
15  that position comes from them.
16          PRESIDENT RAMÍREZ HERNÁNDEZ: Thank you.
17          And my last question--that one is easier--is more
18  out of trying to understand.
19          You talk about the fine that was put to the
20  Ballantines. And I will start with the Claimants and then
21  the Respondent comment.
22          Why was it reduced to 50 percent? There's no
23  place I have found that there are reasons why you
24  reduce--why the Government reduced 50 percent--why not 80?
25  Why not 70?--the fine.

1           PRESIDENT RAMÍREZ HERNÁNDEZ: Claimant, please.
2           MR. BALDWIN: The issue you raised with regard to
3   the fine, Mr. President, is something that sort of we do
4   aegises. We don't--we can't tell you why it's reduced
5   50 percent, why it's reduced sometimes a lot more. There's
6   instances in the record of fines being reduced more than
7   50 percent for people, more in the neighborhood of
8   80 percent that you're talking about.
9           And as far as we know, there are no guidelines at
10  all for when a fine is reduced, what the factors are for
11  the fine being reduced, and how much the fine is reduced.
12  And we understand that to be a purely discretionary thing.
13          So the Ballantines requested that the fine be
14  reduced. They were reduced by 50. We don't know why 50.
15  We don't know why it was reduced. We don't know why others
16  are reduced more than 50.
17          So, as far as we can tell, it's a pure
18  discretionary issue.
19          PRESIDENT RAMÍREZ HERNÁNDEZ: Just to be clear,
20  you did not contest the 50. You pay, at the end, that
21  fine.
22          MR. BALDWIN: It was under--certainly under
23  protest, because we were told that the--or Mr. Ballantine.
24  I wasn't told. Mr. Ballantine was told that the--that his
25  environmental permit would not be considered unless he paid

1   the fine. So he paid it under protest, because he wanted
2   the environmental permit considered.
3           And we're not aware of another situation where an
4   environmental permit was held up based on the waiting for
5   the payment of a fine.
6           MS. SILBERMAN: Just a couple of comments,
7   Mr. President.
8           First of all, the fine was imposed in November of
9   2009 and was paid, I believe, sometime in 2010, which would
10  be before the three-year cutoff for purposes of
11  Article 10.18.1 of DR-CAFTA. So I haven't seen at least
12  recently any claim by the Ballantines in respect to this
13  particular fine.
14          As Ms. Taveras mentioned the other day, the fine
15  was calculated initially by reference to a statutory
16  formula that took into account the amount of the investment
17  that the Ballantines alleged to have made in this
18  particular project.
19          The Ballantines have made a big show of alleging
20  that the Dominican Republic supposedly hasn't collected on
21  fines. And it can be difficult to collect on fines. I'm
22  sure people have outstanding parking tickets.
23          And what the Ministry did in this situation by
24  saying "If you have an outstanding fine, we won't talk to
25  you in respect to the permit" is similar to the way you

```
1   can't get a driver's license in some places if you haven't
2   paid your parking tickets.
3           PRESIDENT RAMÍREZ HERNÁNDEZ:  Okay.  Any other
4   questions?
5           ARBITRATOR CHEEK:  No, nothing further.
6           ARBITRATOR VINUESA:  No.
7           PRESIDENT RAMÍREZ HERNÁNDEZ:  Any other comment by
8   Claimants or Respondent, or anything that they want to
9   raise?
10          MR. Di ROSA:  Just a procedural point, I guess,
11  Mr. Chairman, to confirm that the Dominican Republic has
12  wired the funds, that $150,000 that were required for
13  purposes of this phase of the proceeding.
14          And I just wanted to thank the Tribunal and
15  everyone present here for what has been a productive
16  session.
17          Thank you.
18          PRESIDENT RAMÍREZ HERNÁNDEZ:  Claimant.
19          MR. ALLISON:  We join Mr. Di Rosa and his kind
20  words to us back to him and thank the Tribunal as well.
21  And I'd also like to specifically thank our assistants here
22  today, Larissa Díaz, who has worked tirelessly all week,
23  and also Leslie Gil, who is here from the Dominican
24  Republic.
25          Thank you.
```

```
1           PRESIDENT RAMÍREZ HERNÁNDEZ:  I would like to
2   thank everyone for being present here today.
3           Something else I don't know how to do is to put a
4   PDF file on the screen, and both Parties have shown me how
5   to do it.  That's one of the many abilities I do not have.
6           I would like to thank everyone, the stenographers,
7   the interpreters, and, of course, Julian.  He has been very
8   helpful to the Tribunal.  And, of course, Marney, Raúl.  I
9   would like to thank all of you.
10          One always learns things in these cases, and
11  oftentimes you learn things that you did not want to know;
12  for example, the difference between percentage and degree
13  of a certain slope.
14          But I learned two things, and I leave here with
15  those things.  Of course, deliberations are going to start
16  tomorrow for the Tribunal, and we're going to make a
17  decision in connection with post-hearing briefs.
18          At any rate, I want both Parties to be assured
19  that we don't think that we're going to ask for long or
20  lengthy, rather, post-hearing briefs.  We're going to
21  discuss this.
22          So you take two things from these experiences, and
23  I take two things out of this hearing.  Michael and Lisa, a
24  very nice couple, hard-working couple.  And, also, I did
25  not know that the Dominican Republic had such spectacular
```

```
1   forests.
2           So I would like to thank everyone.  And you're
3   going to hear from us soon.  I don't know how soon, but you
4   will hear from us.
5           Thank you very much.
6           (Whereupon, at 4:46 p.m., the Hearing was
7   concluded.)
```

```
CERTIFICATE OF REPORTER

        I,  Margie  Dauster,  RMR-CRR,  Court
Reporter,  do  hereby  certify  that  the  foregoing
proceedings  were  stenographically  recorded  by  me
and  thereafter  reduced  to  typewritten  form  by
computer-assisted  transcription  under  my  direction
and  supervision;  and  that  the  foregoing  transcript
is  a  true  and  accurate  record  of  the  proceedings.


        I  further  certify  that  I  am  neither
counsel  for,  related  to,  nor  employed  by  any  of
the  parties  to  this  action  in  this  proceeding,  nor
financially  or  otherwise  interested  in  the  outcome
of  this  litigation.


                                _____
                                MARGIE R. DAUSTER
```