## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Lisa Ballantine and Michael Ballantine,

<em>Petitioners</em>,

v.

The Dominican Republic,

<em>Respondent</em>.

Case No. 19-cv-3598
The Honorable Timothy J. Kelly

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO THE PETITION TO VACATE ARBITRATION AWARD

Robert Reeves Anderson
ARNOLD & PORTER KAYE SCHOLER LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-1000
Reeves.Anderson@arnoldporter.com

Raul R. Herrera
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
Raul.Herrera@arnoldporter.com

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    A.  The Ballantines' Arbitration Claims.........................................................2

    B.  International Investment Arbitration .......................................................4

    C.  The Arbitration Proceedings ..................................................................6

STANDARD OF REVIEW.....................................................................................9

ARGUMENT.......................................................................................................11

I.     The Petition Is Time-Barred .....................................................................11

II.    The Petition Does Not Clear the High Hurdle for Vacatur ...................15

    A.  The Tribunal Did Not Exceed Its Powers ............................................15

    B.  The Tribunal Did Not "Manifestly Disregard" the Law ......................30

    C.  The Tribunal Was Impartial .................................................................34

CONCLUSION....................................................................................................37

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abedini v. Gov't of Islamic Republic of Iran*,
   No. 18-cv-588 (JEB), 2019 WL 3037518 (D.D.C. July 11, 2019) ........................................ 13

*Al-Harbi v. Citibank, N.A.*,
   Civ. A. No. 94- 2425(NHJ), 1995 WL 450523 (D.D.C. July 17, 1995) ................... 10, 35, 36

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) .......................................................................................................... 13

* *Argentine Republic v. Nat'l Grid Plc*,
   637 F.3d 365 (D.C. Cir. 2011) ...................................................................................... 11, 14

*Barot v. Embassy of the Republic of Zambia*,
   785 F.3d 26 (D.C. Cir. 2015) ............................................................................................. 13

*Berkowitz v. Republic of Costa Rica*,
   288 F. Supp. 3d 166 (D.D.C. 2018) ................................................................................... 14

*Bernhardt v. Polygraphic Co. of Am.*,
   350 U.S. 198 (1956) .......................................................................................................... 15

*Chase v. Nordstrom, Inc.*,
   Civ. No. CCB-10-2114, 2010 WL 4789442 (D. Md. Nov. 17 2010) .................................. 14

*Chevron Corp. v. Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015) ...................................................................................... 18, 19

*Commonwealth Coatings Corp. v. Continental Cas. Co.*,
   393 U.S. 145 (1968) .......................................................................................................... 35

*Corey v. N.Y. Stock Exch.*,
   691 F.2d 1205 (6th Cir. 1982) ........................................................................................... 12

*Coyne v. Hewlett-Packard Co.*,
   308 F. Supp. 3d 207 (D.D.C. 2018) ................................................................................... 30

*Cullen v. Paine, Weber, Jackson & Curtis, Inc.*,
   863 F.2d 851 (11th Cir. 1989) ........................................................................................... 12

*Dalal v. Goldman Sachs & Co.*,
   541 F. Supp. 2d 72 (D.D.C. 2008) ..................................................................................... 12

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*,
    333 F.3d 383 (2nd Cir. 2003) ............................................................................31

*FBR Capital Mkts. & Co. v. Hans*,
    985 F. Supp. 2d 33 (2013) ..........................................................................31, 33

*Florasynth, Inc. v. Pickholz*,
    750 F.2d 171 (2d Cir. 1984) .......................................................................12, 34

*Folkways Music Publishers, Inc. v. Weiss*,
    989 F.2d 108 (2d Cir. 1993) ...............................................................................9

*Fradella v. Petricca*,
    183 F.3d 17 (1st Cir. 1999) ...............................................................................12

*Glaser v. Legg*,
    928 F. Supp. 2d 236 (D.D.C. 2013) ..................................................................14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ...........................................................................................5

* *Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008) ..............................................................................1, 10, 30

*Int'l Thunderbird Gaming Corp. v. United Mexican States*,
    473 F. Supp. 2d 80 (D.D.C. 2007) ...............................................................31, 34

*LaPrade v. Kidder, Peabody & Co.*,
    94 F. Supp. 2d 2 (D.D.C. 2000) .......................................................................31

*Lawson-Jackson v. Rosenhaus*,
    Civ. No. TDC-16-4049, 2017 WL 4063800 (D. Md. Sept. 13, 2017) ..................14

*Light v. Wolf*,
    816 F.2d 746 (D.C. Cir. 1987) .........................................................................11

*Liteky v. United States*,
    510 U.S. 540 (1994) .........................................................................................36

* *Mesa Power Group, LLC v. Government of Canada*,
    255 F. Supp. 3d 175 (D.D.C. 2017) ............................................................16, 26

*Nat'l City Bank of N.Y. v. Republic of China*,
    348 U.S. 356 (1955) ...........................................................................................5

* *Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013) ................................................................................*passim*

*Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*,
    477 F.3d 1155 (10th Cir. 2007)...................................................................12

*Piccolo v. Dain, Kalman & Quail, Inc.*,
    641 F.2d 598 (8th Cir. 1981) ..............................................................12, 15

*Priority One Servs., Inc. v. W & T Travel Servs., LLC*,
    825 F. Supp. 2d 43 (D.D.C. 2011) ......................................... 9, 10, 27, 28

*Republic of Argentina v. AWG Grp. LTD.*,
    211 F. Supp. 3d 335 (D.D.C. 2016) ......................................... 10, 15, 34

*Republic of Sudan v. Harrison*,
    139 S. Ct. 1048 (2019) ...................................................................12

*Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*,
    300 F. Supp. 3d 137 (D.D.C. 2018) ...........................................................18

*Sanders-Midwest, Inc. v. Midwest Pipe Fabricators, Inc.*,
    857 F.2d 1235 (8th Cir. 1988) ...................................................................12

*Steelworkers v. Enterprise Wheel & Car Corp.*,
    363 U.S. 593 (1960) .......................................................................25

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010) .......................................................................25

*Taylor v. Nelson*,
    788 F.2d 220 (4th Cir. 1986) ...................................................................12

*Technologists, Inc. v. MIR's Ltd.*,
    725 F. Supp. 2d 120 (D.D.C. 2010) ...........................................................11

*United States v. Park Place Assocs., Ltd.*,
    563 F.3d 907 (9th Cir. 2009) ...................................................................12

*Williams Fund Private Equity Grp., Inc. v. Engel*,
    519 F. Supp. 2d 100 (D.D.C. 2007) ...........................................................34

*Wolf v. Sprenger + Lang, PLLC*,
    86 A.3d 1121 (D.C. Cir. 2013), *as amended* (Jan. 30, 2014) ...................9

**STATUTES**

9 U.S.C.
  § 10 ........................................................................................................................ 1, 15
  § 12 ................................................................................................................... 1, 11, 14

28 U.S.C.
  § 1608(a)(1) ................................................................................................................. 12
  § 1608(a)(2) ................................................................................................................. 12
  § 1608(a)(3) ............................................................................................................. 9, 12
  § 1608(a)(4) ................................................................................................................. 13

**RULES & REGULATIONS**

22 C.F.R. § 93.2 ................................................................................................................. 13

Fed. R. Civ. P. 4(j)(1) ....................................................................................................... 12

**OTHER AUTHORITIES**

G.A. Res. 31/98, UNCITRAL Arbitration Rules (Dec. 15, 1976) .................................. 18, 34, 36

Tom Miles, *WTO Being 'Asphyxiated,'' Outgoing Judge Says, in Veiled Rebuke to
  U.S.*, Reuters (May 28, 2018) ........................................................................................ 37

## INTRODUCTION

Petitioners' collateral attack on the final arbitration award is meritless. After years of active international arbitration that concluded with an award spanning 188 pages, petitioners Lisa and Michael Ballantine ask this Court to vacate the Tribunal's Final Award on the theory that the presiding arbitrators exceeded their powers, manifestly disregarded the law, and/or were plainly partial. 9 U.S.C. § 10. Those objections are factually baseless and legally insufficient. While the petition is cloaked in language of the Federal Arbitration Act, its arguments all boil down to the same premise: petitioners' belief that the Tribunal reached the wrong result. It is well-settled that this Court cannot review the underlying substance of an arbitral award, let alone vacate an award on that basis, even if the Court believes that it would have decided the underlying issues differently.

Petitioners' arguments are too little, too late. The Federal Arbitration Act permits review of an arbitration award only if the petition to vacate is served upon the prevailing party "within three months after the award is filed or delivered." 9 U.S.C. § 12. Petitioners missed that deadline by 52 days, thereby precluding this Court's review. But even if this Court considers the substance of the petition, the arguments fall far short of the extraordinary threshold required to vacate an arbitration award. The FAA permits vacatur only for "*egregious* departures from the parties' agreed-upon arbitration" procedure and only allows "review for specific instances of *outrageous* conduct." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (emphases added). The petition comes nowhere near meeting that burden. The award was the product of a years-long arbitral process that ended in a reasoned, thoughtful decision based on a comprehensive examination of the facts and the law by distinguished international arbitrators. A neutral review of the record reveals no hint of lawlessness or bias.

1

The Dominican Republic respectfully asks this Court to deny the vacatur petition swiftly to minimize the drain on the public fisc from having to defend this frivolous action. The Republic's taxpayers should not have to continue bearing the burden of petitioners' litigiousness.

## BACKGROUND

### A.    The Ballantines' Arbitration Claims

The Final Award provides a comprehensive recitation of the disagreement between the parties that precipitated the arbitration proceeding. Final Award ¶¶ 55–156, ECF No. 1-3 ("Award"). The following summary provides an overview of the Ballantines' underlying claims.

In 2000, Lisa and Michael Ballantine moved their family from Chicago to the Dominican Republic to work as Christian missionaries. *Id.* ¶ 55. After returning to Chicago in 2001, the Ballantines continued to visit the Dominican Republic each year. *Id.* During one such trip, the couple decided to develop a luxury real estate complex in the mountains of Jarabacoa, a town located in the heart of the Dominican Republic. *Id.* ¶¶ 56–57. Notwithstanding the fact that Dominican law required government permission for such projects, *id.* ¶¶ 72, 149, and imposed restrictions when building on mountainous land, *id.* ¶¶ 126, 392, the Ballantines began purchasing tracts of land in 2003 with an initial acquisition of 218,552 square meters and began infrastructure projects to create Jamaca de Dios ("Hammock of God"), which petitioners envisioned as a luxury community of mountain homes, a boutique spa hotel, first-class dining, and recreational activities. *Id.* ¶¶ 58–59.

In parallel, the Ballantines—who had been traveling back and forth between Chicago and Jarabacoa—began taking steps to relocate permanently to the Dominican Republic. *Id.* ¶ 576. In 2006, they sold their home and commercial real estate in the United States and moved to the Dominican Republic, where they obtained permanent residency and eventually Dominican citizenship in 2009. *Id.* ¶¶ 576, 578. Concurrently, the Ballantines moved forward with their

housing development by, for example, carving out a new road at the base of the mountain. *Id.* ¶ 70. They then began subdividing and selling individual lots to private purchasers. *Id.* ¶¶ 82–84. By the summer of 2009, the Ballantines had subdivided more than 90 individual parcels of land. *Id.* ¶ 62. The Ballantines sold most of these parcels and considered their project to be "prosperous." *Id.* ¶ 84.

In 2011, the Ballantines decided to expand further up on the mountain and requested permission to do so from the Ministry of Environment and Natural Resources. *Id.* ¶¶ 86–156.[1] However, the Ministry, upon inspecting the site, concluded that the project was "not viable" because of the "*environmental fragility of the area and natural risk, the land topography and slope, which is over 60% in much of the area … natural run-offs, [and] the characteristics of the buildings being built in the Project area.*" *Id.* ¶ 118. Of particular concern was the fact that, in order to expand up the mountain, the Ballantines would have needed to carve out a new road further into the mountain. Given the soil composition on site, this could have resulted in landslides. It also contravened a Dominican law, which since 2000 had prohibited excessive tillage of mountainous land where the slope was steeper than 60%. *Id.* ¶ 126; *see also id.* ¶ 132 ("Also, the [Ministry] asserted that the project would modify the area's natural runoff and the local hydrological and the micro basin's condition, affecting the mountain's ecosystem.").

---

[1] Authorities already were expressing concerns about Petitioners' development project in 2009. Award ¶ 101 ("In the inspections conducted on May 22, 2009, it was discovered that the Claimants (i) had failed to submit the EC Reports, (ii) had cut certain tree species without authorization, (iii) had engaged in unauthorized ground excavations which interfered with the waterways, and (iv) had divided the lots in a manner different to the development plans the [Ministry] had authorized."). In November 2009, the Ministry "imposed a fine of almost one million Dominican Pesos on Jamaca de Dios" for compliance failures. *Id.* ¶ 102. That fine was eventually reduced by half. *Id.* ¶ 108.

Although the Ministry was willing to assess the viability of any other areas the Ballantines might propose for the project, the Ballantines never proposed an alternative site. *Id.* ¶ 126. Instead, they requested reconsideration of their application on three separate occasions. *Id.* ¶¶ 114–149. In response to each request, the Ministry duly dispatched a team of inspectors, and each team independently concluded that the proposed site was not suitable for the project that the Ballantines wished to pursue. On January 15, 2014, the Ministry provided its fourth ruling on the Ballantines' application. *Id.* ¶ 149. The ruling advised the Ballantines that their application had been rejected but that the Ministry remained willing to evaluate other sites. *Id.* ¶¶ 334, 399.

Rather than pursue available relief in Dominican courts for any perceived harm, the Ballantines initiated international investment arbitration against the Dominican Republic in June 2014. They sought, among other things, damages of $37.5 million for losses allegedly associated with the rejection of their permit application and $4 million "for moral damages." *Id.* ¶¶ 4, 157–158. The Ballantines do not claim that the Dominican Republic ever took ownership or physical possession of their investment property; their arbitration claims arise from the denial of the permit application. At the time of arbitration, the Ballantines continued to own all the land that they had purchased in Jarabacoa that had not already been subdivided and sold.[2]

### B.   International Investment Arbitration

International investment arbitration, like other types of arbitration, requires the parties' mutual consent to arbitrate their dispute. "Arbitration is strictly 'a matter of consent' and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit

---

[2] On page 2 of the memorandum in support of the petition, the Ballantines aver that "[i]n 2014" they "sold the property they owned in the DR and left." ECF No. 1-1 ("Petition" or "Pet.") at 2. That statement is contradicted later when Michael Ballantine admits that "since 2015 … [h]e has had to continue to visit the DR to caretake his investment." *Id.* at 14; *see also id.* at 10 (claiming that they sold only "their house" in "June 2015").

to arbitration.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) and *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), respectively). In international investment arbitrations, one of the parties is always a sovereign State; accordingly, in these arbitrations, the principle of consent is especially salient, as sovereign nations enjoy presumptive immunity "from being haled into court as a defendant." *Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 358 (1955). Absent consent, a sovereign State cannot be sued in an international forum.

Some sovereigns have offered by treaty to arbitrate certain claims by foreign investors. The United States–Dominican Republic–Central American Free Trade Agreement (DR-CAFTA) is one such treaty. Its signatories include the United States, the Dominican Republic, Costa Rica, El Salvador, Guatemala, Honduras, and Nicaragua. Broadly speaking, DR-CAFTA seeks to promote regional trade while striking an appropriate balance to also protect State sovereignty. Chapter 10 of DR-CAFTA addresses the issue of foreign investment and consists of three sections. In Section A, each sovereign Party agrees to certain protections toward "investors of another Party" and relating to "covered investments." DR-CAFTA, art. 10.1. Section B covers the subject of "Investor-State Dispute Settlement." *Id.*, arts. 10.15–10.27. It states that a "claimant"—which Section C defines as "an investor of a Party that is a party to an investment dispute with another Party," *id.*, art. 10.28—"may submit to arbitration under this Section a claim (i) that the respondent has breached … an obligation under Section A … and (ii) that the claimant has incurred loss or damage by reason of, or arising out of, that breach." *Id.*, art. 10.16.1. This offer of consent is limited by the terms of the Treaty, as explained below.[3]

---

[3] The full text of DR-CATFA is available at https://bit.ly/3989qRE.

### C.    The Arbitration Proceedings

The Ballantines initiated arbitration against the Dominican Republic under Chapter 10 of DR-CAFTA on June 12, 2014. Award ¶ 4. Pursuant to the governing procedures, the Ballantines and the Dominican Republic each appointed one arbitrator, and the Secretary-General of ICSID appointed the third and presiding arbitrator to constitute the three-member Tribunal. Award ¶¶ 6–11.[4] The Ballantines, the Dominican Republic, and the Tribunal agreed to Terms of Appointment, *id*. ¶ 11, which provided that the proceeding would be conducted in accordance with the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules. *See* Exhibit A filed herewith (Terms of Appointment), at § 3.1.

The arbitral proceedings lasted five years, during which time the Ballantines filed eight briefs totaling more than 2,000 pages of written argument, along with 19 witness statements, eight expert reports, and 180 factual exhibits. The parties also engaged in extensive discovery. In a procedural order, the Tribunal elected to consolidate briefing and argument on the Dominican Republic's jurisdictional objections—which centered on the issue of consent—along with briefing and argument of the merits. Accordingly, after the parties submitted their written memorials, the Tribunal held a five-day hearing in September 2018 that covered issues relating to jurisdiction, merits, and damages.

The Tribunal issued its Final Award on September 3, 2019. It held that the Tribunal lacked jurisdiction over the Ballantines' claims because the Dominican Republic had not consented to arbitrate them. Award ¶ 600. The Tribunal reasoned that under Article 10.16.1(a) of DR-CAFTA,

---

[4] ICSID, the International Centre for Settlement of Investment Disputes, is an independent, depoliticized dispute-settlement institution affiliated with the World Bank. Article 10.19 of DR-CAFTA designates ICSID's Secretary-General as the appointing authority for investment arbitrations under Chapter 10 of the Treaty.

only a "claimant" is authorized to submit a claim to arbitration, and neither of the Ballantines qualified as a "claimant." *Id.* ¶¶ 511–514.

As the Final Award explained, DR-CAFTA defines "claimant" as an "investor of a Party that is a party to an investment dispute with another Party." Award ¶ 513 (quoting DR-CAFTA, art. 10.28). The phrase "*another* Party" confirms that State Parties under DR-CAFTA have *not* consented to the arbitration of claims by their own nationals under the Treaty. In the case of dual nationals (like the Ballantines), DR-CAFTA provides that "a dual national shall be deemed to be exclusively a national of the State of his or her dominant and effective nationality." Art. 10.28.

The Tribunal interpreted the governing text of the Treaty to mean that the Dominican Republic's consent to arbitration was limited to claims by dual nationals who—at the time of alleged Treaty violations and when they submitted their claims—had a *dominant and effective nationality* of a country *other* than the Dominican Republic. Award ¶¶ 512–514. The Tribunal thus focused on the question of Lisa and Michael Ballantine's dominant and effective nationalities, drawing from (i) the parties' extensive filings, and (ii) *amicus curiae* submissions from the governments of Costa Rica and the United States, *id.* ¶¶ 43–44.

The Tribunal summarized the Ballantines' arguments and the facts upon which they relied in paragraphs 195–221 of the Award. Because the Petition spends pages rehashing the Ballantines' arguments to the Tribunal, those points will not be repeated here. To provide a more complete context for the Award, however, some of the facts that the Dominican Republic presented to support the dominance of the Ballantines' Dominican nationalities will be briefly described. The Tribunal summarized the Dominican Republic's jurisdictional arguments and the facts upon which the Tribunal relied in paragraphs 161–194 of the Award.

At the time of the alleged Treaty violations and when the Ballantines filed their arbitration claim, they had deep and abiding ties to the Dominican Republic. Award ¶ 178. The Ballantines sold their U.S. home and many of their possessions to move to the Dominican Republic in 2006. *Id.* ¶ 179. That same year, they acquired permanent residence status, which they renewed in 2008. *Id.* In 2009, both Lisa and Michael Ballantine voluntarily applied to become Dominican citizens. *Id.* ¶ 181. After their applications were approved later that year, the Ballantines used their Dominican nationalities to exercise various rights and privileges that attach exclusively to Dominican citizens. *Id.* ¶ 182. They voted in Dominican elections, obtained Dominican passports, and traveled abroad using such passports. *Id*. They attended church in the Dominican Republic and sent their children to school there. *Id.* They used their Dominican nationalities to obtain Dominican citizenship for their children. *Id.*

The Ballantines' economic lives were also centered in the Dominican Republic. Their U.S. tax returns stated they did not earn a U.S. salary or wages during the relevant time period, and their U.S. bank accounts were barely used. *Id.* ¶ 183. Their joint business—the luxury housing development—was located in the Dominican Republic, and Lisa Ballantine's non-profit "Filter Pure" mainly operated from the Dominican Republic. *Id.* The Ballantines' and their children's social media accounts displayed the family's deep ties with their Dominican nationalities during the relevant time. For example, when the Ballantines moved back to the United States in 2015, Lisa Ballantine stated that they "*have been gone for so long that I feel out of touch with American society. The culture is so different than when I left 10 years ago. I feel such a culture shock coming back.*" *Id.* ¶ 184 (citing Lisa Ballantine's Facebook Profile Page (May 3, 2015), p. 109); *see also id.* ¶ 182.

After thoroughly recounting the parties' respective positions, the Tribunal resolved that, on balance, the Ballantines' dominant and effective nationalities were Dominican at the critical times, thereby precluding the Tribunal from deciding the merits of the Ballantines' claims. *Id.* ¶¶ 558–600. The Tribunal held that the relevant times to assess dominant and effective nationality were (1) when the alleged Treaty breaches occurred and (2) the date on which the claims were submitted. *Id.* ¶¶ 516–557. In both instances, the analysis led to the same result for the Ballantines. *Id.* ¶¶ 558–600. The Award was delivered to the parties on September 3, 2019.

On December 3, 2019, the Ballantines initiated this proceeding to vacate the Award under Section 10 of the FAA. The same day, petitioners' counsel sent by Federal Express a copy of the Petition to the Dominican Republic's former arbitration counsel at Arnold & Porter in Washington, DC. More than a month later, on January 8, 2020, petitioners asked the Clerk of the Court to effect service of the Petition under 28 U.S.C. § 1608(a)(3) by sending a copy of the Petition and summons to the Ministry of Foreign Affairs of the Dominican Republic. *See* Aff. Requesting Foreign Mailing, ECF No. 5. The Clerk acted on that request on January 22, 2020 (ECF 8), and the Ministry of Foreign Affairs received service on January 24, 2020.

## STANDARD OF REVIEW

The review of arbitration awards is "very limited ... in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993). Because subsequent judicial review would frustrate the very purpose of arbitration, "the scope of judicial review … is among the narrowest known at law." *Wolf v. Sprenger + Lang, PLLC,* 86 A.3d 1121, 1133 (D.C. Cir. 2013), *as amended* (Jan. 30, 2014) (quoting *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010)). A party seeking vacatur "faces a 'high hurdle,'" *Priority One Servs., Inc. v. W & T Travel Servs., LLC*, 825 F. Supp. 2d 43, 49 (D.D.C. 2011)

(quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)), and can prevail only where "clear and convincing evidence demonstrates that one of the statutory grounds set forth in 9 U.S.C. § 10 exists," *Al-Harbi v. Citibank, N.A.*, Civ. A. No. 94-2425(NHJ), 1995 WL 450523, at *2 (D.D.C. July 17, 1995), *aff'd,* 85 F.3d 680 (D.C. Cir. 1996).[5]

When deciding a petition to vacate an arbitration award pursuant the FAA, a court may not "'hear claims of factual or legal error by an arbitrator' as they would in 'reviewing decisions of lower courts.'" *Priority One Servs.*, 825 F. Supp. 2d at 49 (quoting *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006)). "Indeed, the standard of review of arbitral awards is so narrow that courts are 'not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.'" *Republic of Argentina v. AWG Grp. LTD.*, 211 F. Supp. 3d 335, 343–44 (D.D.C. 2016), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018) (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). Rather, the FAA vacatur standards address "*egregious* departures from the parties' agreed-upon arbitration" and only permit "review for specific instances of *outrageous* conduct." *Hall St. Assocs.*, 552 U.S. at 586 (emphases added).

---

[5] The FAA's four statutory grounds for vacatur are: "(1) an award procured by corruption, fraud, or undue means; (2) evident partiality or corruption in the arbitrator; (3) misconduct or misbehavior by the arbitrator in refusing to postpone the hearing upon sufficient cause shown; or in refusing to hear evidence pertinent and material to the controversy; or any other prejudicial misbehavior; (4) when the arbitrator has exceeded his or her authority or so imperfectly executed his or her powers that a mutual, final, and definite award was not made." *Al-Harbi*, 1995 WL 450523, at *2 (citing 9 U.S.C. § 10(a)(1)-(4)).

## ARGUMENT

### I.    The Petition Is Time-Barred

Before addressing the merits of the Petition, this Court must first resolve whether Petitioners met the statutory prerequisite to judicial review by serving the vacatur notice within the FAA's three-month statute of limitations. Because Petitioners missed this deadline by almost two months, the Court can and should dismiss the Petition as untimely.

The FAA provides that "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. The Tribunal entered the Award in favor of the Dominican Republic on September 3, 2019, and delivered it to the parties on the same date. The Ballantines were therefore required to serve the Dominican Republic with notice of their petition on or before December 3, 2019. The Ballantines did not effect service on the Dominican Republic until January 24, 2020— 52 days after the statute of limitations expired. *Cf.* Certificate of Clerk, ECF No. 8 (noting mailing on January 22, 2020). "The party on whose behalf service is made"—here, the Ballantines—"has the burden of establishing its validity when challenged." *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987) (quoting Wright & Miller § 1083, at 334).

Section 12 of the FAA requires "service" of the petition within the three-month time period. 9 U.S.C. § 12. When, as here, "the adverse party" is a "nonresident" of the district, then the notice of application "shall be served" in the same manner "as other process of the court"—that is, in the same manner for serving a complaint. *Id.*; *Technologists, Inc. v. MIR's Ltd.*, 725 F. Supp. 2d 120, 127 (D.D.C. 2010) ("[Section] 12 requires a party filing a motion to vacate, correct, or modify an arbitration award to serve notice on any foreign adverse party consistent with Rule 4."). Failure to comply with the three-month limitations period for service of a petition forfeits a petitioner's right to judicial review of the arbitration award, and that "strict deadline" cannot be extended. *Argentine*

*Republic v. Nat'l Grid Plc*, 637 F.3d 365, 368–69 (D.C. Cir. 2011) (per curiam); *Dalal v. Goldman Sachs & Co.*, 541 F. Supp. 2d 72, 76 (D.D.C. 2008) (noting that there are neither common law nor statutory exceptions to the three month deadline).[6]

Section 1608(a) of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–11, provides the exclusive procedures to effect service of process on a foreign state. *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1054 (2019); *see also* Fed. R. Civ. P. 4(j)(1) ("A foreign state … must be served in accordance with 28 U.S.C. §1608."). Section 1608(a) sets out four methods of service, in hierarchical order. *Republic of Sudan*, 139 S. Ct. at 154. First, the summons and complaint must be delivered "in accordance with any special arrangement for service between the [petitioner] and the foreign state." 28 U.S.C. § 1608(a)(1). Second, "if no special arrangement exists," the summons and complaint must be delivered "in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(a)(2). Third, if service under the first and second method is not possible, a petitioner must effect service:

> by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned.

28 U.S.C. § 1608(a)(3).

---

[6] All other circuit courts that have considered the issue have similarly rejected petitions to vacate arbitration awards served after the three-month deadline. *See, e.g.*, *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 934 (9th Cir. 2009); *Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007) (affirming dismissal of petition to vacate arbitral award served four days late); *Fradella v. Petricca*, 183 F.3d 17, 21 (1st Cir. 1999); *Cullen v. Paine, Weber, Jackson & Curtis, Inc.*, 863 F.2d 851, 854 (11th Cir. 1989); *Sanders-Midwest, Inc. v. Midwest Pipe Fabricators, Inc.*, 857 F.2d 1235, 1238 (8th Cir. 1988) ("[T]he Federal Act has made section 12 service of notice a precondition to judicial review of the award."); *Taylor v. Nelson*, 788 F.2d 220, 225 (4th Cir. 1986); *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 175 (2d Cir. 1984); *Corey v. N.Y. Stock Exch.*, 691 F.2d 1205, 1212 (6th Cir. 1982); *Piccolo v. Dain, Kalman & Quail, Inc.*, 641 F.2d 598, 600 (8th Cir. 1981).

Finally, "if service cannot be made within 30 days under paragraph [(a)](3)," the clerk of the court may dispatch the service materials to the U.S. Secretary of State for service "through diplomatic channels." 28 U.S.C. § 1608(a)(4).

It is well-established that "[w]hen serving a foreign sovereign, 'strict adherence to the terms of 1608(a) is required.'" *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)); *id.* ("[N]either substantial compliance, nor actual notice, suffice[s] under section 1608(a)(3) … ."); *see also* 22 C.F.R. § 93.2 (specifying contents of service, including copy of FSIA). Strict compliance with the FSIA is necessary because the requirements of Section 1608(a) "are jurisdictional." *Abedini v. Gov't of Islamic Republic of Iran*, Civil Action No. 18-588 (JEB), 2019 WL 3037518, at *2 (D.D.C. July 11, 2019); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989) ("FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court.").

Petitioners did not attempt, let alone effectuate, service under § 1608(a) prior to the December 3, 2019 deadline. Because no special arrangement for service of process exists between the Ballantines and the Dominican Republic, and because the Dominican Republic is not a party to any applicable international convention on service of judicial documents, the Ballantines were required to serve the Dominican Republic under § 1608(a)(3). Indeed, the Ballantines initiated that process on January 8, 2020 (Aff. Requesting Foreign Mailing, ECF No. 5), and the Court processed that request on January 22, 2020 (Certificate of Clerk, ECF No. 8). The fact that the Ballantines voluntarily sought service under § 1608(a)(3) on January 8, 2020, is a tacit admission that the notice of petition had *not* been served prior to that date, and that FSIA service was required.

The Ballantines' *filing* of the petition on December 3, 2019, did not constitute service under 9 U.S.C. § 12, and any contrary argument would be "meritless." *Glaser v. Legg*, 928 F. Supp. 2d 236, 239 (D.D.C. 2013). "[T]he plain text of the statute requires *service* of notice of a motion to vacate rather than mere filing within the three month time limit … ." *Id.*; *accord Lawson-Jackson v. Rosenhaus*, Civil No. TDC-16-4049, 2017 WL 4063800, at *2 (D. Md. Sept. 13, 2017); *Chase v. Nordstrom, Inc.*, Civil No. CCB-10-2114, 2010 WL 4789442, at *2 (D. Md. Nov. 17 2010) (holding that motion to vacate an arbitration award, filed on the last day of the three-month period and not served until one month later, was time-barred). In *National Grid*, the D.C. Circuit affirmed dismissal of a petition to vacate served six days late, even though the applicant had filed its petition and a separate motion to extend time to serve notice within the limitations deadline. 637 F.3d at 367–69. The D.C. Circuit reasoned that "courts have consistently interpreted the FAA notice provision to create a strict deadline" to which neither statutory nor common law exceptions apply. *Id.* at 368.[7]

The FAA's three-month statute of limitations is strictly applied—as is the FSIA's procedure for serving a foreign state. The Ballantines' failure to effect service within the three-month period following the Award compels dismissal of their Petition. *National Grid*, 637 F.3d at

---

[7] As noted above, Petitioners' counsel mailed a copy of the Petition to the Dominican Republic's arbitration counsel on December 3, 2019. That delivery does not constitute timely service for multiple reasons. First, this method of service does not comply with § 1608(a) of the FSIA. Second, the mailing did not contain the summons (which would not issue for another 7 days) or other documents required by Rule 4 and the FSIA. Third, arbitration counsel was not authorized to accept service; they informed Petitioners' counsel by letter on December 16, 2019, that they have "not been counsel to the Dominican Republic since the conclusion of the arbitral proceeding." *See* Exhibit B, attached hereto. Undersigned counsel was retained following service on the Foreign Ministry on January 24, 2020. These circumstances are similar to the fact pattern in *Berkowitz v. Republic of Costa Rica*, 288 F. Supp. 3d 166, 171 (D.D.C. 2018), in which this Court held that service on prior arbitration counsel was insufficient to effect service of the vacatur petition on the sovereign defendant under the FSIA.

14

368–69; *Piccolo*, 641 F.2d at 600 ("A party to an arbitration award who fails to comply with the statutory precondition of timely service of notice forfeits the right to judicial review of the award.").

## II.   The Petition Does Not Clear the High Hurdle for Vacatur

Even if the Court were to reach the substance of the Petition, it must nevertheless be denied because it does not satisfy any of the grounds for vacatur under 9 U.S.C. § 10.

### A.   The Tribunal Did Not Exceed Its Powers

The majority of the Ballantines' arguments rely on Section 10(a)(4) of the FAA, which allows vacatur of an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). "A party seeking relief under that provision bears a heavy burden." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013). Even a "serious error" in the arbitrators' decision is not enough to overturn the award. *Id.* (quoting *Stolt-Nielsen*, 559 U.S. at 671).

To evaluate whether or not arbitrators exceeded their powers as set forth in a treaty, courts follow the same standard that applies in contract-based arbitrations. "The fact that the document containing an arbitration agreement is a treaty does not 'make[] a critical difference,' since '[a]s a general matter, a treaty is a contract, though between nations.'" *AWG Grp. LTD.*, 211 F. Supp. 3d at 344 (quoting *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014)). Whether the arbitrators got the meaning of the parties' agreement right or wrong is not subject to judicial review. *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 203 n.4 (1956). Rather, the "sole question" is "whether the arbitrator (even arguably) interpreted the parties' contract." *Oxford Health*, 569 U.S. at 569. "[A]n arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." *Id.* (quoting *Eastern Associated Coal*

*Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)); *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 165 (5th Cir. 1998) (An award must be upheld as long as it "is rationally inferable from the letter or purpose of the underlying agreement." (quoting *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994))).

When courts examine whether a tribunal exceeded its powers, the question is not whether the tribunal engaged in the *correct* analysis of the treaty's text, but whether the tribunal engaged in that analysis at all. For example, in *Mesa Power Group, LLC v. Government of Canada*, 255 F. Supp. 3d 175 (D.D.C. 2017), the arbitrators analyzed several of Mesa's claims against Canada, all of which turned on whether a certain Canadian renewable energy program qualified as a "procurement" under NAFTA. *Id.* at 179. The tribunal determined that the program was a procurement and therefore did not consider Mesa's claims. *Id.* Mesa petitioned the district court to vacate the arbitration award, arguing, among other things, that errors in the tribunal's analysis when interpreting the term "procurement" showed that the tribunal exceeded its powers. *Id.* at 184.

In denying Mesa's petition to vacate, the court noted that the tribunal "comprehensively examined the text [of the treaty] and the parties' arguments regarding the text" before determining whether the energy program was a "procurement." *Id.* at 185. It found that "[t]here [could] be no serious debate that the tribunal was interpreting the text of NAFTA to reach its conclusion." *Id.* The court refused to review the merits of the tribunal's analysis, including whether its reasoning was correct and whether it gave appropriate weight to precedent when applying the treaty. *See id.* Because "the tribunal *did* undoubtedly interpret the text of the treaty," any flaws in that interpretation could not justify vacating the award. *Id.* at 186.

The same is true here. The Tribunal interpreted the applicable DR-CAFTA provisions regarding consent and weighed the parties' competing evidence on dominant and effective

nationality to decide that the Tribunal lacked jurisdiction to address the merits of the Ballantines' claims. As explained below, the Tribunal unquestionably had *authority* to decide its own competence, and the Tribunal *exercised* that authority by comprehensively examining the text of DR-CAFTA, the relevant law, and the parties' arguments. Each of the Ballantines' six so-called "separate bases" for vacatur under Section 10(a)(4), Pet. 19, attacks *how* the Tribunal reached that decision—specifically, whether the Tribunal considered the right evidence in the right way under the right legal principles (from the Ballantines' perspective). The Ballantines contend that the arbitrators exceeded their powers by: "[u]sing the wrong time period," "[f]ailing to consider the entire [lives]" of each of the Ballantines, "[r]elying on factors relating to the naturalization [of the Ballantines]," "[r]elying on factors related to the investment," and failing to make separate factual findings for Lisa Ballantine. Errata Pet., ECF No. 2. Each of these arguments impermissibly seeks to relitigate the nationality question at the heart of the arbitration proceeding. None justifies vacatur.

1. **The Tribunal Did Not Exceed Its Powers In Declining Jurisdiction [Objection G][8]**

Petitioners' overarching objection is that the Tribunal declined jurisdiction despite Petitioners' belief that the Dominican Republic had consented to arbitration in DR-CAFTA. From this belief, Petitioners argue that "a tribunal exceeds its power when they fail to arbitrate an arbitrable dispute." Pet. 37; *id.* ("The legal issue here is that the Majority refused to hear a case that it should have heard."). Petitioners cite no authority whatsoever to support that proposition, which is easily disposed.

---

[8] Petitioners' arguments jump among different grounds for vacatur and do not track the logical flow of the Tribunal's analysis. For ease of cross-reference, the subheadings in this section include bracketed references to signal which of Petitioners' arguments is being primarily addressed. "Objection G" refers to Section II.G of Petitioners' memorandum, ECF No. 1-1.

The arbitrators indisputably acted within their powers in deciding the question of their own authority—specifically, in resolving that neither of the Ballantines qualified as a "claimant" under DR-CAFTA and that therefore the Tribunal lacked jurisdiction to decide the merits of their claims. The Ballantines commenced arbitration proceedings against the Dominican Republic pursuant to Article 10.16(3)(c) of DR-CAFTA, which incorporates the UNCITRAL Arbitration Rules. The Terms of Appointment of the Tribunal, signed by all parties, confirms that "[p]ursuant to Articles 10.16(3) and 10.16(5) of [DR-CAFTA], this arbitration shall be conducted in accordance with the UNCITRAL Rules, except to the extent modified by [DR-CAFTA]." Ex. A, Terms of Appointment, § 3.1. Article 21 of the UNCITRAL Arbitration Rules explicitly provides that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction." G.A. Res. 31/98, art. 21, UNCITRAL Arbitration Rules (Dec. 15, 1976). The D.C. Circuit has recognized that "[i]ncorporation of the UNCITRAL arbitration rules … constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 208 (D.C. Cir. 2015) (quoting *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1077 (9th Cir.2013)).[9]

To be sure, the Ballantines' objections do not focus on *whether* the arbitrators interpreted the threshold jurisdictional rules on "dominant and effective nationality" under DR-CAFTA. Rather, they take issue with *how* the arbitrators interpreted those rules with regard to the Ballantines, and the result. However, where, as here, the parties have delegated the question of jurisdiction to the tribunal, a petitioner "is not entitled to an independent judicial redetermination of that same question." *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, 300 F. Supp. 3d

---

[9] The Ballantines bore "the burden to prove facts necessary to establish jurisdiction" in the arbitration. Award ¶ 510.

137, 146–47 (D.D.C. 2018) (quoting *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 74 (2d Cir. 2012)); *see also Chevron Corp.*, 795 F.3d at 208. Thus, the Tribunal did not exceed its powers in deciding the question of its own jurisdiction, even if the Ballantines did not like the answer.

The remainder of the Ballantines' objections under 9 U.S.C. § 10(a)(4)—addressed in the following subsections—focus on specific legal determinations or evidentiary findings made by the Tribunal in deciding the issue of consent, none of which are sufficient grounds for vacatur of the Final Award.

### 2. The Tribunal Did Not Exceed Its Powers In Deciding the Applicable Time Period to Assess Dominant and Effective Nationality [Objection F]

When determining whether the Ballantines satisfied the nationality requirement of DR-CAFTA, the Tribunal examined two separate questions: (1) "what are the *relevant times* in which an individual shall comply with the nationality requirement?" and (2) "what is the legal standard under DR-CAFTA to determine *dominant* and *effective nationality*." Award ¶ 515. The Tribunal began with the first question, which informs the second.

The Tribunal settled on the relevant time periods for DR-CAFTA's nationality requirement based on a reasoned analysis of the Treaty's text. During the arbitration, the Ballantines argued, as they do now, that DR-CAFTA "requires that the dominant and effective nationality be examined when the investment is made." Pet. 36; Award ¶ 516. The Tribunal rejected the Ballantines' argument and concluded that the relevant time periods are (1) at the moment of the alleged Treaty breach and (2) at the moment the arbitration claim was submitted. *Id.* ¶ 527.[10]

---

[10] All three arbitrators agreed on this point. *See* Partial Dissent of Ms. Cheek on Jurisdiction ¶ 2, ECF No. 1-4 ("I am in agreement with my colleagues that, as a threshold matter, DR-CAFTA instructs that dual citizens such as the Ballantines may only assert a claim against the Dominican Republic if their dominant and effective nationality is, in this case, that of the United States at the time of the alleged breach and at the time of submission of the claim."). The Petitioners'

The Tribunal came to this conclusion after considering the arguments of the parties and the relevant Treaty provisions. *Id.* ¶¶ 516–528. For example, the tribunal considered that "[t]he terminology used in Section B of Chapter 10 provides a useful context to our interpretation that the text does not limit the nationality condition to the actions allowed in relation to an investment" and that "Article 10.16 makes clear that a claimant must exist at the moment of submission of a claim." *Id.* ¶¶ 520, 522; *see also id*. ¶ 521 (explaining Treaty provisions that require existence of a claimant "at the moment of the investment dispute"). While the Ballantines now contend that "the Tribunal ignored the treaty provision and decided upon its own rules," the Award's thorough textual analysis, which need not be repeated here, reveals otherwise. *Id.* ¶¶ 516–528. There can be no doubt that the Tribunal's analysis was grounded in the Treaty itself, and a petition to vacate cannot be used to rehash the merits of failed arbitration arguments. *See Oxford Health*, 569 U.S. at 569.

Notably, the Tribunal adopted the legal interpretation advocated by the United States on the relevant time period to assess DR-CAFTA's nationality requirement. *See* Exhibit C, United States' Non-Disputing Party Submission (July 6, 2018). The United States argued that the relevant time periods were "at the time of the purported breach" and "at the time of submission of the claim." *Id.* ¶¶ 3–4. The United States concluded that "[w]here the requisite nationality does not exist at the operative times set out above, the respondent Party has not consented to the submission of a claim to arbitration at the outset, and the tribunal therefore lacks jurisdiction *ab initio* under Article 10.17." *Id.* ¶ 5. The position of the United States undercuts the Ballantines' policy objection that the Tribunal's decision could "open up the floodgates" to claims against the United States by

---

implication that "the *Majority* exceeded its powers by using the wrong time period," Pet. 6 (emphasis added), is misleading, as all arbitrators agreed with the Dominican Republic on this question of Treaty interpretation.

its own citizens. Pet. 26. If the United States shared that policy concern, it would have voiced it to the Tribunal or modified its legal position accordingly. Instead, the United States advocated for the very standard that the Tribunal applied in the Final Award. Adopting that position did not exceed the Tribunal's powers.[11]

### 3. The Tribunal Did Not Exceed Its Powers In Construing, Applying, and Weighing the Factors to Assess Dominant and Effective Nationality

After the Tribunal determined at what points in time it was necessary for the Ballantines to satisfy DR-CAFTA's nationality requirement, the Tribunal answered its second fundamental question: "what is the legal standard under DR-CAFTA to determine *dominant* and *effective nationality*?" Award ¶ 515. The answer to this question, it concluded, is that DR-CAFTA requires a "holistic assessment" that considers "all the facts of the case." *Id.* ¶ 556. It noted that no one factor "exclusively indicate[s] that a particular nationality was dominant and effective." *Id.* ¶ 558. Based on the facts of the case and the text of the Treaty, the Tribunal concluded that some factors carried more weight than others. *Id.* ¶¶ 558–596.

There can be no question that the Tribunal was construing Article 10.28 of DR-CAFTA when determining the meaning of "dominant and effective nationality." The Tribunal began its task by looking to the text of the Treaty itself. The Tribunal noted that the "treaty does not prescribe the factors that may be considered," nor does the relevant provision refer to customary international law. *Id.* ¶ 530. The Tribunal then considered both parties' arguments on the applicability of customary international law. *Id.* ¶ 532. Ultimately, the Tribunal determined that

---

[11] The Petition repeatedly argues that this Court should vacate the Award because the Tribunal's reasoning "sets a dangerous precedent." Pet. 38–39. As a technical matter, the Award does not set any precedent at all, let alone a "dangerous" or "scary" one. *Id.* at 39. Article 10.26.4 of DR-CAFTA provides that "[a]n award made by a tribunal shall have no binding force except between the disputing parties and in respect of the particular case." In any event, the Award was issued following due process and is well-reasoned.

the case was one of first impression related to dual-nationality provisions in the specific context of DR-CAFTA. *Id.* ¶ 530. Accordingly, the Tribunal "deem[ed] it appropriate to give specific meaning to the terms used in DR-CAFTA rather than directly incorporating any other standard, which would disregard the rules of interpretation [it is] bound to apply under the VCLT." *Id.* ¶ 533.[12] The arbitrators then examined the meaning of the words "dominant" and "effective" by looking at their dictionary definitions, how they are used within the context of the Article 10.28, and how they have been used in other relevant, though distinguishable, international law cases. *Id.* ¶¶ 535–557. After concluding that DR-CAFTA required a "holistic assessment," *id.* ¶ 556, the Tribunal considered a number of factors that it found relevant to the dominant and effective nationality determination, including factors relating to the Ballantines' "entire lives" and factors related to their investment and naturalization in the Dominican Republic, among other considerations, *id.* ¶¶ 558–596.

As set forth below, the Ballantines take issue with the manner in which the Tribunal applied those factors, but this Court may not second-guess the Tribunal's analysis of DR-CAFTA's nationality provisions or vacate the Final Award on that basis, even if this Court would have reached a different result in the first instance. *Oxford Health*, 569 U.S. at 569.

### a.   Weight of Evidence Regarding the Ballantines' Entire Lives [Objection B]

The Ballantines' first weight-of-the-evidence objection is that the arbitrators purportedly did not "consider the entire lives of each of the Ballantines" but rather "deliberately ignored the entire lives of the Ballantines and instead focused on a short time period." Pet. 23, 24. Those characterizations of the Award are demonstrably false. The Award explains "that a claimant's

---

[12] The Vienna Convention on the Laws of Treaties regulates the Tribunal's interpretation of DR-CAFTA. *See* Award ¶ 511.

entire life is relevant but not dispositive when assessing whether nationality is dominant and effective." Award ¶ 555.[13] The Tribunal acknowledged that "[i]n cases dealing with double nationality (with one acquired after the other), it would most likely be evident that a person that was born and lived in a particular country during a long period of his or her life will have many attachments, connections and closeness with that country." *Id.* The Tribunal likewise considered "that the majority of Claimants' lives was spent in the United States, which consequently would entail deep connections." *Id.* ¶ 567. But the Tribunal cautioned that "[t]aking into account a claimant's entire life within the analysis of dominance and effectiveness *at a particular time* does not necessarily entail ascribing more weight to one nationality over the other due to the amount of time each of them has been held. Rather an analysis should be performed to examine how, *at that particular time*, the connections to both States could be characterized in terms of dominance and effectiveness." *Id.* ¶ 556.

The Final Award shows that the Tribunal did, in fact, consider the entirety of the Ballantines' lives—or as the Tribunal put it, quoting the Ballantines, "from their birth until today." *Id.* ¶ 558. It considered "their place of birth," "the place where the majority of their lives was spent," "the place of their permanent residence," and "their personal and professional relationships," among other factors. *Id.* However, the Tribunal resolved that "none of those factors exclusively indicate that a particular nationality was dominant and effective." *Id.* "Although the factors related to the life of the Claimants before they moved [to] and invested in the Dominican Republic are relevant," the Tribunal concluded that "they should be analyzed with a view to

---

[13] Even the arbitrator that dissented on jurisdiction acknowledged that the Ballantines' entire lives were considered in the Award. *See* Partial Dissent of Ms. Cheek on Jurisdiction ¶ 13, ECF No. 1-4 ("[T]he Majority and I agree that the Claimants' entire lifetime is relevant to the dominant and effective nationality inquiry … .").

determining their connection with the Dominican Republic and the United States at the relevant times." *Id*. The Tribunal concluded:

> Having analyzed the evidence and arguments put forward by the Parties, while this Tribunal cannot deny the fact that during the relevant period, the Claimants maintained connections to the United States and this also seems natural from the fact that they were born and lived in that country for the majority of their lives, in this Tribunal's opinion, during the relevant period the Dominican nationality was effective and took precedence over the American nationality.

*Id.* ¶ 597.

The Ballantines apparently hope to convince this Court that the Tribunal should have given *more* weight to factors relating to the Ballantines' lives before they moved to the Dominican Republic and before they acquired Dominican nationality. But, respectfully, this Court has no responsibility or license under the FAA to reconsider what the Ballantines deem to be an "absurd" result. Pet. 4.[14] This Court cannot reweigh the relevant factors that the Tribunal indisputably already considered.

The unspoken premise of the Ballantines' argument seems to be that it is implausible for a person who was born in and lived in one country for a significant part of her life to acquire stronger ties to a nationality that she acquires later in life. But why? Millions of people emigrate from their birth country to start a new life abroad. If they are fortunate enough to become naturalized citizens in their adopted home, and if they fully and genuinely embrace their second nationality, why wouldn't their *chosen* nationality become dominant and effective over their original nationality? The Ballantines' Dominican nationalities were "not forced upon them[;] it was requested and accepted by them." Award ¶ 599 (footnote omitted).  As the Tribunal explained, the dominant and

---

[14] Calling the Award "absurd" twelve times does not make it so. Pet. 1, 4, 19, 25, 26, 28, 31, 33, 37. The same goes for Petitioners' belief that the Award was "perverse" and "inconceivable." *Id.* at 37, 39.

effective nationality test is not about whether a person has "renounce[ed] one nationality or ceas[ed] to have connections with one's country of origin," it is about which nationality "took precedence during the relevant times." *Id*. ¶¶ 599–600.

Regardless of whether the Court finds factors related to the Ballantines' early lives more or less persuasive than did the Tribunal, the Award "must stand." *Oxford Health*, 569 U.S. at 569 ("[A]n arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." (quoting *Mine Workers*, 531 U.S. 57, 62 (2000))).[15]

### b. Weight of Evidence Relating to the Ballantines' Naturalization [Objection C]

Next, the Ballantines object to the Tribunal's consideration of evidence relating to their naturalization. In deciding how much weight to give facts related to the Ballantines' naturalization as Dominican citizens, the Tribunal looked to international law and the Treaty for guidance. It found that certain international decisions considered naturalization to be of "*profound significance*." Award ¶ 579. The Tribunal agreed that naturalization was an important factor, and that it creates a particular bond to a country that certainly has legal consequences, and thus, should not be taken lightly." *Id*. The Tribunal thus conducted its analysis after a careful interpretation of the Treaty and other relevant law. *Id*. ¶¶ 578–584. The Ballantines cite no legal authority to

---

[15] This section of the Petition closes with a citation to the Supreme Court's statement in *Stolt-Nielsen* that arbitrators cannot dispense their "own brand of industrial justice." 559 U.S. at 671 (2010) (ultimately quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). In that case, the Supreme Court vacated an arbitration award that "impos[ed] class arbitration on parties whose arbitration clauses are 'silent' on that issue." *Id*. at 666. The Court held that "it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. In this case, however, the arbitration panel imposed class arbitration even though the parties concurred that they had reached 'no agreement' on that issue." *Id*. at 684. Here, the Tribunal undoubtedly interpreted the Treaty to effectuate its terms, not to "impose its own policy preference." *Id*. at 676. And the Tribunal correctly found no agreement to arbitrate Petitioners' claims under DR-CAFTA.

substantiate their position that the Tribunal exceed its powers in considering naturalization as a relevant factor in its legal assessment. Their disagreement with the Tribunal's analysis cannot serve as a basis to vacate an Award that was grounded in the Tribunal's reasoned interpretation of the Treaty.

c.      **Weight of Evidence Relating to the Ballantines' Investment [Objection D]**

The Ballantines' arguments concerning the Tribunal's analysis of factors related to their investment in the Dominican Republic are similarly unavailing. The Tribunal viewed the Ballantines' investment in the Dominican Republic as part of its holistic assessment of dominant and effective nationality. To the extent the Ballantines now argue that the circumstances of their investment should be irrelevant to the determination of dominant and effective nationality, those arguments are directed to the wrong forum. The Tribunal noted that "[n]ationality (and in the case of dual nationals, dominant and effective nationality) is *interrelated* to the concept of investor" in Chapter 10 of DR-CAFTA and therefore circumstances surrounding the investment are "relevant factors." Award ¶¶ 553–554. There can be no doubt that the arbitrators interpreted the text of DR-CAFTA—and did so exhaustively—in determining that neither Michael nor Lisa Ballantine qualified as a "claimant" as that term is used in the Treaty. "Because 'it is the arbitrator's construction of the contract which was bargained for' and 'the arbitrators' decision concerns construction of the contract,' [a] Court therefore has 'no business overruling the tribunal.'" *Mesa Power Grp., LLC v. Gov't of Canada*, 255 F. Supp. 3d 175, 186 (D.D.C. 2017) (internal alterations omitted) (quoting *Oxford Health Plans*, 569 U.S. at 573).

As with the Ballantines' objections regarding evidence of their "entire lives" and "naturalization," their "investment" objection again focuses on the weight of the evidence. In addition to these factors, the arbitrators also examined the Ballantines' place of habitual

residence; their personal attachment for a particular country; the center of their economic, social, and family life; their reasons for naturalization; the conduct of the host state and other authorities in regards to the Ballantines; and the fact that the Ballantines "presented themselves as Dominicans." Award ¶¶ 558–596. The Tribunal found some of the factors to favor the Ballantines' U.S. nationalities and some to weigh more towards their Dominican nationalities. The Tribunal also found some factors to be more persuasive than others while recognizing that no one factor "exclusively indicate[s] that a particular nationality was dominant and effective." *Id.* ¶ 558. By adopting the UNCITRAL Arbitration Rules to govern the arbitration, the parties agreed that the Tribunal would make that ultimate determination; even a "serious error" in the arbitrators' decision would not suffice to overturn the award. *Oxford Health*, 569 U.S. at 569 (quoting *Stolt-Nielsen*, 559 U.S. at 671).[16]

### d.    Weight of Evidence Concerning Lisa Ballantine Individually [Objection A]

Finally, the Ballantines contend that the tribunal exceeded its powers by failing to make separate factual findings for Lisa Ballantine. Once again, the record proves otherwise. But before turning to the specific evidence, it bears repeating that "claims of factual or legal error by an arbitrator" are not grounds to vacate an arbitration award. *Priority One Servs.*, 825 F. Supp. 2d at 49 (quoting *Kurke*, 454 F.3d at 354). The Ballantines' allegations of "false finding[s]," Pet. 21, even if true, would not provide basis for vacatur, because "arbitrators are not required to explain

---

[16] The Petitioners repeatedly assert that "by fiat" under the Award, a so-called "active investor" would always have the dominant and effective nationality of the country in which the investment is located. Pet. 5, 33; *id.* at 32 ("[B]ased on the decision, it is impossible in the eyes of the Majority for any active investor with dual nationality to bring a claim because this investor would need to take steps to manage his or her investment."). The Award adopted no such rule. Nor did the Award conclude that "spending time there to manage the investment," or having a "residence [or] bank account" (*id.* at 33) would be sufficient. Those are Petitioners' words, not the Tribunal's. No one has "penalized" the Ballantines for the "simple act of opening a bank account." *Id.* at 27.

the basis for their award when the grounds can be gleaned from the record." *Priority One Servs.*, 825 F. Supp. 2d at 51. Nevertheless, the examples offered by the Ballantines are taken out of context and are not representative of the Tribunal's full findings.

The Ballantines misrepresent the record in claiming that the tribunal failed to make separate factual findings for Lisa Ballantine. Pet. 20. The arbitrators consistently made factual findings for Lisa Ballantine separate from Michael Ballantine. *See, e.g.*, Award ¶ 565 (making separate findings as to the amount of time Mr. and Ms. Ballantine spent in each country); *id.* ¶¶ 570–571 (making separate findings regarding Mr. and Ms. Ballantines' personal attachment to each country); *id.* ¶ 575 (making separate findings for Mr. and Ms. Ballantine concerning their financial connections to each country); *id.* ¶ 598 ("In the case of Ms. Ballantine, although she managed her non-profit organization and travelled more, she still was resident and established herself in the Dominican Republic."). The Tribunal's findings with regard to Lisa Ballantine are based on a full and fair examination of her own witness statements, the Ballantines' submissions to the Tribunal, and the evidence presented by the parties. *Id.* ¶¶ 558–600. It is evident from the record that the Tribunal reviewed evidence with respect to both Lisa Ballantine and Michael Ballantine and made findings for them each individually, as the Tribunal expressly set out to do in the Final Award. Award ¶ 559 ("[W]e are called upon to examine the nationality of *each* Claimant, Mr. and Ms. Ballantine … "; "the evaluation must be made in relation to *each* of them … ." (emphases added)).

The Tribunal did not "eras[e] facts relevant to Lisa Ballantine." Pet. 22. The Ballantines take issue with the Tribunal's statement that, "[c]laimants have mentioned that discriminatory treatment was one of the reasons for becoming Dominican." *Id.* at 20–21. Petitioners claim that Michael, not Lisa, provided this reason for *his* taking Dominican nationality and thus the use of the word "claimants" is a "critical example" of how the Tribunal failed to analyze Lisa's claims

individually. *Id.* The Tribunal's statement, however, comes directly from the Ballantines' own submission. *See* Award ¶ 581 (citing Claimants' Reply Memorial, ¶ 13 ("*The Ballantines …* attained dual nationality in 2010 … seeking to avoid the discrimination from the market and from the government. … *The Ballantines* wrongly believed that attaining citizenship might help level the commercial and political playing field." (emphases added)).[17] The arbitrators' finding was based *on the Ballantines' own arguments and statements to the Tribunal*, which did not distinguish between Lisa Ballantine and Michael Ballantine, but rather referred to the collective intent of both "Ballantines."

As another example, the Ballantines highlight the Tribunal's statement that "*they* conducted" a business in the Dominican Republic as evidence that the Tribunal improperly "attributed acts of Mr. Ballantine to Ms. Ballantine." Pet. 22. That is yet another mischaracterization. The entire sentence states:

> They started a business there (*in the case of Ms. Ballantine she established a factory for her non-profit organization*) which they conducted for that period of time and it would be difficult to consider that they did not integrate into the Dominican community during that time without making personal connections of some type.

Award ¶ 569 (emphasis added). Contrary to Petitioners' claim, Lisa Ballantine was in fact explicitly considered separately from Michael Ballantine, even though their submissions to the Tribunal described the investment as one they made together, as a couple. Petitioners' other

---

[17] The Claimants' Reply Memorial, in turn, cites Michael Ballantine's January 4, 2017 witness statement (*see* ECF 1-6), which explains the reason the couple obtained dual-nationality: "Due to the discrimination *we* faced as 'gringos' … *we* wanted to diminish this obstacle as *we* prepared for *our* expansion. The decision was made to help protect *our* investment and to minimize government obstruction, as well as any perceived biases in the market since *our* clients are predominantly Dominican." ¶ 88 (emphases added) [ECF 1-6, p.136]. Having made these express and unequivocal representations to the Tribunal, the Ballantines cannot change their story now to argue that the Tribunal misinterpreted the evidence. The parties' submissions to the Tribunal are available on the website for the Permanent Court of Arbitration: https://pca-cpa.org/en/cases/143/.

"examples of the Majority simply erasing facts relevant to Lisa Ballantine" (Pet. 22) are similarly baseless and unrepresentative of the Tribunal's actual findings.[18]

At bottom, Petitioners' statement to this Court that Lisa Ballantine has "no ties to the DR" (Pet. 7) is patently false. The Tribunal did not exceed its powers in weighing the evidence to conclude otherwise.[19]

**B.      The Tribunal Did Not "Manifestly Disregard" the Law [Objections B & E]**

In addition to invoking the FAA's enumerated grounds for vacatur, the Ballantines also ask this Court to vacate the Award because it purportedly was rendered in "manifest disregard of the law." Pet. 23. The Supreme Court has held, however, that Section 10 of the FAA provides the "exclusive grounds for expedited vacatur." *Hall St. Assocs.*, 552 U.S. at 584. Since *Hall Street*, this Court has questioned the survival of the "manifest disregard" theory of vacatur, which is not included in Section 10 of the FAA. *See, e.g.*, *Coyne v. Hewlett-Packard Co.*, 308 F. Supp. 3d 207, 210 (D.D.C. 2018) (recapping the Supreme Court and D.C. Circuit's treatment of the "manifest disregard" theory since "its apparent death knell in *Hall Street*" (quoting *FBR Capital Mkts. & Co.*

---

[18] For example, Petitioners argue (at 22, first bullet point) that the Tribunal incorrectly stated that "the majority of her days between 2010 and 2014 were spent in the Dominican Republic." Award ¶ 565. Again, by truncating the Tribunal's analysis, Petitioners omit clarifying context. Paragraph 565 of the Award appears to be comparing the number of days that Ms. Ballantine spent in the Dominican Republic against the number of days she spent in the United States from 2010 to 2014. The Tribunal understandably focused on time spent in the two relevant countries, not on trips outside those nations. There is no dispute that in that context, the Tribunal was correct that "the majority of her days [spent in either the Dominican Republic or the United States] between 2010 and 2014 were spent in the Dominican Republic." *Id.* During that period, Ms. Ballantine spent 904 days in the Dominican Republic, 641 days in the United States, and 281 days in other countries. This point is made explicit in footnote 1082 of the Award, which breaks down the exact number of days that Lisa spent in each country, *id.* 158 n.1082 (citing the Supplemental Witness Statement of Michael Ballantine ¶ 21).

[19] The Petition asserts in cursory fashion that the Tribunal's purported failure to separately assess Lisa Ballantine's dominant and effective nationality makes the Award "so imperfect that it cannot be said to be valid" and "also a manifest disregard of law." Pet. 23. The Petition does not elaborate on these *ipse dixit* conclusions. In any event, they are wrong for the reasons set forth above.

*v. Hans*, 985 F. Supp. 2d 33, 36 (2013))). When the issue is raised, this Court has "assumed without deciding" that "manifest disregard" may still be a viable grounds for vacatur, but this Court has not granted a petition to vacate based on the "suspicio[us]" and "uncertain proposition" since *Hall Street*. *See id.* Not surprisingly, the Ballantines' limited authority for this theory from the D.C. Circuit predates the Supreme Court's 2008 decision in *Hall Street*. *See* Pet. 18, 19.

Even assuming that the manifest-disregard theory could provide an independent basis for vacatur, nothing in the Petition approaches the doctrine's high bar. Courts have always viewed the manifest-disregard theory as an extremely limited "doctrine of last resort." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2nd Cir. 2003) ("Our reluctance over the years to find manifest disregard is a reflection of the fact that it is a doctrine of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent … ."). To show that a tribunal acted in manifest disregard of the law, a petitioner must demonstrate "more than error or misunderstanding with respect to the law." *Int'l Thunderbird Gaming Corp. v. United Mexican States*, 473 F. Supp. 2d 80, 83 (D.D.C. 2007) (quoting *Kanuth v. Prescott, Ball & Turben, Inc.*, 959 F.2d 1175, 1178 (D.C. Cir. 1991)). Rather, a petitioner must demonstrate that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *FBR Capital Mkts. & Co*, 985 F. Supp. 2d at 36. "In addition, there must be no colorable support for the Panel's award in the record[.]" *LaPrade v. Kidder, Peabody & Co.*, 94 F. Supp. 2d 2, 6 (D.D.C. 2000), *aff'd*, 246 F.3d 702 (D.C. Cir. 2001).

The Ballantines cite two instances in which they allege that the arbitrators manifestly disregarded the law—both of which concern factors the Ballantines think the arbitrators should have considered when determining dominant and effective nationality. First, they claim that

customary international law required that the Tribunal examine the entire lives of the Ballantines, as opposed to "a small sliver of their lives." Pet. 3, 23–28. Second, they claim that international law required that the Tribunal consider the conduct of the state host (the Dominican Republic) towards the Ballantines. *Id.* at 33–34. Both arguments fail for two reasons: (1) there is no well-defined, explicit law that is clearly applicable the "dominant and effective nationality" test of DR-CAFTA, (2) the arbitrators *did* examine those factors the Ballantines contend were overlooked.

First, contrary to what the Ballantines state in their memorandum in support of their petition (at 3, 25), the arbitrators did not simply adopt from customary international law the test for dominant and effective nationality under DR-CAFTA. As explained above, the Tribunal determined that the issue was one of first impression. The arbitrators found customary international law to be "instructive" but "deem[ed] it appropriate to give specific meaning to the terms used in DR-CAFTA rather than directly incorporating any other standard." Award ¶ 533. Additionally, the Tribunal noted that "this case presents a unique fact pattern," further distinguishing it from prior international arbitration decisions, which are not binding in any event. *Id.* ¶ 534; *see also id.* ¶ 542 ("[T]he Tribunal considers that such precedents are distinguishable to the case before us, either because (i) the relevant provision was different than the one contained in DR-CAFTA or (ii) the factual scenario was different, or (iii) both." (footnotes omitted)).

While the Ballantines now contend that the Tribunal "admitted that customary international law governed the dispute" but "deliberately ignored the law," Pet. 3, 25, notably it was the *Ballantines* who pressed the Tribunal to reject customary international law during the arbitration. *See* Award ¶ 532; *see also* Claimant's Reply Memorial, ¶¶ 22–23 ("Although the U.S. Claims Tribunal cases hare [sic] instructive and can be a guide in some parts, these cases do not obviously control or provide precedent in this case."). Given the Tribunal's careful resolution of an issue of

first impression by examining relevant legal sources and developing a Treaty-specific test, it is implausible to contend that the arbitrators blatantly ignored an established "governing legal principle." *FBR Capital Mkts. & Co.*, 985 F. Supp. 2d at 36.

Second, as to the evidentiary issues, the Tribunal did examine the factors that the Ballantines claim the Tribunal ignored during its dominant and effective nationality analysis. As discussed above, the Tribunal considered factors related to every period of the Ballantines' lives. *See, e.g.*, Award ¶ 558 ("[F]actors related to the life of the Claimants before they moved and invested in the Dominican Republic are relevant" and "should be analyzed with a view to determining their connection with the Dominican Republic and the United States at the relevant times."); *id*. ¶ 561 (considering place of birth as a factor). The Tribunal also considered the conduct of the host state towards the Ballantines. *See* Award ¶¶ 585–587. In this discussion, the Tribunal cited paragraphs 59–75 of the Ballantines' Reply Memorial, in which they presented their arguments and evidence regarding "How the US and the DR Viewed the Ballantines." To be sure, the Tribunal did not find these factors particularly persuasive during its analysis. But there can be no doubt that the Tribunal considered them. The weight afforded to those factors is a determination reserved to the Tribunal.[20]

---

[20] The Ballantines criticize the Tribunal for "fail[ing] to even mention" a video they submitted as evidence. Pet. 35. The parties submitted 522 exhibits during the course of arbitration. The Ballantines cannot seriously contend that the Tribunal "manifestly disregarded the law" by not discussing each and every exhibit, particularly an exhibit described primarily in footnotes. *See* Claimants' Rejoinder on Jurisdiction and Admissibility (ECF No. 1-12) at 3 n.1, 21 n.56. The video is a compilation of interviews with townspeople who were upset that Michael Ballantine had erected a gate across the main access road to prevent travel. *See* Award ¶¶ 89–98 (discussing "Issues with the Road" and citing related evidence). Petitioners fail to mention that the Award did, in fact, cite to *individual* video statements that appeared in the compilation, even though the Tribunal did not cite to the compilation video exhibit. *Id*. ¶ 93 n.90 (citing Exhibit C-63); *id*. ¶ 138 n.180 (citing Exhibit C-25, with link to the video). In any event, the statements on the compilation exhibit, including an interview with the local mayor, have minimal probative value, and the

The Ballantines did not bring any of these objections—either the purported errors of "law" or evidence—to the Tribunal's attention. The UNCITRAL Arbitration Rules give the parties 30 days to request further "interpretation" or "correction" of the award or to seek an additional award to address "claims presented in the arbitral proceedings but not decided by the arbitral tribunal." UNCITRAL Arbitration Rules, arts. 37–39. The Ballantines chose not to seek relief from the Tribunal itself, depriving the arbitrators any chance to address any perceived errors in the Award. Instead, Petitioners launched this collateral attack in this Court seeking vacatur of the entire Award, relying on a dubious legal theory and mischaracterizing the arbitration record.

Ultimately, the Tribunal interpreted the Treaty, determined the applicable legal standard, and applied that legal standard by considering all evidence presented by the parties. Under those circumstances, the Tribunal cannot be said to have proceeded in manifest disregard of the law. *See Int'l Thunderbird Gaming Corp.*, 473 F. Supp. 2d at 83 ("Manifest disregard of the law 'means more than error or misunderstanding with respect to the law.'" (quoting *Kanuth*, 949 F.2d at 1178)).

### C.    The Tribunal Was Impartial [Objection H]

The Ballantines' final challenge to the Award is based on the alleged "evident partiality" of two arbitrators: Professor Ricardo Ramírez Hernández (the presiding arbitrator) and Professor Raúl Emilio Vinuesa. As with the FAA's other limited grounds for vacatur, "a challenger to an arbitrator's partiality has a steep slope to climb." *AWG Grp. LTD.*, 894 F.3d at 335. "[A] mere appearance of bias is insufficient to demonstrate evident partiality." *Williams Fund Private Equity Grp., Inc. v. Engel*, 519 F. Supp. 2d 100, 104 (D.D.C. 2007) (quoting *Alston v. UBS Fin. Servs., Inc.*, No. Civ. A. 04-01798(HHK), 2006 WL 20516, at *3 (D.D.C. Jan. 2, 2006)); *Pickholz*, 750

---

Tribunal did not manifestly disregard the law by failing to cite the compilation video exhibit separately.

F.2d at 173–74 (2d Cir. 1984) (FAA's "evident partiality" standard is higher than "appearance of bias that might disqualify a judge."). A party seeking to vacate an arbitration award based on evident partiality bears the "heavy" burden of establishing "specific facts that indicate improper motives on the part of an arbitrator." *Al-Harbi*, 85 F.3d at 683 (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993)). The alleged partiality must be "direct, definite, and capable of demonstration rather than remote, uncertain or speculative." *Id.* (quoting *Peoples Sec.*, 991 F.2d at 146). This is an "onerous standard for vacatur." *Id.*

Before the arbitration began, each of the arbitrators and the parties signed the Terms of Appointment that would govern the proceedings. In that document, the arbitrators confirmed that they would "remain impartial and independent of the Parties." Ex. A, Terms of Appointment, § 5.5. The parties in turn confirmed that "they have no objection to the appointment of any member of the Tribunal on the grounds of conflict of interest or lack of independence or impartiality in respect of matters known." *Id*. § 5.6. No party objected during the course of arbitration to the continued service of the members of the Tribunal. Now, after losing the proceeding, the Ballantines disregard their prior representations and make reckless allegations of partiality. To be clear, the Ballantines do not suggest, as is typically the case with allegations of evident partiality, that these arbitrators had a disqualifying bias due to some special relationship to a party or interest in the outcome of the proceedings. *See, e.g., Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145 (1968). In fact, they do not allege a connection of any kind between the arbitrators and the parties. Rather, they rely on one arbitrator's prior public voting record and another's Twitter feed.

The Ballantines begin with Professor Vinuesa, who was appointed to the Tribunal by the Dominican Republic. According to the Ballantines, Professor Vinuesa's prior judicial record of voting in favor of State parties indicates his "evident partiality." Pet. 41–42. Of course, Professor

35

Vinuesa's voting record is not a new revelation; his record as an arbitrator predated his appointment in this case, yet the Ballantines confirmed at that time that they had "no objection" to his appointment on the basis of partiality. Ex. A, Terms of Appointment § 5.6. The UNCITRAL Arbitration Rules provide a mechanism to challenge an arbitrator's impartiality or independence, *see* UNCITRAL Arbitration Rules, art. 10; *id*., art. 11.1 (notice of challenge must be filed within 15 days after purportedly disqualifying circumstances become known to a party), but the Ballantines never invoked those rules throughout the course of arbitration.

Instead, dissatisfied with the result of the arbitration, the Ballantines now allege that Professor Vinuesa was not able to "review the evidence and follow the facts and the law." Pet. 42. Notwithstanding this slanderous allegation, the Ballantines do not offer any "specific facts that indicate improper motives," *Al-Harbi*, 85 F.3d at 683 (quoting *Peoples Sec.*, 991 F.2d at 146), underlying Professor Vinuesa's prior arbitration decisions (as opposed to those ruling simply being products of his judgment). Nor do they show how Professor Vinuesa's past decisions—based on different parties, different facts, and different claims—lead to evident partiality in *this* case. On the contrary, the 188-page Final Award demonstrates the majority's comprehensive examination of the evidence and its reasoned application of the facts to the law. Even under the more permissible recusal standards for U.S. proceedings, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). So too here.

The Ballantines' allegations of partiality leveled against Professor Ramírez, the ICSID-appointed presiding arbitrator, border on ludicrous. This objection is based on, of all things, a Tweet—but not by Professor Ramírez. Pet. 42–43. Instead, the Ballantines seek to vacate the product of a five-year arbitration proceeding because Professor Ramírez "retweeted" a Tweet authored by a Reuters journalist linking to a Reuters article about Professor Ramírez's own

retirement as Chair of the World Trade Organization's Appellate Body. *Id.* The Retweet occurred in May 2018, but Petitioners raised no objection at the time. Instead, they waited until the presiding arbitrator ruled against them to level accusations of bias. This Court should rebuke such gamesmanship.

Nor is there any evident partiality (let alone "actual animus," *id.* 7, 41) behind the benign Tweet. Retweeting to the article does not indicate Professor Ramírez's adoption of the article's headline or his endorsement of the article's content, in which the reporter draws inferences from Professor Ramírez's retirement speech. In fact, Professor Ramírez's post is silent as to his opinion about the article. Moreover, the Tweet, and the article it links to, in no way supports the Ballantines' allegation that Professsor Ramírez is "against the United States." *Id.* at 42. On the contrary, the article states that "Ramírez-Hernández did not point fingers directly at any particular country" when advocating for the survival of the WTO during his retirement speech. Tom Miles, *WTO Being 'Asphyxiated,' Outgoing Judge Says, in Veiled Rebuke to U.S.*, Reuters (May 28, 2018), https://reut.rs/3dhsoIG. Any speculation about Professor Ramírez's attitudes towards the United States in relation to the WTO is insufficient to demonstrate that evident partiality influenced his review of the *Ballantines*' claims. It is an especially curious accusation that Professor Ramírez held "actual animus and partiality against the U.S." (Pet. 41) when the Final Award, in fact, adopted the position proposed by the United States in its submission to the Tribunal. Petitioners' unfounded speculation of bias comes nowhere near the FAA's "heavy burden" to prove evident partiality.

## CONCLUSION

The Dominican Republic respectfully requests that the Court deny the Petition to Vacate.

37

Dated:  March 24, 2020

Respectfully submitted,

/s/ *R. Reeves Anderson*

Robert Reeves Anderson
ARNOLD & PORTER KAYE SCHOLER LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-1000
Reeves.Anderson@arnoldporter.com

Raul R. Herrera
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
Raul.Herrera@arnoldporter.com